1 | Lionel Z. Glancy (#134180)
Michael Goldberg (#188669)
2 | Andy Sohrn (#241388)
info@glancylaw.com
3 | GLANCY BINKOW
   & GOLDBERG LLP
4 | 1801 Ave. of the Stars, Suite 311
Los Angeles, CA 90067
5 | Telephone: (310) 201-9150
Facsimile: (310) 201-9160
6
POMERANTZ HAUDEK
7 |    GROSSMAN & GROSS LLP
Marc I. Gross
8 | Jeremy A. Lieberman
100 Park Avenue, 26th Floor
9 | New York, New York 10017
Telephone: (212) 661-1100
10 | Facsimile: (212) 661-8665

11 | POMERANTZ HAUDEK
   GROSSMAN & GROSS LLP
12 | Patrick V. Dahlstrom
10 South LaSalle Street, Suite 3505
13 | Chicago, IL 60603
Phone: 312-377-1181
14 | Fax: 312-377-1184

15 | *Attorneys for Plaintiffs*
*and the Proposed Classes*
16

**IN THE UNITED STATES DISTRICT COURT**
17 | **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

18

19 | JIMMY ELIAS KARAM, Individually )
and On Behalf of All Others Similarly )  Case No. 10-CV-6523-GHK (RCx)
20 | Situated, )
                        )
21 |             Plaintiffs, )  **FIRST AMENDED CLASS**
22 |                       )  **ACTION COMPLAINT**
23 |     vs. )
24 | CORINTHIAN COLLEGES, INC., )
JACK P. MASSIMINO, PETER C. )
25 | WALLER, MATTHEW A. OUIMET, )  **JURY TRIAL DEMANDED**
26 | and KENNETH S. ORD, )
                        )
27 |           Defendants. )
28 |                         )

CLASS ACTION COMPLAINT

Plaintiff Jimmy Elias Karam ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his First Amended Class Action Complaint against defendants, alleges upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based on, inter alia, the investigation conducted by and through his attorneys, which included, among other things: a review of the defendants' public documents; conference calls and announcements made by defendants; Securities and Exchange Commission ("SEC") filings; wire and press releases published by and regarding Corinthian Colleges, Inc. ("Corinthian" or the "Company"); securities analysts' reports and advisories about the Company; and information readily obtainable on the Internet.

## NATURE OF THE ACTION

1.     This is a securities fraud class action on behalf of all persons who purchased or acquired Corinthian securities during the period from October 30, 2007 through and including August 19, 2010 (the "Class Period").  This class action is brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a); and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

2.     Throughout the Class Period, defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, defendants

made false and/or misleading statements and/or failed to disclose: (1) the Company overstated its growth prospects by engaging in illicit and improper recruiting activities, which also had the effect of artificially inflating the Company's reported results and future growth prospects; (2) the Company's financial results were overstated in that the Company's colleges inflated tuition costs and its student loan repayment rates were well below levels required for participation in federal loan programs; (3) the Company failed to maintain adequate systems of internal operational or financial controls; and (4) based on the foregoing, defendants lacked a basis for their positive statements about the Company, its prospects and growth.

3.      On August 3, 2010, the U.S. General Accounting Office ("GAO") issued a report that concluded that for-profit educational institutions such as Corinthian had engaged in an illegal and fraudulent course of action designed to recruit students and overcharge the federal government for the cost of such education.  Thereafter, a Congressional Committee launched an investigation of such practices; the U.S. Department of Education ("DOE") released data showing that the loan repayment rates for Corinthian enrollees were well below the level required for federal loan program eligibility; and the Company disclosed that its enrollee default rates had significantly increased, and were continuing to do so.

4.      As a result of these revelations, the Company's stock fell from $9.25 on August 2, 2010 to $4.49 on August 20, 2010 when it declined nearly 17%.

5.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

6.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

7.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

8.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b).  Corinthian is listed on the NASDAQ.

9.     In connection with the challenged conduct, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

**Plaintiff**

10.     Plaintiff as set forth in his certification attached hereto purchased Corinthian securities during the Class Period and was damaged when the

disclosures of the Company's recruitment practices and student loan repayment rate caused the price of Corinthian shares to decline.

**Defendants**

11.    Defendant Corinthian is a Delaware corporation with its principal place of business located at 6 Hutton Centre Drive, Suite 400, Santa Ana, California.  The aggregate number of shares of Corinthian securities outstanding as of April 29, 2010 is approximately 88 million shares.  Corinthian is actively traded on the NASDAQ under the ticker symbol "COCO."

12.    Defendant Jack P. Massimino ("Massimino") has been the Company's Executive Chairman of the Board of Directors ("Board") since July 2009.  He served as Chief Executive Officer of the Company from November 2004 through June 2009.  In addition, he was Chairman of the Board from August 2008 through June 2009.

13.    Defendant Peter C. Waller ("Waller") has been the Company's Chief Executive Officer since July 2009.  Waller served as President and Chief Operating Officer of Corinthian from February 2006 through June 2009.

14.    Defendant Matthew A. Ouimet ("Ouimet") has been the Company's President and Chief Operating Officer since July 2009.  Ouimet joined Corinthian in January 2009 as Executive Vice President, Operations.

15.    Defendant Kenneth S. Ord ("Ord") has been the Company's Executive Vice President and Chief Financial Officer since February 2005.

16.     The defendants referenced above in ¶¶12-15 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

17.     Corinthian is a private, for-profit post-secondary education company operating in the United States and Canada.  As of June 30, 2009, the Company had a student enrollment of 86,088, and operated 89 schools in 24 states and 17 schools in the province of Ontario, Canada.  The Company offers a variety of diploma programs and associate's, bachelor's and master's degrees.   The Company's training programs include healthcare, criminal justice, mechanical, trades, business and information technology.  The Company offers online learning in two categories of students, including those attending online classes exclusively, and those attending a blend of traditional classroom and online courses. As of June 30, 2010, Corinthian's total student population is 110,580.  The Company's brands include Everest, WyoTech, and Heald College.  Everest College Phoenix consists of two ground schools and on online learning unit with about 5,800 students.

### Defendants' False and Misleading Statements

18.     On October 30, 2007, the Company issued a press release announcing its financial results for the first quarter ended September 30, 2007. The Company reported net revenue of $247.5 million, compared to $222.1 million

in the same period of the prior year.  The Company also reported net income of $1.95 million, or $0.02 per diluted share, compared to net income of $1.4 million, or $0.02 per diluted share in the same period of the prior year.

19.    In the press release, defendant Massimino represented the following:

> Our company-wide initiatives to revitalize growth and improve service to students are beginning to produce results…. In particular, more effective advertisements, brand consolidation, and a shift toward national advertising helped generate positive growth over the past several months. In the first quarter, new student growth increased 13%, and we expect growth of 8% - 9% in fiscal 2008. Over time, we believe that a higher student population will allow us to achieve greater economies of scale, improve facility utilization, and expand margins.

20.    On November 9, 2007, the Company filed its quarterly report on a Form 10-Q for the first quarter ended September 30, 2007 with the SEC, which was signed by defendants Massimino and Ord.  In addition, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), the Form 10-Q contained signed certifications by defendants Massimino and Ord stating that the Form 10-Q did not contain any material misrepresentations.

21.    On January 29, 2008, the Company issued a press release announcing its financial results for the second quarter ended December 31, 2007.  The Company reported net revenue of $272.6 million, compared to $235.1 million in the same period of the prior year.  The Company further reported net income of $8.11 million, or $0.10 per diluted share for the quarter, compared to net income of $2.58 million, or $0.03 per diluted share in the same period of the prior year.

22.     In the press release, defendant Massimino represented the following:

> In the second quarter we continued our positive growth trend, posting a 10% increase in new student starts…. More effective marketing, coupled with higher employee retention and continued improvement in other key business processes, has helped generate enrollment growth over the past three quarters. We expect that growth to continue in the second half of the fiscal year.

23.     On February 4, 2008, the Company filed its quarterly report on a Form 10-Q for the second quarter ended December 31, 2008 with the SEC, which was signed by defendants Massimino and Ord.  In addition, pursuant to SOX, the Form 10-Q contained signed certifications by defendants Massimino and Ord stating that the Form 10-Q did not contain any material misrepresentations.

24.     On April 30, 2008, the Company issued a press release announcing its financial results for the third quarter ended March 31, 2008.  The Company reported net revenue of $281.5 million, compared to $241.1 million in the same period of the prior year.  The Company further reported net income of $11.82 million, or $0.14 per diluted share for the quarter, compared to net income of $12 million, or $0.14 per diluted share in the same period of the prior year.

25.     In the press release, defendant Massimino represented the following:

> In the third quarter we continued our positive growth trend, posting a 13.3% increase in new student starts….  Growth was broad-based across our U.S. operations, both ground schools and online. More effective marketing, coupled with higher employee retention, better service to students and continued operational improvements, has helped generate strong enrollment growth over the past four quarters.

26.    On May 7, 2008, the Company filed its quarterly report on a Form 10-Q for the third quarter ended March 31, 2008 with the SEC, which was signed by defendants Massimino and Ord.  In addition, pursuant to SOX, the Form 10-Q contained signed certifications by defendants Massimino and Ord stating that the Form 10-Q did not contain any material misrepresentations.

27.    On August 26, 2008, the Company issued a press release announcing its financial results for the fourth quarter and year ended June 30, 2008.   The Company reported net revenue of $274 million, compared to $231.6 million in the same period of the prior year.  The Company further reported net loss of ($0.62) million, or ($0.01) per diluted share for the quarter, compared to net loss of ($8.76) million, or ($0.10) per diluted share in the same period of the prior year. For the year, the Company reported net revenue of $1.069 billion, compared to $919.2 million in the previous year.  The Company further reported net income of 21.27 million, or $0.25 per diluted share for the year, compared to $7.23 million, or $0.08 per diluted share in the previous year.

28.    In the press release, defendant Massimino represented the following:

> Over the past three fiscal years, we have implemented several company-wide initiatives to revitalize growth and improve service to students…. These initiatives, which focus on employee retention and development, marketing, regulatory compliance, and other key operational processes, are producing tangible results. For continuing operations, we generated new student growth of 13.0% in fiscal 2008 and began to improve operating margins. In fiscal 2009, we believe higher enrollment will allow us to achieve greater economies of scale,

improve facility utilization, and further expand margins.

29.    On August 29, 2008, the Company filed its annual report on a Form 10-K for the year ended June 30, 2008 with the SEC, which was signed by defendants Massimino, Ord and Waller.  In addition, pursuant to SOX, the Form 10-K contained signed certifications by defendants Massimino and Ord stating that the Form 10-K did not contain any material misrepresentations.

30.    The Form 10-K represented the following in relevant parts:

**Admissions**

As of June 30, 2008, we employed approximately 1,400 admissions representatives who work directly with prospective students to facilitate the admissions process. These representatives interview and advise students interested in specific careers and are a key component of our effort to generate interest in our educational services. We conduct quarterly student satisfaction surveys at our campuses in the United States in which students have consistently given high marks to our admissions personnel for helpfulness, courtesy and accuracy of information.   Because our success is highly dependent on the efficiency and effectiveness of our admissions process, we invest considerable resources to train our admissions representatives in product knowledge, regulatory compliance, and customer service. We also employ various admissions supervisory and monitoring programs, and conduct student surveys which help us ensure compliance with both government regulations and our corporate policies.

One of our objectives in the admissions process is to identify students who have the ability to succeed in our schools. The majority of prospective students must pass a standardized admissions test. Most of our colleges in the United States accept non-high school graduates who can demonstrate an ability to benefit ("ATB students") from the program by passing certain tests which are required by the ED. We believe

that ATB students can successfully complete many of our diploma programs and our colleges have demonstrated success in graduating and placing these students over the years. As of June 30, 2008, ATB students accounted for approximately 21.5% of total enrollments in our U.S. schools.

\*\*\*

*Cohort Default Rates.* A significant requirement imposed by Congress is a limitation on participation in the Title IV Programs by institutions whose former students defaulted on the repayment of federally guaranteed or funded student loans at an "excessive" rate ("Cohort Default Rates"). Many institutions, including all of our institutions within the U.S., have responded by implementing aggressive student loan default management programs aimed at reducing the likelihood of students failing to repay their federally guaranteed loans in a timely manner....

We proactively manage our students' repayment obligations and have engaged a professional default management firm to assist us in managing the Cohort Default Rates at our U.S. institutions. We believe that professional default management services can continue to assist us in managing these Cohort Default Rates.

\*\*\*

In addition to the efforts of our outside professional default management firm, each of our colleges has adopted an internal student loan default management plan. Those plans emphasize to students the importance of meeting loan repayment requirements and provide for extensive loan counseling, along with methods to increase student persistence and completion rates and graduate employment (placement) rates. Immediately upon a student's cessation of enrollment, the professional default management firm initiates regular contact with the student, maintains regular contact throughout the grace period, and continues this activity through the entire cohort period. The colleges continue to work with the default management firm to maintain accurate and up-to-date information on address changes, marital status changes, or changes in circumstance that may allow the student to apply for deferments. These activities

are all in addition to the loan servicing and collection activities of FFEL lenders and guarantee agencies.

31.   On November 5, 2008, the Company issued a press release announcing its financial results for the first quarter ended September 30, 2008. The Company reported net revenue of $289.6 million, compared to $247.5 million in the same period of the prior year.  The Company also reported net income of $5.49 million, or $0.06 per diluted share, compared to net income of $1.95 million, or $0.02 in the same period of the prior year.

32.   In the press release, defendant Massimino represented the following:

> The first quarter marked our tenth consecutive quarter of start growth in continuing operations, primarily driven by our on-going initiatives to improve marketing and operational effectiveness.... Our end-of-quarter student population increased 11.3% over September 30 last year, and we believe continued growth will allow us to leverage fixed expenses and increase operating margins over time.

33.   On November 7, 2008, the Company filed its quarterly report on a Form 10-Q for the first quarter ended September 30, 2008 with the SEC, which was signed by defendants Massimino and Ord.  In addition, pursuant to SOX, the Form 10-Q contained signed certifications by defendants Massimino and Ord stating that the Form 10-Q did not contain any material misrepresentations.

34.   On February 3, 2009, the Company issued a press release announcing its financial results for the second quarter ended December 31, 2008.  The Company reported net revenue of $310.3 million, compared to $270.3 million in

the same period of the prior year.  The Company also reported net income of $15.08 million, or $0.18 per diluted share, compared to net income of $8.11 million, or $0.10 in the same period of the prior year.

35.   In the press release, defendant Massimino represented the following:

> Our strong second quarter reflects our continued focus on fundamentals - hiring, developing and retaining the best employees, growing enrollment, improving student outcomes, strengthening business processes, and increasing marketing effectiveness…. We have reported increased start growth for eleven consecutive quarters, and the resulting rise in student population is leveraging fixed costs. In addition, our marketing initiatives continue to produce an increased number of quality leads at a lower cost. We achieved significant operating margin expansion in the quarter and remain on track to meet or exceed our three-year financial goals.

36.   On February 6, 2009, the Company filed its quarterly report on a Form 10-Q for the second quarter ended December 31, 2008 with the SEC, which was signed by defendants Massimino and Ord.  In addition, pursuant to SOX, the Form 10-Q contained signed certifications by defendants Massimino and Ord stating that the Form 10-Q did not contain any material misrepresentations.

37.   On April 30, 2009, the Company issued a press release announcing its financial results for the third quarter ended March 31, 2009.  The Company reported net revenue of $346.4 million, compared to $279.9 million in the same period of the prior year.  The Company also reported net income of $15.08 million, or $0.18 per diluted share, compared to net income of $8.11 million, or

1    $0.10 in the same period of the prior year.

2        38.    In the press release, defendant Massimino represented the following:

3

4            Our strong third quarter results reflect the continued progress of
5            our business initiatives as well as some favorable impact from
             the recession…. We have now reported increased start growth
6            for twelve consecutive quarters, and the resulting rise in student
7            population is leveraging fixed costs. In addition, increased
             marketing effectiveness and lower advertising costs are
8            producing higher quality, less expensive leads. Given all of
             these factors, we achieved significant operating margin
9            expansion in the quarter and raised earnings guidance for the
10           balance of the fiscal year.

11       39.    On May 4, 2009, the Company filed its quarterly report on a Form
12
13   10-Q for the third quarter ended March 31, 2009 with the SEC, which was signed
14   by defendants Massimino and Ord.  In addition, pursuant to SOX, the Form 10-Q
15
16   contained signed certifications by defendants Massimino and Ord stating that the
17   Form 10-Q did not contain any material misrepresentations.
18
19       40.    On August 25, 2009, the Company issued a press release announcing
20   its financial results for the fourth quarter and year ended June 30, 2009.  The
21
22   Company reported net revenue of $353.5 million, compared to $274 million in the
23   same period of the prior year.  The Company further reported net income of
24   $23.19 million, or $0.27 per diluted share for the quarter, compared to net loss of
25
26   $0.62 million, or $0.01 per diluted share in the same period of the prior year.  For
27   the year, the Company reported net revenue of $1.31 billion, compared to $1.07
28   billion in the previous year.  The Company further reported net income of 68.76

million, or $0.80 per diluted share for the year, compared to $21.27 million, or $0.25 per diluted share in the previous year.

41.     In the press release, defendant Waller represented the following:

> Our strong fourth quarter and fiscal year results reflect the continued progress of our initiatives to improve the student experience and increase top and bottom line growth.... We have successfully increased our student population for three consecutive years, and during fiscal 2009, the recession helped increase our growth momentum. The higher student population has resulted in improved leverage of facility and other fixed costs. Increased advertising effectiveness and lower media costs have improved efficiencies in marketing and admissions. Given all of these factors, our operating margin and cash flow increased substantially in fiscal 2009, and we expect continued improvement in the current fiscal year.

42.     On August 26, 2009, the Company filed its annual report on a Form 10-K for the year ended June 30, 2009 with the SEC, which was signed by defendants Massimino, Ord and Waller.  In addition, pursuant to SOX, the Form 10-K contained signed certifications by defendants Waller and Ord stating that the Form 10-K did not contain any material misrepresentations.

43.     The Form 10-K represented the following in relevant parts:

**Admissions**

> As of June 30, 2009, we employed approximately 1,700 admissions representatives who work directly with prospective students to facilitate the admissions process. These representatives interview and advise students interested in specific careers and are a key component of our effort to generate interest in our educational services. We conduct semi-annual student satisfaction surveys at our campuses in the United States in which students have consistently given high

marks to our admissions personnel for helpfulness, courtesy and accuracy of information. Because our success is highly dependent on the efficiency and effectiveness of our admissions process, we invest considerable resources to train our admissions representatives in product knowledge, regulatory compliance, and customer service. We also employ various admissions supervisory and monitoring programs, and conduct student surveys which help us ensure compliance with both government regulations and our corporate policies.

One of our objectives in the admissions process is to identify students who have the ability to succeed in our schools. The majority of prospective students must pass a standardized admissions test. Most of our colleges in the United States accept non-high school graduates who can demonstrate an ability to benefit ("ATB students") from the program by passing certain tests which are required by the ED. We believe that ATB students can successfully complete many of our diploma programs and our colleges have demonstrated success in graduating and placing these students over the years. As of June 30, 2009, ATB students accounted for approximately 23.8% of total enrollments in our U.S. schools.

***

*Cohort Default Rates.* A significant requirement imposed by Congress is a limitation on participation in the Title IV Programs by institutions whose former students defaulted on the repayment of federally guaranteed or funded student loans at an "excessive" rate ("Cohort Default Rates"). Many institutions, including all of our institutions within the U.S., have responded by implementing aggressive student loan default management programs aimed at reducing the likelihood of students failing to repay their federally guaranteed loans in a timely manner....

We monitor our students' repayment obligations and have engaged a professional default management firm to assist us in managing the Cohort Default Rates at our U.S. institutions. We believe that professional default management services can continue to assist us in managing these Cohort Default Rates.

CLASS ACTION COMPLAINT                                16

***

In addition to the efforts of our outside professional default management firm, each of our campuses has adopted an internal student loan default management plan. Those plans emphasize to students the importance of meeting loan repayment requirements and provide for extensive loan counseling, along with methods to increase student persistence and completion rates and graduate employment (placement) rates. The professional default management firm initiates regular contact with the student upon receipt of delinquency notification from the guarantee agencies and continues this activity through the entire cohort period. The colleges continue to work with the default management firm to maintain accurate and up-to-date information on address changes, marital status changes, or changes in circumstance that may allow the student to apply for deferments. These activities are all in addition to the loan servicing and collection activities of FFEL lenders and guarantee agencies.

44.    On October 29, 2009, the Company issued a press release announcing its financial results for the first quarter ended September 30, 2009. The Company reported net revenue of $388.5 million, compared to $289.6 million in the same period of the prior year. The Company also reported net income of $32.91 million, or $0.37 per diluted share, compared to net income of $5.49 million, or $0.06 in the same period of the prior year.

45.    In the press release, defendant Waller represented the following:

Our strong first quarter results primarily reflect the continued success of our initiatives to enhance the student experience and improve operational performance.... We have increased our student population for more than three consecutive fiscal years, resulting in improved leverage of facility and other fixed costs. Increased advertising effectiveness and lower media costs have improved efficiencies in marketing and admissions.

46.   On October 30, 2009, the Company filed its quarterly report on a Form 10-Q for the first quarter ended September 30, 2009 with the SEC, which was signed by defendants Waller and Ord.  In addition, pursuant to SOX, the Form 10-Q contained signed certifications by defendants Waller and Ord stating that the Form 10-Q did not contain any material misrepresentations.

47.   On February 2, 2010, the Company issued a press release announcing its financial results for the second quarter ended December 31, 2009.   The Company reported net revenue of $414.3 million, compared to $318.3 million in the same period of the prior year.   The Company also reported net income of $39.4 million, or $0.44 per diluted share, compared to net income of $15.5 million, or $0.18 in the same period of the prior year.

48.   In the press release, defendant Waller represented the following:

> The continued growth in student population has resulted in improved leverage of facility expenses and other fixed costs…. In addition, marketing and bad debt expenses continued to decline as a percent of revenue. Given all of these factors, our operating margin and cash flow from operations improved substantially compared with the prior year. We achieved these results while continuing to make substantial investments in graduate employment services and student loan default management.

49.   On February 4, 2010, the Company filed its quarterly report on a Form 10-Q for the second quarter ended December 31, 2009 with the SEC, which was signed by defendants Waller and Ord.  In addition, pursuant to SOX, the

Form 10-Q contained signed certifications by defendants Waller and Ord stating that the Form 10-Q did not contain any material misrepresentations.

50.    On May 4, 2010, the Company issued a press release announcing its financial results for the third quarter ended March 31, 2010.   The Company reported net revenue of $478.3 million, compared to $346.4 million in the same period of the prior year.   The Company also reported net income of $39.8 million, or $0.45 per diluted share, compared to net income of $25.3 million, or $0.29 in the same period of the prior year.

51.    In the press release, defendant Waller represented the following:

> The continued growth in student population has resulted in improved leverage of facility expenses and other fixed costs…. In addition, marketing and bad debt expenses continued to decline as a percent of revenue. Given all of these factors, our operating margin and cash flow from operations improved substantially compared with the prior year. We achieved these results while continuing to make additional investments in graduate employment services and student loan default management.

52.    On May 4, 2010, the Company filed its quarterly report on a Form 10-Q for the second quarter ended March 31, 2010 with the SEC, which was signed by defendants Waller and Ord.  In addition, pursuant to SOX, the Form 10-Q contained signed certifications by defendants Waller and Ord stating that the Form 10-Q did not contain any material misrepresentations.

53.     The statements referenced above in ¶¶18-52 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them: (1) the Company overstated its growth prospects by engaging in illicit and improper recruiting activities, which also had the effect of artificially inflating the Company's reported results and future growth prospects; (2) the Company's financial results were overstated in that the Company's colleges inflated tuition costs and its student loan repayment rates were well below levels required for participation in federal loan programs; (3) the Company failed to maintain adequate systems of internal operational or financial controls; and (4) based on the foregoing, defendants lacked a basis for their positive statements about the Company, its prospects and growth.

**The Truth Slowly Begins to Emerge**

54.     On August 3, 2010, the news media began to circulate an undercover investigative report conducted by the GAO entitled, "For-Profit Colleges: Undercover Testing Finds Colleges Encouraged Fraud and Engaged in Deceptive and Questionable Marketing Practices." The report concluded that (1) certain for-profit schools used deceptive recruiting practices; (2) certain for-profit schools "encouraged fraudulent practices" to their students such as falsifying their financial aid forms to qualify for federal aid; (3) certain for-profit schools substantially inflated their tuition costs; and (3) certain for-profit schools engaged

in other "troubling" practices.  As reported by the *Wall Street Journal* ("WSJ"),
the GAO accused several colleges of encouraging fraud and engaging in deceptive
and questionable marketing practices.  By using undercover tests at 15 for-profit
colleges, the GAO "found that four privately held schools encouraged fraudulent
practices and all 15 made deceptive or otherwise questionable statements to the
GAO's undercover applicants."  Further, the WSJ reported the following:

> The GAO report said that four undercover applicants were
> encouraged by college personnel to falsify their financial-aid
> forms to qualify for federal aid, while other college
> representatives exaggerated potential salaries after graduation
> and failed to provide clear information about program duration,
> costs or graduation rates despite federal regulations requiring
> them to do so.

> The GAO said in the report that it plans to refer cases of school
> officials encouraging fraud and engaging in deceptive practices
> to the Department of Education's Office of Inspector General,
> where appropriate.

> The report is scheduled to be presented as part of testimony
> Wednesday before the Senate Committee on Health, Education,
> Labor and Pensions, chaired by Sen. Tom Harkin (D., Iowa).

> "The results of this broad-reaching survey of for-profit school
> recruiting practices leave little question that these practices
> occur across the industry and are in no way limited to a few
> rogue recruiters or even schools," a spokeswoman for Mr.
> Harkin said.

55.    On August 4, 2010, the U.S. Senate Health, Education, Labor and
Pensions Committee (the "Committee") held a congressional hearing on
recruitment practices of many of the for-profit educational providers.  Senator

Tom Harkin, the Committee's Chairman noted in his remarks at the hearing that the GAO report illustrates that the recruitment process at for-profit educational providers is "specifically designed to do whatever it takes to drive up enrollment numbers, more often than not to the disadvantage of students" and is "disturbingly clear that abuses in for-profit recruiting are not limited to a few rogue recruiters or even a few schools with lax oversight. To the contrary, the evidence points to a problem that is systemic to the for-profit industry."

56.    As a result of the disclosures, Corinthian's securities dropped more than 16% or $1.44 between August 3, 2010 and August 5, 2010, to close at $7.81 on August 5, 2010.

57.    On August 9, 2010, the Company filed a Form 8-K with the SEC disclosing that it received a request for information from the Committee. Specifically, the Committee requested information:

> on how the Company recruits and enrolls students, sets program price or tuition, determines financial aid including private or institutional loans, tracks attendance, handles withdrawal of students and return of Title IV dollars and manages compliance with the 90/10 rule. The request also seeks information regarding the number of students who complete or graduate from the Company's programs, how many of those students find work in their fields of study, the debt levels of students enrolling and completing programs and how the Company tracks and manages cohort default rates. The Committee has also requested that the Company provide a broad range of information about its business, including detailed information relating to financial results, management, operations, personnel, recruiting, enrollment, graduation, student withdrawals, receipt

of Title IV Program funds, accreditation, regulatory compliance and other matters.

58.    On August 13, 2010, the DOE released data showing estimated student loan repayment rates.  Under the DOE's proposed "gainful employment" rule, for-profit educational providers would fully qualify for federal aid in one of two ways: either more than 45% of their former students are paying off principal on loans, or the debt burden of former students is below 8% of total income or below 20% of discretionary income.  Accordingly, schools are eligible for federal loans if they prepare their students for "gainful employment in a recognized profession" under the Higher Education Act of 1965.  However, schools lose eligibility if repayment rates are below 35% or debt burden is above 12 percent of total income and 30 percent of discretionary income.

59.    As to Corinthian, the DOE data showed that 33 of the 86 Corinthian's Everest colleges had loan repayment rates of less than 20%, and at other campuses the rates were less than 10%.  As a result, Deutsche Bank AG downgraded Corinthian securities to "hold" from "buy" citing the Company's "lower-than-feared" repayment rates.

60.    Following these additional revelations, shares of Corinthian securities fell $1.44 per share, or 22%, to close at $5.22 per share on August 16, 2010.

61.    On August 20, 2010, the Company issued a press release announcing its financial results for the fourth quarter and year ended June 30, 2010.  For the

fourth quarter, the Company reported net revenue of $482.7 million, compared to

$353.5 million in the same period of the prior year.  The Company also reported

net income of $33.9 million, or $0.38 per diluted share, compared to net income of

$24.7 million, or $0.28 in the same period of the prior year.

62.   In the press release, the Company additionally disclosed the following:

**Regulatory Update**

**NPRM-** The federal Department of Education, pursuant to its rule-making process, recently published two Notices of Proposed Rule Making (NPRM). The first NPRM, published on June 18, 2010, focused on a range of issues affecting private sector schools, including incentive compensation for admissions representatives, misrepresentation, and gainful employment disclosures…. The second NPRM, published on July 23, 2010, focuses exclusively on gainful employment….

**Senate HELP Committee -** As part of its review of the private sector education industry, the Senate Higher Education Labor and Pensions Committee ("Committee") has requested information from approximately 30 private sector education companies, including Corinthian. The information requested includes such areas as: recruiting and enrollment practices, pricing policies, student financial aid processes, attendance tracking, student withdrawal policies, 90/10 compliance, placement, completion, cohort default rates, accreditation, and company financial results, management and operations. The Committee has requested that a portion of the information be provided by August 26, 2010 and that the remainder be provided by September 16, 2010. We are in the process of responding to the Committee's request.

**Accreditation Status, Everest College Phoenix -** Everest College Phoenix (ECP) consists of two ground schools and an online learning division and has approximately 5,800 students. On May 9, 2009, ECP was notified by the Higher Learning

Commission of the North Central Association of Colleges and Schools (HLC), that ECP had been placed on probation. The probation action primarily focuses on questions about ECP's autonomy and governance as it relates to Corinthian's ownership.

An evaluation team from HLC visited ECP in May 2010, and, on July 27, 2010, issued a Report on a Comprehensive Evaluation Visit. In its report, the team noted that while there had been positive developments, deficiencies in other criteria were not sufficient to warrant removal of ECP's probationary status. The evaluation team has recommended the withdrawal of ECP's accreditation. We disagree with the evaluation team's recommendation, and intend to challenge its findings before the Commission over the next several months. We expect HLC's board to make a determination on ECP's probation status in November. If we disagree with the HLC board's decision, we could pursue an appeal that could last for several months beyond that time.

***Cohort Default Management Update***
During fiscal 2010, we restructured and expanded our cohort default management program and it was fully operational as of the end of the third quarter. Although we believe that our default management efforts have slowed the rate of increase for the 2009 cohort, current trend information indicates that cumulative defaults have trended substantially higher for the 2009 cohort of students compared with the 2008 cohort at the same time last year. Information currently available also indicates that the number of our OPEIDs which could exceed DOE's 25% cohort default rate threshold for the 2009 cohort will be substantially higher than for the 2008 cohort. In the 2008 cohort, nine of our OPEIDs exceeded the 25% threshold.

We believe that continuing high unemployment, which is particularly challenging for the demographic we serve, has contributed to higher cohort default rates (CDRs). In addition, major structural changes in the student lending industry over the past two years have negatively impacted CDRs. Such changes include: student lender bankruptcies in the wake of the 2008 credit crisis; the sale of distressed student loan portfolios

to the federal government by bankrupt lenders or lenders that could no longer fund such loans; the lack of default management on distressed loans; the shift to direct lending and the associated phase out of guaranty agency responsibilities for default management.

These changes in student lending have reduced data timeliness and trend visibility. As more data has emerged, we have gained a more transparent view of how the changes have impacted the 2009 cohort of students. The most recent federal data indicates that the changes in student lending have increased cohort default rates substantially for the 2009 cohort.

Given the information recently available, we now believe that up to three of our OPEIDs could exceed the federal threshold of 25% for three consecutive years under the current two-year measurement methodology. Under the current two-year methodology, OPEIDs which exceed the federal threshold of 25% for three consecutive years, or 40% in one year, become ineligible to participate in the Title IV student aid program. We remain confident that none of our OPEIDs will exceed the 40% threshold for the 2009 cohort.

We expect the higher two-year rates for the 2009 cohort to translate into elevated three-year rates for the same cohort. We thus expect a majority of our OPEIDs to exceed the 30% threshold under the three-year measurement for the 2009 cohort. Schools cannot be sanctioned under the three-year measurement methodology until 2014 (the year the 2011 cohort data will be final) on either the 30% or 40% thresholds, and we will aggressively pursue default mitigation efforts between now and then.

To help reduce cohort default rates for the 2010 cohort and beyond, and to improve student outcomes, in fiscal 2010 we began to reduce enrollments of students who lack a high school diploma or equivalent. These students attend our schools under the federal Ability to Benefit (ATB) program. At the end of fiscal 2010, ATB students represented 15% of our total student population, down from 24% at the same point in the prior year.

ATB students drop out at a higher rate, are more challenging to assist with career placement, and default on their loans at a higher rate than high school graduates. Although serving ATB students has historically been a part of Corinthian's mission, given the anticipated shift to a three-year CDR measurement period, and the impact of structural changes in the student lending environment, we will no longer be able to serve these students at our U.S. Everest and WyoTech campuses effective September 1, 2010. We will continue to help currently enrolled ATB students finish their programs and find employment.

63.    Moreover, in a conference call with the investing public, the Company postponed its Investor Day scheduled for September 15, 2010 due to "potential changes in regulation, the NPRM response and the Senate Committee information request due shortly and our recent decision to stop enrolling ATB students."

64.    As a result of these additional revelations, Corinthian securities fell an additional $0.91 or nearly 17% and closed at $4.49 on August 20, 2010.

## CLASS ACTION ALLEGATIONS

65.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Corinthian securities during the Class Period (the "Class"); and were damaged thereby.    Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

66.     The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Corinthian securities were actively traded on the Nasdaq.   While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by Corinthian or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

67.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

68.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.   Plaintiff has no interests antagonistic to or in conflict with those of the Class.

69.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Corinthian;

- whether the Individual Defendants caused Corinthian to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Corinthian securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

70.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.    Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

71.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Corinthian securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the Nasdaq, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold Corinthian securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

72.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## CLAIMS FOR RELIEF

## COUNT I

### (Against All Defendants For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder)

73.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

74.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

75.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as

a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Corinthian securities; and (iii) cause Plaintiff and other members of the Class to purchase Corinthian securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

76.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Corinthian securities and options. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Corinthian's finances and business prospects.

77.     By virtue of their positions at Corinthian, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

78.     Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Corinthian securities from their personal portfolios.

79.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of Corinthian, the Individual Defendants had knowledge of the details of Corinthian internal affairs.

80.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly,

control the content of the statements of Corinthian. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Corinthian's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Corinthian securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Corinthian's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased Corinthian securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants and were damaged thereby.

81.    During the Class Period, Corinthian securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of Corinthian securities and options at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased said shares and options, or would not have purchased them at the inflated prices that were paid. At the time of the purchases by Plaintiff and the Class, the true value

of Corinthian securities and options were substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Corinthian securities and options declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

82.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

83.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

84.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

85.     (a)    During the Class Period, the Individual Defendants participated in the operation and management of Corinthian, and conducted and participated, directly and indirectly, in the conduct of Corinthian's business affairs.  Because of their senior positions, they knew the adverse non-public information about Corinthian's misstatement of income and expenses and false financial statements.

(b)    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Corinthian's financial condition and results of operations, and to correct promptly any public statements issued by Corinthian which had become materially false or misleading.

(c)    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Corinthian disseminated in the marketplace during the Class Period concerning Corinthian's results of operations.    Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Corinthian to engage in the wrongful acts complained of herein.    The Individual Defendants therefore, were "controlling persons" of Corinthian within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Corinthian securities and options.

86.    Each of the Individual Defendants, therefore, acted as a controlling person of Corinthian.    By reason of their senior management positions and/or being directors of Corinthian, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Corinthian to engage in the unlawful acts and conduct complained of herein.    Each of the Individual Defendants exercised control over the general operations of Corinthian and

possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

87.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Corinthian.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury of all issues that may be so tried.

Dated:  September 1, 2010

Respectfully submitted,

By: _____
Lionel Z. Glancy (SBN 134180)
Michael Goldberg (SBN188669)
Andy Sohrn (SBN241388)
**GLANCY BINKOW & GOLDBERG
LLP**
1801 Ave. of the Stars, Suite 311
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
info@glancylaw.com

**POMERANTZ HAUDEK
    GROSSMAN & GROSS LLP**
Marc I. Gross
Jeremy A. Lieberman
100 Park Avenue, 26th Floor
New York, New York 10017
Telephone: (212) 661-1100
Facsimile:  (212) 661-8665

**POMERANTZ HAUDEK
    GROSSMAN & GROSS LLP**
Patrick V. Dahlstrom
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Phone: 312-377-1181
Fax: 312-377-1184

***Attorneys for Plaintiff***

1

## PROOF OF SERVICE VIA U.S. MAIL

2
    I, the undersigned, say:

3
    I am a citizen of the United States and am employed in the office of a member

4
of the Bar of this Court. I am over the age of 18 and not a party to the within action. My business address is 1801 Avenue of the Stars, Suite 311, Los Angeles, California

5
90067.

6
    On September 1, 2010, I caused to be served the following documents:

7
## FIRST AMENDED CLASS ACTION COMPLAINT

8
on the parties and counsel for the parties in this action, addressed as stated below:

9
**See Attached Service List.**

10
    **By U.S. Mail:** by placing true and correct copies thereof in individual sealed

11
envelopes, with courier fees fully prepaid, which I deposited with my employer for collection and delivery by the US Postal Service. I am readily familiar with my

12
employer's practice for the collection and processing of correspondence for delivery with said service.

13
    I certify under penalty of perjury under the laws of the United States of

14
America that the foregoing is true and correct. Executed on September 1, 2010, at Los Angeles, California.

15

16
Harry H. Kharadjian

17

18

19

20

21

22

23

24

25

26

27

28

**SERVICE LIST**

**PARTIES  RECEIVING NOTICE VIA U.S. MAIL**

**FOR PLAINTIFFS**

POMERANTZ HAUDEK
    GROSSMAN & GROSS LLP
Marc I. Gross
Jeremy A. Lieberman
100 Park Avenue, 26th Floor
New York, New York 10017
Telephone: (212) 661-1100
Facsimile:  (212) 661-8665

POMERANTZ HAUDEK
    GROSSMAN & GROSS LLP
Patrick V. Dahlstrom
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Phone: 312-377-1181
Fax: 312-377-1184

*For Plaintiff Jimmy Elias Karam*

**FOR DEFENDANTS**

CORINTHIAN COLLEGES
JACK P. MASSIMINO
 PETER C. WALLER,
MATTHEW A. OUIMET
 KENNETH S. ORD
6 Hutton Centre Drive
Suite 400
Santa Ana, CA 92707

*For Corinthian Colleges, Inc., Jack
P. Massimino, Peter C. Waller,
Matthew A. Ouimet, and Kenneth S.
Ord*

Name & Address:
Michael Goldberg (#188669)
GLANCY BINKOW & GOLDBERG LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
Telephone: (310) 201-9150

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JIMMY ELIAS KARAM, Individually and On Behalf of All Others Similarly Situated,<br><br>PLAINTIFF(S)<br><br>v.<br><br>CORINTHIAN COLLEGES, INC., JACK P. MASSIMINO, PETER C. WALLER, MATTHEW A. OUIMET and KENNETH S. ORD,<br><br>DEFENDANT(S). | CASE NUMBER<br><br>CV10-6523 GHK (RCx)<br><br><br><br>**SUMMONS**<br>On First Amended Complaint |

TO:   DEFENDANT(S): CORINTHIAN COLLEGES, INC., JACK P. MASSIMINO, PETER C. WALLER,
       MATTHEW A. OUIMET and KENNETH S. ORD.

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, _Michael Goldberg_____, whose address is _1801 Avenue of the Stars, Ste 311, Los Angeles, CA 90067_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: ___SEP - 1 2010___

By: ____**SHEA BOURGEOIS**____
Deputy Clerk

**SEAL**
(Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

CV-01A (12/07)                                    SUMMONS

SEP-02-2010   09:60                                    P.003

Name & Address:
Michael Goldberg (#188669)
GLANCY BINKOW & GOLDBERG LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
Telephone: (310) 201-9150

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JIMMY ELIAS KARAM, Individually and On Behalf of All Others Similarly Situated,<br><br>PLAINTIFF(S)<br><br>v.<br><br>CORINTHIAN COLLEGES, INC., JACK P. MASSIMINO, PETER C. WALLER, MATTHEW A. OUIMET and KENNETH S. ORD,<br><br>DEFENDANT(S). | CASE NUMBER<br><br>CV10-6523 GHK(RCx)<br><br><br>SUMMONS<br>On First Amended Complaint |

TO: DEFENDANT(S): <u>CORINTHIAN COLLEGES, INC., JACK P. MASSIMINO, PETER C. WALLER,</u>
<u>MATTHEW A. OUIMET and KENNETH S. ORD.</u>

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, <u>Michael Goldberg</u>, whose address is <u>1801 Avenue of the Stars, Ste 311, Los Angeles, CA 90067</u>. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: **SEP - 1 2010**

By: _____
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

CV-01A (12/07)                          SUMMONS