E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-6523-GHK (PJWx) | Date | January 30, 2012 |
|---|---|---|---|
| Title | *Jimmy Elias Karam v. Corinthian Colleges, Inc., et al.* | | |

**Presiding: The Honorable**          **GEORGE H. KING, U. S. DISTRICT JUDGE**

| Beatrice Herrera | N/A | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

**Proceedings:**          **(In Chambers) Order re:** Motion to Dismiss Second Amended Complaint; **[61]**

This matter is before the Court on Defendants Corinthian Colleges, Inc. ("Corinthian"), Jack P. Massimino ("Massimino"), Peter C. Waller ("Waller"), Matthew A. Ouimet ("Ouimet"), and Kenneth S. Ord's ("Ord" and collectively "Defendants") Motion to Dismiss Second Amended Complaint ("Motion"). This is a putative federal securities fraud class action brought pursuant §§ 10(b) and 20(a) of the Securities and Exchange Act of 1934 and Securities Exchange Commission ("SEC") Rule 10b-5. Defendants move to dismiss the Second Amended Complaint against them on the ground that it fails to meet the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"). Specifically, Defendants argue that Plaintiffs (1) fail to identify a single false or misleading statement or omission, (2) fail to allege particularized facts creating a strong inference of scienter, and (3) fail to adequately plead loss causation. We have considered the arguments in support of and in opposition to the Motion and deem this matter appropriate for resolution without oral argument. L.R. 7-15. As the Parties are familiar with the facts, we will repeat them only as necessary. Accordingly, we rule as follows.

**I.      Legal Standard for Motion to Dismiss Under Rule 12(b)(6) & the PSLRA**

In ruling on a 12(b)(6) motion to dismiss in a securities fraud action, the court must accept all factual allegations in the complaint as true. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The court must consider the complaint in its entirety, materials incorporated into the complaint by reference, and matters of which a court may take judicial notice. *Id.* at 322-23.

"The required elements of a private securities fraud action are: (1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008). When seeking to enforce federal securities laws, private plaintiffs must meet the higher, more exacting pleading standards of the PSLRA. *See Tellabs*, 551 U.S. at 313-14. The PSLRA requires that "the complaint must raise a 'strong inference' of scienter–*i.e.*, a strong inference that the defendant acted with an intent to deceive, manipulate, or defraud." *Metzler*, 540 F.3d at 1061 (citing 15 U.S.C. § 78u-4(b)(2)). In reviewing a complaint under this standard, "the court must consider *all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-6523-GHK (PJWx) | | Date | January 30, 2012 |
|---|---|---|---|---|
| Title | *Jimmy Elias Karam v. Corinthian Colleges, Inc., et al.* | | | |

plaintiffs." *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002). This examination requires the court to scrutinize the complaint in its entirety, not to simply scrutinize individual allegations in isolation. *See Tellabs*, 551 U.S. at 322.

The PSLRA also requires that the "complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). This requirement of specificity "prevents a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by particularized explanation stating *why* the defendant's alleged statements or omissions are deceitful." *Metzler*, 540 F.3d at 1061.

## II. Factual Background[1]

Lead Plaintiffs Wyoming Retirement System and Stichting Pensioenfonds Metaal en Techniek (collectively, "Plaintiffs") seek to represent a class of investors who acquired Corinthian's publicly traded securities between October 30, 2007, and August 19, 2010 ("Class Period"). The Defendants include Corinthian and four of its officers: Massimino, Corinthian's current Executive Chairman of the Board and former CEO and Chairman of the Board; Waller, Corinthian's President and COO from February 2006 through June 2009, and CEO from July 2009 to December 2010; Ouimet, Corinthian's President and COO from July 2009 until October 2010; and Ord, Corinthian's Executive Vice President and CFO from July 2009 until October 2010.

### A. SAC's Allegations of Fraud and Falsity

Corinthian is a for-profit education company that operates campuses in the United States and Canada under the Everest, Wyotech, and Heald brands. The majority of Corinthian's revenue is generated from federal Title IV funding. (SAC ¶ 4). Plaintiffs allege that during the Class Period Corinthian "engaged in a practice of misleading applicants and enrolling and maintaining as many students as possible without regard to their abilities or academic progress" in order to maximize the amount of federal Title IV funding Corinthian received. (SAC ¶ 3). This practice included: enrolling students who were incapable of passing classes, (SAC ¶ 50); providing students with deceptive job placement numbers, (SAC ¶ 71); falsely telling students that certain course credits would be transferable to other schools when those course credits in fact were not transferable, (SAC ¶ 82); failing to disclose to students the complete cost of their education, (SAC ¶ 83); and changing failing grades to passing grades to keep students enrolled, (SAC ¶ 75). These allegations are supported by statements from six confidential witnesses ("CWs"), a 2010 Government Accountability Office Report ("GAO Report"), and allegations in another lawsuit brought by former students against Corinthian. The CWs are former Corinthian employees and include an admissions representative, a vice president responsible for audit

---

[1] Our factual background is taken from the SAC, documents incorporated into the SAC by reference, and documents submitted by the Parties that are properly subject to judicial notice.

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-6523-GHK (PJWx) | Date | January 30, 2012 |
|---|---|---|---|
| Title | *Jimmy Elias Karam v. Corinthian Colleges, Inc., et al.* | | |

work, a financial aid representative, an admissions recruiter, a dean and instructor, and a student finance representative. The SAC alleges that four of these CWs worked at a single Everest College campus. The accounts of the other two CWs reference only Everest, although the SAC does not expressly allege that these CWs worked only at Everest. The SAC relies on these statements to show that Corinthian's predatory admissions practices and efforts to maintain failing students were purportedly widespread.

The SAC alleges that Corinthian failed to disclose this "predatory business model to the market and its shareholders," and instead provided "a completely different picture of what drove its revenue." (SAC ¶ 31). Plaintiffs devote 33 pages of the SAC to statements made by various Defendants during the nearly three-year Class Period attributing the company's growth to (1) successful marketing campaigns, (SAC ¶ 126); (2) "creati[ing] an outstanding experience for students," (SAC ¶ 154); (3) "more effective advertisements, brand consolidation, and a shift toward national advertising," (SAC ¶ 114); and (4) "success in graduating and placing [non-high school graduates]," (SAC ¶¶ 128, 146). The SAC also lists statements regarding Corinthian's compliance with regulations concerning Title IV funding, including several statements made by Massimino claiming "compliance is a very big issue for me," "[s]o compliance is a huge, all or nothing . . . factor for the organization," and "[t]he good news about that is that the tone at the top of our organization is all about compliance." (SAC ¶ 123). The SAC follows this list of statements with a single paragraph that alleges that

> Defendants' statements concerning Corinthian's compliance with regulations concerning the disbursement of federal financial funds, the Company's Ethics Code, placement rates and the value provided to students enrolled in Corinthian campus programs were false and misleading in light of the widespread predatory and misleading practices detailed above and identified by confidential witnesses, former students and the GAO investigation, and Corinthian's poor drop-out and default rate.

(SAC ¶ 176). In sum, the SAC alleges that through a collection of statements over the Class Period Defendants created the impression that Corinthian was well run, when in fact the company was based on a "systemically predatory business model." (SAC ¶¶ 186-87).

**B.     SAC's Allegations of Scienter**

The SAC alleges that the Defendants were aware of the alleged widespread problems by virtue of their positions at Corinthian. (SAC ¶ 181). It alleges that they "had access to non-public information about [Corinthian's] business, finances, enrollment, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith." (SAC ¶181). Additionally, the SAC alleges that Defendants were aware of the problems at Corinthian as a result of information provided to them by the CWs. (SAC ¶ 171). However, the only CW alleged to have communicated with Defendants is CW2; and CW2 is only alleged to have communicated with

---

CV-90 (06/04)                    **CIVIL MINUTES - GENERAL**

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-6523-GHK (PJWx) | Date | January 30, 2012 |
|---|---|---|---|
| Title | *Jimmy Elias Karam v. Corinthian Colleges, Inc., et al.* | | |

Massimino and Waller.  Thus, CW2 is the only CW on whom Plaintiffs can rely to establish scienter, and Plaintiffs can only rely on CW2 as to Massimino and Waller.

CW2 worked as a vice-president at Corinthian from March 2008 to September 2008 – approximately 1/6 of the Class Period.  (SAC ¶ 52).  CW2 was responsible for audit work intended to ensure compliance with requirements for government grants and student loans.  (SAC ¶ 52).  CW2 reported directly to Massimino.  (SAC ¶ 52).  CW2's work included evaluating whether Corinthian's campuses were complying with Title IV criteria for federal funding, including – among other things – student grades.  (SAC ¶ 53).  CW2 and CW2's subordinates would visit Corinthian campuses[2] for several days to review individual student records, including grades, attendance, and financial profiles.  (SAC ¶ 53).

The SAC alleges that "[a]s a result of the audits, CW2 found numerous areas of ongoing non-compliance, which CW2 presented to Massimino, who was fully briefed on the findings."  (SAC ¶ 54).  It alleges that "CW2 learned that numerous failing students were continuing to be carried and given passing grades so that Corinthian could still get paid," and that "CW2 raised these issues with Massimino, however, Massimino was not intersted in them."  (SAC ¶ 55).  The SAC also describes

> a specific conversation where CW2 suggested [to Massimino] that the Company clarify and enforce policies with respect to enrollment and maintenance of failing students.  Massimino stated that they knew about that, had tried it, that it didn't work and that it was all about the numbers, about the starts.  CW2 understood this to mean that the current practices were necessary to maintain Corinthian's revenues.  After the first two or three meetings with Massimino to review CW2's campus audits and advising Massimino of the findings, CW2 concluded that it was apparent that there was no point in making suggestions for improvement.

(SAC ¶ 57).  The SAC alleges that "CW2 also met with defendant Waller and informed Waller of CW2's campus visits and findings of consistent problems with failing students being kept on enrollment."  (SAC ¶ 60).  The SAC alleges that "Waller advised CW2 that he was aware of these issues," but adds nothing as to Waller's opinion of these practices.  (SAC ¶ 60).

Because Defendants' were allegedly aware of the pervasive problems at Corinthian, the SAC alleges that the Defendants "knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading."  (SAC ¶ 177).  The SAC alleges that the Defendants were "motivated to commit fraud as a result of the Company's executive compensation structure . . . [because their] compensation was variable and tied to the Company's short-term financial performance."  (SAC ¶ 179).

---

[2] The SAC does not state how many Corinthian campuses CW2 visited, and the allegations regarding CW2 only specifically reference Everest campuses.

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-6523-GHK (PJWx) | Date | January 30, 2012 |
|---|---|---|---|
| Title | *Jimmy Elias Karam v. Corinthian Colleges, Inc., et al.* | | |

**C.    SAC's Allegations that Corinthian's Fraud Was Revealed to the Market, Causing Plaintiffs' Losses**

The SAC alleges that the following disclosures purportedly revealed the pervasive fraud at Corinthian to the market, thus causing Plaintiffs' losses:

- A February 2, 2010 conference call with market analysts, wherein "the Company expressed concern over the potential effects of proposed government regulations on financial aid resources, specifically aimed to protect students from taking on debt that they would not be able to repay."   (SAC ¶ 157; *accord* SAC ¶ 190).  "That day, the price per share of Corinthian stock fell nearly 3% . . . ."  (SAC ¶ 157).
- A May 27, 2010 "report that the [Department of Education] was expected to issue new proposed regulations that would cut financial aid to for-profit education programs if most of the students enrolled in the program do not earn enough money to repay their loans." That day, "the price per share of Corinthian stock fell another 3%."   (SAC ¶ 162; *accord* SAC ¶ 190).
- A June 16, 2010 announcement by the Department of Education "that it was proposing new tougher regulations on the industry designed to protect college students and taxpayers from abusive or fraudulent practices."   (SAC ¶ 164).
- An August 4, 2010 GAO Report citing instances of deceptive recruitment practices at for-profit schools, including two Corinthian campuses.  (SAC ¶ 169).
- Data released by the Department of Education on August 13, 2010, showing that student loan repayment rates at for-profit colleges were 20% lower than those at private non-profit institutions.  (SAC ¶ 170).
- Information released by Corinthian on August 16, 2010, disclosing its "low student loan repayment rates."  (SAC ¶ 191).
- An August 16, 2010 announcement by the Department of Education "regarding its proposed new regulations governing an institution's eligibility to receive federal financial aid."  (SAC ¶ 191).

The SAC states that "[t]hese partial disclosures had a dramatic effect on the price of Corinthian publicly traded securities.  The cumulative impact of these declines was that the price of Corinthian publicly traded securities fell 79% from its Class Period high of $21.47 to $4.49 per share on August 20, 2010, causing substantial harm to investors who suffered losses as the artificial inflation generated by defendants' fraud was removed."  (SAC ¶ 191).

**III.    Discussion**

**A.    Falsity**

---

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-6523-GHK (PJWx) | Date | January 30, 2012 |
|---|---|---|---|

| Title | *Jimmy Elias Karam v. Corinthian Colleges, Inc., et al.* |
|---|---|

"The PSLRA has exacting pleading requirements for 'falsity.'" *Metzler*, 540 F.3d at 1070.  The Complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  "A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet this standard."  *Metzler*, 540 F.3d at 1070; *accord Falkowski v. Imation Corp.*, 309 F.3d 1123, 1133 (9th Cir. 2002), *abrogated on other grounds by Proctor v. Vishay Intertech. Inc.*, 584 F.3d 1208 (9th Cir. 2009) ("Although the allegations here are voluminous, they do not rise to the level of specificity required under the PSLRA.  The allegations consist of vague claims about what statements were false or misleading, how they were false, and why we can infer intent to mislead.  We have dismissed much more specific and compelling allegations."); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1075 (N.D. Cal. 2001)
("[C]ourts have repeatedly lamented plaintiffs' counsels' tendency to place the burden . . . on the reader to sort out the statements and match them with the corresponding adverse facts to solve the 'puzzle' of interpreting Plaintiffs' claims." (internal quotation marks omitted)); *In re PetSmart, Inc. Sec. Litig.*, 61 F. Supp. 2d 982, 991 (D. Ariz. 1999) ("The court should not have to play connect-the-dots . . . .").

Plaintiffs' allegations lack the specificity that the PSLRA requires.  Namely, the SAC does not specifically identify any false statements or provide the particular reasons why any statement is false, but rather presents a 33-page list of statements made by various Defendants during the Class Period and follows the list with a single paragraph alleging that all of the statements were false when made.  As shown above, courts have frequently dismissed complaints based on this "puzzle" style form of pleading.  Indeed, in *Metzler*, the Ninth Circuit dismissed a similar complaint in another putative securities class action brought against Corinthian.  In *Metzler*, the court concluded that the "allegations lack the specificity that the PSLRA requires" because

> The [Third Amended Complaint] alleges that virtually every statement made by Corinthian during the Class Period related to the company's financial health or performance was, by definition, false.  The TAC mistakes quantity for quality.  Although the TAC sets forth a considerable number of alleged false statements, the TAC's explanation of how and why the statements are false is decidedly vague.  The TAC alleges that Corinthian's statements regarding its financial status were false because they "create the false impression that defendants ran their business with proper financial reporting compliance with student enrollment and federal loan practices which were critical to the viability of the business, and that quality of education was emphasized."  But this Circuit has consistently held that the PSLRA's falsity requirement is not satisfied by conclusory allegations that a company's class period statements regarding its financial well-being are *per se* false based on plaintiffs allegations of fraud generally.

*Metzler*, 540 F.3d at 1070.  In sum, the SAC suffers from the same deficiency criticized in *Metzler*.

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-6523-GHK (PJWx) | Date | January 30, 2012 |
|---|---|---|---|

| Title | *Jimmy Elias Karam v. Corinthian Colleges, Inc., et al.* |
|---|---|

Plaintiffs attempt to put some of the pieces of the puzzle together in their Opposition by grouping the alleged misleading statements made by Corinthian into three categories: (1) "Misleading Statements Concerning Revenue and Enrollment Growth"; (2) "Misrepresentations Concerning [Non-High School Graduate] Students"; and (3) "Misleading Assurances Regarding Legal Compliance." (*See* Opp., Dkt. No. 81, at 15, 19). However, as explained below, Plaintiffs still fail to set forth "specific facts indicating why [particular] statements are false." *Metzler*, 540 F.3d at 1070.


### 1.    *Misleading Statements Concerning Revenue and Enrollment Growth*

Plaintiffs allege that Defendants made misleading statements by attributing Corinthian's "favorable results and growth to proper business practices while concealing that those results also depended upon improper and deceptive practices such as false grading practices, admitting and retaining unqualified students and misleading recruitment practices." (Opp., Dkt. No. 81, at 18). However, the SAC does not plead particularized facts showing that the supposed improper practices contributed materially to Corinthian's growth, let alone how much the supposedly undisclosed improper practices contributed to growth versus the legitimate company-wide initiatives asserted by Corinthian. Logic dictates that the alleged improper practices would have to be widespread to render false any statement attributing the company's growth to legitimate business practices. The SAC does not sufficiently plead facts demonstrating that the alleged improper practices were widespread.

As noted, the SAC relies on the accounts of the CWs, a GAO Report, and allegations in another lawsuit against Corinthian to establish that Corinthian relied on the improper practices detailed in the SAC for the majority of its revenue. However, none of the CWs is alleged to have worked at Corinthian throughout the entire Class Period, and what they supposedly said appears to be limited to a few Everest campuses. Thus, the information provided by the CWs cannot be relied on to establish that the alleged improper practices were pervasive throughout all, or most, of the Corinthian campuses. Because the CWs cannot be relied on to establish that the alleged improper practices were pervasive at Corinthian, they cannot be relied on to establish that any particular statement Corinthian made attributing its company-wide growth to proper business practices was false or misleading.

Plaintiffs also rely on the August 4, 2010 GAO Report to allege that there was pervasive enrollment fraud at Corinthian. The GAO Report described undercover visits made by investigators to fifteen for-profit colleges, two of which were Corinthian schools. (SAC ¶ 109). The SAC contains no particularized pleading showing how these two visits render false any public statement made by Corinthian, nor how these two visits demonstrate pervasive, widespread fraud. Moreover, as Defendants point out, on November 30, 2010, the GAO revised its report to "clarify and add more precise wording" to various sections of the report. (RJN Ex. 33, Dkt. No. 72, at 149). The revised report removed several of the allegations in the August 4, 2010 GAO Report that Plaintiffs rely on in the SAC. For example, in the SAC, Plaintiffs allege that according to the August 4, 2010 GAO Report, a

---

CV-90 (06/04)                        **CIVIL MINUTES - GENERAL**

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-6523-GHK (PJWx) | Date | January 30, 2012 |
|---|---|---|---|
| Title | *Jimmy Elias Karam v. Corinthian Colleges, Inc., et al.* | | |

"representative failed to provide graduation rate information after directly being asked."  (SAC ¶ 109).  This allegation, however, was removed and is not found in the corrected November 30, 2011 GAO Report.  Plaintiffs fail to address how this revised report affects the allegations in the SAC.  Based on the foregoing, the GAO Report cannot be relied on to demonstrate widespread fraud at Corinthian.

Finally, Plaintiffs also rely on allegations made in a lawsuit filed by former students against Corinthian.  (SAC ¶ 78).  As with the CWs, however, the allegations in the lawsuit referenced in the SAC appear to relate to a single Everest campus.  Thus, these allegations in no way suggest that the alleged improper practices were pervasive or widespread at Corinthian.  Moreover, other courts have noted that a plaintiff may not rely on allegations raised in another lawsuit to form the basis of the allegations in his complaint, because doing so does not comport with Federal Rule of Civil Procedure 11(b)'s requirement that an attorney "personally . . . validate the truth and legal reasonableness of the papers filed" and "conduct a reasonable factual investigation."  *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008).  Accordingly, we conclude that the allegations made in a separate lawsuit against Corinthian do not establish that any statement recited in the SAC was false or misleading.

In sum, neither the CW accounts, nor the GAO Report, nor the allegations in the lawsuit filed by former Corinthian students shows that the alleged improper practices at Corinthian were widespread or pervasive.  Because Plaintiffs have failed to plead facts showing that the alleged improper practices were widespread, Plaintiffs have failed to demonstrate that any statement made by Corinthian that attributed its growth to legitimate business practices was false.

### 2. *Misrepresentations Concerning Non-High School Graduates*

Plaintiffs' Opposition claims that Corinthian's statements regarding the "academic success" of its students are misleading.  (Opp., Dkt. No. 81, at 19).  Plaintiffs point to a statement from Corinthian's August 29, 2009 Form 10K, which states that Corinthian believes that students without high school diplomas "can successfully complete many of our diploma programs and our colleges have demonstrated success in graduating and placing these students over the years."  (SAC ¶¶ 127-28).  Plaintiffs assert that this statement was "misleading in view of the widespread problems with improper grading practices, changing failing grades to passing grades and retaining failing students."  (Opp., Dkt. No. 81, at 19).  However, Plaintiffs at no point whatsoever identify facts showing that Corinthian did not have success in graduating and placing students without high school diplomas at the time this statement was made.  Thus, because Plaintiffs have not pled specific facts showing why the statements in the SAC regarding Corinthian's prior success in graduating students without high school diplomas are false, Plaintiffs have not met the PSLRA's pleading standard for falsity.

### 3. *Misleading Assurances Regarding Legal Compliance*

The statements identified in the SAC relating to compliance include: "[c]ompliance is a very big issue for me," (SAC ¶ 123); "the good news . . . is that the tone at the top of our organization is all about

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-6523-GHK (PJWx) | Date | January 30, 2012 |
|----------|----------------------|------|------------------|

| Title | *Jimmy Elias Karam v. Corinthian Colleges, Inc., et al.* |
|-------|--------------------------------------------------------|

compliance," (SAC ¶ 123); and "[w]e also employ various . . . monitoring programs . . . which help us ensure compliance," (SAC ¶ 128).  The SAC does not, however, specifically identify any particularized facts showing how or why each of these statements was misleading.  Rather, Plaintiffs merely plead, in conclusory fashion, that "Defendants' statements concerning Corinthian's compliance with regulations concerning the disbursement of federal financial funds . . . were false and misleading in light of the widespread predatory and misleading practices detailed above."  (SAC ¶ 176).  The SAC makes no attempt to even connect a particular alleged improper business practice to the violation of a statute or regulation.  Moreover, to the extent Corinthian's improper practices failed to comply with any statutes or regulations, as noted above, Plaintiffs have only identified specific instances of these alleged improper practices at a handful of Corinthian campuses.  Plaintiffs must identify particularly and specifically more widespread problems of noncompliance in order to establish that a statement such as "the tone at the top of our organization is all about compliance" was misleading.  Moreover, the SAC itself shows that Corinthian's statements regarding compliance were frequently accompanied by more cautionary statements, including: compliance is "always a risk" and that there would be problems with compliance "periodically."  (SAC ¶ 123).  Thus, it would not be fair to characterize Corinthian's public statements as full sail guarantees of perfect compliance.  As such, Plaintiffs fail to plead particular facts establishing the falsity of any statements made by Corinthian regarding legal compliance.

In sum, the allegations of falsity in the SAC do not meet the PSLRA's heightened pleading standard because SAC fails to set forth particularized facts showing why any statements made by Corinthian during the Class Period were false or misleading.

## B.    Scienter

In order to state a claim for securities fraud, a plaintiff must allege that the defendant acted with scienter – that the defendant had an intention "to deceive, manipulate, or defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976).  To establish that a corporate defendant, such as Corinthian, acted with scienter, a plaintiff must show that one or more of its directors or officers acted with scienter.  *See Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1435 (9th Cir. 1995); *In re Apple Computer, Inc. Sec. Litig.*, 243 F. Supp. 2d 1012, 1023 (N.D. Cal. 2002).

Under the PSLRA, Plaintiffs "can no longer aver intent in general terms of mere motive and opportunity or recklessness, but rather, must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent."  *Metzler*, 540 F.3d at 1066 (internal quotation marks omitted).  The complaint must state with particularity facts giving rise to a strong inference that Defendants acted with the required state of mind.  *Id.*  For such an inference to qualify as "strong," it "must be more than merely plausible or reasonable – it must be cogent and at least as compelling as an opposing inference of nonfraudulent intent."  *Id.* (quoting *Tellabs*, 551 U.S. at 314).

The court "must engage in a comparative evaluation; it must consider, not only inferences urged by plaintiff . . . but also competing inferences rationally drawn from the facts alleged."  *Tellabs*, 551 U.S. at 314.  Under this standard, "the Court must consider *all* reasonable inferences to be drawn from

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-6523-GHK (PJWx) | Date | January 30, 2012 |
|---|---|---|---|

| Title | *Jimmy Elias Karam v. Corinthian Colleges, Inc., et al.* |
|---|---|

the allegations, including those unfavorable to the plaintiffs." *Metzler*, 540 F.3d at 1061 (quoting *Gompper*, 298 F.3d at 897). "Where pleadings are not sufficiently particularized or where, taken as a whole, they do not raise a 'strong inference' that misleading statements were knowingly or [with] deliberate recklessness made to investors, a private securities fraud complaint is properly dismissed under Rule 12(b)(6)." *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001).

Since the gravamen of the SAC is that the Defendants concealed that allegedly fraudulent practices were pervasive at Corinthian, Plaintiffs must plead facts establishing a strong inference that the individual Defendants knew of the extent of the supposed fraud and intended to mislead investors. Plaintiffs allege that Defendants knew of the extent of the supposed fraud (1) by virtue of their positions at Corinthian and (2) through information provided to them by the CWs. Additionally, Plaintiffs allege that Defendants were (3) "motivated to commit fraud as a result of the Company's executive compensation structure." (SAC ¶ 179). As explained below, Plaintiffs' allegations do not give rise to a "strong inference" of scienter sufficient to defeat dismissal.

> **1.     *Whether Defendants Knew of the Extent of the Supposed Fraud by Virtue of Their Positions at Corinthian***

Plaintiffs argue that it can be inferred that each of the individual Defendants had knowledge of the widespread improper practices alleged in the SAC by virtue of their senior-level positions within the company. However, a similar argument was rejected by the Ninth Circuit in *Metzler*, a similar putative shareholder class action filed against Corinthian. In *Metzler*, the plaintiffs alleged that Corinthian's former CEO, CFO, and COO (none of whom are defendants here) exercised close oversight over school performance, as described in the company's 2003 Form 10-K. 540 F.3d at 1058. Moreover, the plaintiffs had several confidential witnesses who corroborated the fact that Corinthian management closely monitored performance at campuses, including information regarding student enrollment and retention. *Id.* Based on these facts, the plaintiffs attempted to draw the inference "that Corinthian's management must have known about underlying fraudulent conduct to achieve maximum federal funding at various schools." *Id.* The Ninth Circuit declined to draw this inference, however, and stated, "As this court has noted on more than one occasion, corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter–at least absent some additional allegation of specific information conveyed to management and related to the fraud." *Id.* at 1068.

In light of this precedent, we conclude that the fact that Defendants held senior-level positions at Corinthian does not support a strong inference that they acted with scienter, absent some additional allegation of specific information conveyed to Defendants and related to the specific improper practices detailed in the SAC

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-6523-GHK (PJWx) | Date | January 30, 2012 |
|---|---|---|---|
| Title | *Jimmy Elias Karam v. Corinthian Colleges, Inc., et al.* | | |

> **2.      *Whether Defendants Knew of the Extent of the Supposed Fraud Through Information Provided to Them by the CWs***

The SAC alleges that Defendants were aware of the widespread improper practices at Corinthian because this information was provided to them by the CWs. However, as Defendants correctly point out, the only CW alleged to have communicated with the individual Defendants is CW2. Moreover, CW2 is only alleged to have communicated with Defendants Massimino and Waller. Thus, Plaintiffs cannot rely on any of the statements by the CWs to establish that Defendants Ord and Ouimet acted with scienter. Accordingly, we must only analyze whether CW2's statements support a strong inference that Defendants Massimino and Waller acted with scienter.

A complaint relying on statements from confidential witnesses to establish scienter must meet two elements: (1) the complaint must describe the confidential witnesses with sufficienct particularity to establish their reliability and knowledge; and (2) the statements reported by the confidential witness must themselves be indicative of scienter. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009).

As set forth above, CW2 worked as a vice-president at Corinthian from March 2008 to September 2008 – approximately 1/6 of the Class Period. (SAC ¶ 52). CW2 reported directly to Massimino and was responsible for evaluating whether Corinthian's campuses were in compliance with Title IV criteria for federal funding. CW2 and CW2's subordinates visited Corinthian campuses for several days to review individual student records and to interview students and employees. (SAC ¶¶ 53-56). The SAC alleges that "[i]n talking with employees and students, CW2 learned that teachers were encouraged to give passing grades to failing students after working out agreements with students to improve on certain areas in the next grading period." (SAC ¶ 55). The SAC also alleges that "during the campus visits, many employees indicated that they were annoyed at Corinthian's refusal to get rid of failing students." (SAC ¶ 55). CW2 also observed the admissions process and went through portions of the admissions procedure without disclosing that CW2 was in fact a Corinthian employee. (SAC ¶ 56). After going through portions of the admissions process, CW2 "concluded that it was obvious that Corinthian would let anyone in as a student and would keep them as long as they wanted to stay." (SAC ¶ 56). The SAC does not state how many Corinthian campuses CW2 visited, and only Everest College is specifically referenced in the allegations relating to CW2.

The SAC also describes

> a specific conversation where CW2 suggested [to Massimino] that the Company clarify and enforce policies with respect to enrollment and maintenance of failing students. Massimino stated that they knew about that, had tried it, that it didn't work and that it was all about the numbers, about the starts. CW2 understood this to mean that the current practices were necessary to maintain Corinthian's revenues. After the first two or three meetings with Massimino to review CW2's campus audits and advising Massimino of the findings, CW2

---

E-Filed

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-6523-GHK (PJWx) | Date | January 30, 2012 |
|---|---|---|---|
| Title | *Jimmy Elias Karam v. Corinthian Colleges, Inc., et al.* | | |

concluded that it was apparent that there was no point in making suggestions for improvement.

(SAC ¶ 57).  The SAC alleges that "CW2 also met with defendant Waller and informed Waller of CW2's campus visits and findings of consistent problems with failing students being kept on enrollment."  (SAC ¶ 60).  The SAC alleges that "Waller advised CW2 that he was aware of these issues," but adds nothing as to Waller's opinion of these practices.  (SAC ¶ 60).  At no point does the SAC purport to quote anything CW2 said or anything that was said to CW2.

> a.      *Whether the SAC describes CW2 with sufficient particularity to establish CW2's reliability and knowledge*

Plaintiffs seek to rely on CW2 to establish that Defendants Massimino and Waller were aware of the widespread improper business practices alleged in the SAC and thus acted with scienter when they made various statements over the course of the entire Class Period attributing Corinthian's company-wide success to legitimate business practices.  Thus, Plaintiffs must establish with particularity that CW2 had sufficient knowledge of the alleged widespread improper business practices such that CW2 could have conveyed that knowledge to Massimino and Waller.  The SAC's allegations are insufficient in this regard.

Plaintiffs have set forth facts demonstrating that CW2 only had knowledge of and could reliably speak to the fact that there were improper practices at *some* Corinthian campuses.  Specifically, the SAC describes CW2's role in auditing Corinthian campuses, the fact that CW2 visited an unspecified number of campuses, and the fact that CW2 went through portions of the admissions process.  Critically, however, the SAC does not state, or even attempt to approximate, how many campuses CW2 visited or audited.  Moreover, the allegations regarding CW2 only specifically reference Everest College.  These allegations are insufficient to even raise an inference that CW2 had knowledge as to Corinthian's company-wide business practices.  Without allegations of such knowledge, CW2 could not have conveyed to Massimino and Waller that the alleged improper practices at Corinthian were widespread.  Because Plaintiffs are required to set forth specific facts that raise a "strong inference" of scienter that is "at least as compelling as an opposing inference," *Metzler*, 540 F.3d at 1066, we conclude that Plaintiffs' allegations regarding CW2 are insufficient to establish that Massimino and Waller acted with scienter when they made various statements over the course of the Class Period.

Moreover, the SAC fails to link the information conveyed to Massimino and Waller by CW2 to any specific alleged false statement.  Because CW2 only worked at Corinthian for 1/6 of the Class Period, it is unclear how any information provided to Massimino and Waller by CW2 could establish that Massimino and Waller acted with scienter when they made some or all of the alleged false statements because the alleged false statements were made over the course of the entire class period.  That is, insofar as CW2 could have conveyed to Massimino and Waller that improper practices were widespread at Corinthian during the time CW2 worked at Corinthian, and thus demonstrate that Massimino and Waller acted with scienter when they made various statements attributing the companies

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-6523-GHK (PJWx) | | Date | January 30, 2012 |
|---|---|---|---|---|
| Title | *Jimmy Elias Karam v. Corinthian Colleges, Inc., et al.* | | | |

growth to legitimate business practices during the time CW2 worked at Corinthian, the SAC fails to specifically identify any such statements.

In light of the foregoing, we conclude that the SAC does not describe the information obtained by CW2 with sufficient particularity to establish that CW2 could have conveyed to Massimino and Waller that the alleged improper practices at Corinthian were widespread. Thus, CW2's statements do not support a "strong inference" of scienter.

> *b.        Whether CW2's statements themselves are indicative of scienter*

The two instances described in the SAC where CW2 had direct communications with Massimino and Waller show that Massimino and Waller were aware of CW2's concern that an unspecified number of Corinthian campuses were passing failing students. Again, however, because the SAC does not show that CW2 had knowledge of Corinthian's *company-wide* practices, there is no basis from which we can infer that Massimino and Waller were made aware of a *company-wide* practice of passing failing students. Moreover, it is unclear what exactly CW2 said to Waller and Massimino because at no point does the SAC purport to quote CW2. Thus, we cannot say that CW2's statements themselves are indicative of scienter. Indeed, on these facts, it is reasonable to draw the inference that Massimino and Waller were made aware of improper practices at only a few campuses, and thus we cannot say that the facts support a strong inference that Massimino and Waller acted with an intent to deceive when they made statements attributing Corinthian's company-wide growth to legitimate business practices.

In sum, we conclude that allegations in the SAC relating to CW2 do not support a strong inference of scienter.

> *3.        Whether Defendants Acted with Scienter Because They Had a Motive to Hide the Truth*

Finally, the SAC alleges that the Defendants acted with scienter because they had potential bonuses tied to Corinthian's short-term financial performance. This allegation fails to establish a strong inference of scienter because the Ninth Circuit has held that "simple allegations of pecuniary motive" are not enough to establish scienter. *Zucco Partners*, 552 F.3d at 1005 (holding that an allegation "that executive-level bonuses were based in part on [the defendant company's] financial performance . . . [is] inadequate to meet the heightened pleading requirements of *Silicon Graphics* and *Tellabs*" (internal quotation marks omitted)). Indeed, if the opposite were true, "virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *Id.* (internal quotation marks omitted). Accordingly, we conclude that the fact that Defendants had potential bonuses tied to Corinthian's short-term financial performance does not create a strong inference of scienter.

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-6523-GHK (PJWx) | Date | January 30, 2012 |
|---|---|---|---|

| Title | *Jimmy Elias Karam v. Corinthian Colleges, Inc., et al.* |
|---|---|

In sum, none of the allegations in the SAC gives rise to a "strong inference" of scienter to defeat dismissal.

### C. Loss Causation

A plaintiff does not need to prove loss causation in order to avoid dismissal, but the plaintiff must properly allege it. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) ("[N]either the [Federal] Rules [of Civil Procedure] nor the securities statutes impose any special further requirement [beyond Rule 8(a)(2)] in respect to the pleading of proximate causation or economic loss."). Loss causation is the "causal connection between the [defendant's] material misrepresentation and the [plaintiff's] loss." *Id.* at 342. "The complaint must allege that the practices that the plaintiff contends are fraudulent were revealed to the market and caused the resulting losses." *Metzler*, 540 F.3d at 1063.

As set forth above, Plaintiffs allege that a number of disclosures show that the market became aware of the improper practices described in the SAC and that Corinthian's stock price fell upon the disclosure of this information. The disclosures include (1) a conference call between Corinthian and market analysts wherein the company's directors expressed concern over proposed government regulations, (2) a report that the Department of Education was expected to issue new proposed regulations, (3) the August 4, 2010 GAO Report, (4) data regarding Corinthian's student loan repayment rates, and (5) data regarding the for-profit industry's loan repayment rates. However, the SAC makes no attempt to link any of the specific fraudulent practices described in the SAC to any of the specific disclosures. Instead the SAC leaves it to the court to put together the puzzle pieces. Having thoroughly reviewed these disclosures, we conclude that none of them revealed to the market the supposedly pervasive fraud alleged in the SAC. Thus, we conclude that Plaintiffs fail to adequately plead loss causation.

The "disclosures" identified by Plaintiffs show that Corinthian's stock price movements were primarily in response to announcements about potential changes in regulations related to Title IV funding, not disclosure of the alleged pervasive fraud at Corinthian. The only disclosure that comes close to revealing any of the fraudulent practices alleged in the SAC is the August 4, 2010 GAO Report, which found "that many of the companies in the [for-profit school] industry employed fraudulent and deceptive practices in their student recruitment." (SAC ¶ 169). However, as noted above, the report was not exclusive to Corinthian, and in fact, detailed recruiting practices at only two Corinthian campuses. Thus, this report is insufficient to show that the market was alerted to Corinthian's alleged widespread fraud. Indeed, in *Metzler*, the Ninth Circuit reached the same conclusion based on a similar limited disclosure of alleged fraudulent practices at Corinthian. In alleging loss causation, the plaintiffs relied on – among other things – a "*Financial Times*" story reporting a Department of Education investigation at one Corinthian campus. 540 F.3d at 1063. Even though the report related to only one campus, Corinthian stock lost 10 percent of its value the day it was published. *Id.* at 1064. The Ninth Circuit, however, held that the plaintiffs failed to adequately plead loss causation because the *Financial Times* story did not "disclose–or even suggest[]–to the market that Corinthian was manipulating student enrollment figures *company-wide* in order to procure excess federal funding, which is the fraudulent

---

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-6523-GHK (PJWx) | Date | January 30, 2012 |
|---|---|---|---|
| Title | *Jimmy Elias Karam v. Corinthian Colleges, Inc., et al.* | | |

activity that [plaintiffs] contend forced down the stock that caused its losses." *Id*. at 1063. Similarly, here, the GAO Report cannot be reasonably read to reveal the pervasive *company-wide* recruitment and enrollment practices, which is the fraudulent activity that Plaintiffs allege in the SAC.

Moreover, the SAC at no point alleges that any of the CW accounts Plaintiffs rely on to establish the alleged fraud was revealed to the market. Thus, the SAC fails to plead that the primary sources detailing the alleged fraud ever revealed their accounts of that fraud to the market. In sum, the SAC fails to identify any sources disclosing the pervasive fraud alleged in the SAC to the market. In fact, the "disclosures" identified by Plaintiffs show that Corinthian's stock dropped when new federal funding regulations were proposed, not when the alleged widespread fraud at Corinthian was supposedly revealed to the market. Accordingly, the SAC fails to adequately allege loss causation.

**IV.     Conclusion**

In light of the foregoing, Plaintiffs have (1) failed to set forth particularized facts showing why any statements made by Corinthian during the Class Period were false or misleading, (2) failed to allege particularized facts creating a strong inference of scienter, and (3) failed to adequately plead loss causation. As such, Plaintiffs have failed to state a claim under § 10(b) of the Securities and Exchange Act of 1934 and SEC Rule 10b-5 thereunder, and Count I of the SAC must be dismissed.

Count II of the SAC asserts a claim under § 20(a) of the Securities and Exchange Act of 1934 for controlling person liability. "To establish 'controlling person' liability, the plaintiff must show that a primary violation was committed and that the defendant 'directly or indirectly' controlled the violator." *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996). Because Plaintiffs have failed to state a claim under § 10(b) and Rule 10b-5, Plaintiffs have failed to show that a primary violation was committed. As such, their claim for controlling person liability under Count II must also be dismissed.

Accordingly, Defendants' Motion is **hereby GRANTED**. In the event of dismissal, Plaintiffs have requested leave to amend the SAC. (Opp., Dkt. No. 81, at 31). A district court may grant leave to amend when dismissing a case for failure to state a claim, "unless the court determines that the pleading could not possibly be cured by the allegations of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)). We cannot say that the SAC cannot possibly be cured by the allegations of other facts. Therefore, Plaintiffs' request for leave to amend is **GRANTED**. Plaintiffs must file any Third Amended Complaint ("TAC") **within thirty (30) days hereof**. Failure to timely file a TAC will be deemed Plaintiffs' abandonment of this action, and this action will be dismissed for Plaintiffs' failure to prosecute and failure to comply with our Order. If Plaintiffs file a TAC, Defendants shall respond to it within thirty (30) days thereafter. If Plaintiffs choose to amend, they should be clear and concise in identifying the false statements and articulating the factual allegations supporting an inference that the statements are false or misleading. As noted above, Plaintiffs must not "place the burden . . . on the reader to sort out the statements and match them with corresponding adverse facts to solve the 'puzzle' of interpreting Plaintiffs' claims." *In re Splash Tech.*

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-6523-GHK (PJWx) | Date | January 30, 2012 |
|---|---|---|---|
| Title | *Jimmy Elias Karam v. Corinthian Colleges, Inc., et al.* | | |

*Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1075 (N.D. Cal. 2001) (internal quotation marks omitted).

**IT IS SO ORDERED.**

|  | -- | : | -- |
|---|---|---|---|
| Initials of Deputy Clerk | | Bea | |