FILED

2012 FEB 29 PM 4: 17

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:_____

1  ROBBINS GELLER RUDMAN
   & DOWD LLP
2  JOHN K. GRANT (169813)
   Post Montgomery Center
3  One Montgomery Street, Suite 1800
   San Francisco, CA 94104
4  Telephone: 415/288-4545
   415/288-4534 (fax)
5  johnkg@rgrdlaw.com
       – and –
6  DAVID W. HALL (274921)
   655 West Broadway, Suite 1900
7  San Diego, CA 92101
   Telephone: 619/231-1058
8  619/231-7423 (fax)
   dhall@rgrdlaw.com
9
   Lead Counsel for Plaintiffs
10
   [Additional counsel appear on signature page.]
11
                   UNITED STATES DISTRICT COURT
12
                   CENTRAL DISTRICT OF CALIFORNIA
13
                        WESTERN DIVISION
14

15  JIMMY ELIAS KARAM, Individually    )  Case No. 2:10-CV-06523-GHK-(PJWx)
    and on Behalf of All Others Similarly )
16  Situated,                          )  CLASS ACTION
                                        )
17                    Plaintiff(s),     )  THIRD AMENDED COMPLAINT
                                        )  FOR VIOLATION OF THE FEDERAL
18       vs.                            )  SECURITIES LAWS
                                        )
19  CORINTHIAN COLLEGES, INC.,         )
    JACK P. MASSIMINO, PETER C.        )
20  WALLER, MATTHEW A. OUIMET,         )
    KENNETH S. ORD,                    )
21                                      )
                      Defendant(s).     )  DEMAND FOR JURY TRIAL
22  _____)

23

24

25                    RECEIVED
                CLERK, U.S. DISTRICT COURT
26
27                  FEB 2 9 2012

28              CENTRAL DISTRICT OF CALIF.
                BY              D

   688211_1

1

# TABLE OF CONTENTS

2

**Page**

INTRODUCTION ............................................................................. 1

JURISDICTION ............................................................................... 6

VENUE ............................................................................................ 6

PARTIES ......................................................................................... 7

FRAUDULENT SCHEME AND COURSE OF BUSINESS ................................ 8

CLASS ACTION ALLEGATIONS .................................................. 9

THE FOR-PROFIT EDUCATION INDUSTRY BACKGROUND ...................... 10

INFORMATION OBTAINED FROM CONFIDENTIAL AND PUBLIC SOURCES CONCERNING CORINTHIAN'S MANIPULATIVE AND UNETHICAL BUSINESS PRACTICES ................................................ 17

DEFENDANTS' FALSE STATEMENTS ....................................... 36

A.   Corinthian Student Enrollment and Revenue Growth .......................................................................... 36

    1.   False Statements ............................................. 36

    2.   Reasons Why Defendants' Statements Concerning Student Enrollment and Revenue Growth Were False and Misleading ...................................................................... 42

B.   Corinthian's Graduation and Placement Rates ........................... 44

    1.   False Statements ............................................. 44

    2.   Reasons Why Defendants' Statements Concerning Graduation and Placement Rates Were False and Misleading ...................... 47

C.   Corinthian's Regulatory and Ethics Compliance ........................ 49

    1.   False Statements ............................................. 49

    2.   Reasons Why Defendants' Statements Regarding Regulatory and Ethics Compliance Were False and Misleading ................... 54

D.   Corinthian's Admissions Practices ............................................ 56

    1.   False Statements ............................................. 56

688211_1

|  | Page |
|---|---|
| 2. Reasons Why Defendants' Statements Concerning Corinthian's Admissions Practices Were False and Misleading | 58 |
| SCIENTER | 60 |
| LOSS CAUSATION/ECONOMIC LOSS | 64 |
| APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE | 74 |
| NO SAFE HARBOR | 75 |
| PRAYER FOR RELIEF | 77 |
| JURY DEMAND | 77 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

688211_1

- ii -

**INTRODUCTION**

1.     Lead Plaintiffs Wyoming Retirement System and Stichting Pensioenfonds Metaal en Techniek (collectively, "plaintiffs") bring this action against Corinthian Colleges, Inc. ("Corinthian" or the "Company"), Jack P. Massimino, Peter C. Waller, Matthew A. Ouimet and Kenneth S. Ord (collectively, "defendants"), on behalf of a proposed class (the "Class") of all purchasers of Corinthian's publicly traded securities between October 30, 2007 and August 19, 2010, inclusive (the "Class Period").

2.     During the Class Period, defendants misled investors about Corinthian's prospects and the liabilities associated with defendants' ongoing manipulation of federal student loan and grant programs, predatory and deceptive recruiting and enrollment practices, and systemic grade falsification at the Company's Everest-brand campuses. The widespread nature of Corinthian's concealed problems was confirmed when a congressional investigation revealed that the *majority* of Corinthian students who enrolled in associate's degree programs quickly dropped out. An astounding *66.5%* of the students who enrolled during fiscal 2009 in Corinthian's associate's degree programs (which typically take two years) dropped out without graduating after a median attendance period of just 4.1 months.[1]

3.     The U.S. Department of Education ("DOE") has also confirmed the existence of widespread problems at Corinthian, by reporting a sharp increase in Corinthian's loan payment default rate to 40% for Corinthian's 2008 three-year cohort.[2] The 40% default rate for the 2008 cohort actually understated Corinthian's

---

[1]     A Health, Education, Labor and Pensions Committee study reported that of the 44,436 students who enrolled in associate's degree programs between August 2008 and July 2009, *66.5%* had dropped out as of August 2010.

[2]     The term "cohort" refers to a group of students whose loans go into repayment between October 1 of the preceding year and September 30 of the nominal cohort year. The two-year and three-year cohort default rates ("CDR") refer to the

1  problems given Corinthian's August 20, 2010 admission that the 2009 cohort default

2  rate was expected to be "substantially higher" than the 2008 default rate.

3      4.    Corinthian's widespread predatory and deceptive enrollment practices

4  and systematic grade falsification were further confirmed on August 20, 2010 when

5  the company revealed that it would jettison its Ability to Benefit ("ATB") program for

6  non-high school graduates.  That program had accounted for 24% of Corinthian's

7  students as recently as 2009.  Confirming the dropout-rate problem, Corinthian

8  announced that it would no longer enroll ATB students because "ATB students drop

9  out at a higher rate, are more challenging to assist with career placement, and default

10  on their loans at a higher rate than high school graduates."

11      5.    Corinthian's problems were well known to Company senior executives

12  throughout the Class Period.  Corinthian's Vice President for Internal Audit[3] had

13  repeatedly warned defendant Massimino (who has admitted he was aware of the

14  problem) and other executives in 2008 that the Everest campuses were experiencing

15  serious problems involving the admission and retention of unqualified, non-attending

16  and failing students, and that failing students were being given passing grades.  The

17  warnings of systemic abuses were based on the Vice President's review of 30 to 40

18  compliance audits conducted at Corinthian campuses over a six-month period,

19  approximately 18 Everest campus visits conducted by the Vice President for Internal

20  Audit at a time when Everest comprised 94% of Corinthian's operations, and a review

21  of compliance audits conducted over the prior three years.

percentage of students whose loans go into repayment in a given cohort year and
default during the two or three years as measured from the beginning of their cohort
year.

[3]    The Vice President for Internal Audit is identified below as Confidential
Witness ("CW") 2.  *See* ¶¶56-77 below.

6.      That Defendants' manipulations were not restricted to a few isolated Corinthian campuses, but were systemic is confirmed by: (i) the 66.5% associate's degree program dropout rate (and 4.1 month median attendance pre-withdrawal); (ii) the 40%-plus loan default rate; (iii) the abandonment of 15% to 24% of Corinthian's customer base due to problems with dropout rates, placement, and loan defaults; and (iv) the repeated warnings of noncompliance and failing students from the Vice President for Internal Audit responsible for all Corinthian campuses.  Problems of this magnitude, at a Company with 69,000 to 100,000 total students at more than 100 campuses, do not appear or disappear overnight.  Problems impacting 40% or 66% of the student base during one year will almost certainly exist before and after that period.  Battleships do not turn on a dime.

7.      On February 7, 2011, Senator Tom Harkin (D-IA) ("Senator Harkin"), Chairman of the U.S. Senate Health, Education, Labor and Pension Committee ("HELP Committee") singled out Corinthian in connection with Senate hearings on abuses in the for-profit education industry, stating:

> Rather than offering students a better life, these types of strong-arm, emotionally abusive tactics are all too typical of schools that have little or no interest in providing students the academic help and support they need to succeed.

>                 *      *      *

> And let me cite one more example: Corinthian Colleges.   At Corinthian, recruiters are taught to convince students that their lives are bad and can be improved only by enrolling in the school.  As a former recruiter, Shayler White, testified in a lawsuit filed against Corinthian by ex-students: "The ultimate goal was to essentially make [prospective students] wallow in their grief, feel that pain of having accomplished nothing in life, and then use that pain" to pressure them to enroll.  I've

688211_1

focused on the blatant exploitation of pain to demonstrate the terrible cynicism that pervades these companies.

\*     \*     \*

Mr. President, the bottom-line finding of my Committee's investigation is that the schools are expensive. They are exploitative. And, as these documents show, they are focused on their own success, not the success of their students.

8. The vast bulk of Corinthian's revenue during the Class Period was generated from federal financial aid provided by Title IV ("Title IV") of the Higher Education Act of 1965, as amended (the "HEA"). Indeed, Corinthian derived as much as 89% of its revenue from Title IV funding during the Class Period.

9. The widespread practice of falsifying grades at Corinthian was inconsistent, however, with applicable federal law and regulations, including the requirement that it "appl[y] reasonable standards for measuring . . . satisfactory academic progress" (34 C.F.R. §§668.16(e)), while the deceptive enrollment practices violated prohibitions on "misrepresentation of the nature of its educational program, its financial charges, or the employability of its graduates." 20 U.S.C. §1094(c)(3)(A); 34 C.F.R. §668.71(b).

10. Defendants were well aware that violating applicable regulations would risk losing Corinthian's Title IV funding eligibility, which would be a corporate death knell for Corinthian because Title IV funds were the life blood of Corinthian's financial success.

11. As detailed below, former employees, students and government investigators confirm that defendants orchestrated a variety of deceptive and predatory tactics in order to benefit from as much financial aid as possible. The growth reported by the Company during the Class Period was dependent on misleading, abusive and predatory practices, and rendered Corinthian's statements concerning enrollments and

- 4 -

revenue, graduation and placements, compliance, and admission practices, materially false and misleading.

12.  Despite defendants' best efforts, they could not keep their scheme concealed forever.  Through a series of partial disclosures regarding the Company's business practices, the artificial inflation came out of the price of Corinthian's publicly traded securities.  For example, on August 16, 2010, Corinthian's traded securities dropped 22% following a DOE publication showing student loan repayment rates at some Corinthian campuses were less than 20%, compared to 54% at public universities and 56% at private non-profit institutions.

13.  On August 20, 2010, before the market opened, Corinthian announced guidance for its fiscal year 2011 below analyst estimates.[4]  The release further provided:

> "We are actively monitoring proposed changes in federal regulation and Congressional actions which pertain to private sector education . . . .  Given the information currently available, we are unable to gauge the full impact of these proposals on our students and the company.  We continue to meet with policy-makers to work toward reasonable solutions and to provide accurate information about our company, industry, the demographic we serve and the outcomes we help our students achieve."

14.  Corinthian also announced it would terminate new enrollments in its ATB program, which had represented 24% of its enrolled student base in 2009 and 15% in 2010.  On this news, Corinthian stock dropped $0.91 per share to close at $4.49 per share on August 20, 2010, a one-day decline of 17% on high volume.

15.  On September 28, 2010, Illinois Senator Richard Durbin reported that:

---

[4]   Corinthian's fiscal year 2010 began July 1, 2009 and ended June 30, 2010.

*Data from the Department of Education indicates that Corinthian, overall – in all their different colleges – has a 24-percent repayment rate. Three out of four students who go to their schools cannot pay the principal on their debt after they finish – three out of four. It is the lowest repayment rate of any publicly traded corporation in this business.*

156 Cong. Rec. S7587 (daily ed. Sept. 28, 2010) (statement of Sen. Durbin).

16.     During the Class Period, defendants issued materially false and misleading statements concealing the Company's ongoing manipulation of federal student loan and grant programs, predatory and deceptive recruiting and enrollment practices and systemic grade falsification.  Defendants' scheme and wrongful course of business caused Corinthian's publicly traded securities to trade at artificially inflated prices throughout the Class Period.  As the truth emerged and seeped into the market, however, the Company's shares were hammered by massive sales, causing them to drop by almost 80% from their Class Period high.

## JURISDICTION

17.     Jurisdiction is conferred by §27 of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §78aa, as the claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. §240.10b-5.

## VENUE

18.     Venue is proper in this District pursuant to §27 of the 1934 Act.  Many of the false and misleading statements were made in or issued from this District.

19.     Corinthian's principal executive offices are located at 6 Hutton Centre Drive, Suite 400, Santa Ana, California 92707.

20.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including,

- 6 -

but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

21.    Lead Plaintiff Wyoming Retirement System purchased 144,220 Corinthian's publicly traded securities during the Class Period as set out in its previously filed certification and was damaged thereby.

22.    Lead Plaintiff Stichting Pensioenfonds Metaal en Techniek purchased 366,410 Corinthian's publicly traded securities during the Class Period as set out in its previously filed certification and was damaged thereby.

23.    Defendant Corinthian is a for-profit post-secondary education company in the United States and Canada.  It operates through its Everest, Wyotech and Heald campuses.  As of June 30, 2008, Corinthian operated 106 schools, including 100 Everest schools, 82 in 22 states and 17 in Ontario, Canada, with approximately 69,000 students enrolled.  By June 30, 2010, Corinthian operated 118 schools, including 101 Everest schools, in 25 states and Ontario, Canada, with more than 110,000 students enrolled.

24.    Defendant Jack D. Massimino ("Massimino") has served as Chairman of the Board since August 2008 and as Chief Executive Officer ("CEO") from November 2004 to July 2009.  He was named Executive Chairman of the Board in July 2009.

25.    Defendant Peter C. Waller ("Waller") served as CEO of Corinthian from July 1, 2009 until his resignation November 29, 2010.  Previously, Waller served as President and Chief Operating Officer ("COO") of Corinthian from February 2006 through June 2009 as well as a member of the Board from August 2008 until his resignation.

26.    Defendant Matthew A. Ouimet ("Ouimet") served as President and COO of Corinthian from July 2009 until his resignation in October 2010.

688211_1

27.     Defendant Kenneth S. Ord ("Ord") was at all relevant times, Chief Financial Officer ("CFO") and Executive Vice President of Corinthian beginning in February 2005.

28.     Defendants Massimino, Waller, Ouimet and Ord (the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Corinthian's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

29.     Defendants are liable for: (i) making false statements; (ii) failing to disclose adverse facts known to them about Corinthian; and (iii) pursuing a deceptive and misleading course of business.  Defendants' fraudulent scheme and course of business operated as a fraud or deceit on purchasers of Corinthian's publicly traded securities and successfully: (i) deceived the investing public regarding Corinthian's prospects and business; (ii) artificially inflated the prices of Corinthian's publicly traded securities; (iii) allowed defendants to be paid millions of dollars in incentive awards based in part on Corinthian's purported success; and (iv) caused plaintiffs and other members of the Class to purchase Corinthian's publicly traded securities at inflated prices.

688211_1

**CLASS ACTION ALLEGATIONS**

30.     Plaintiffs bring this matter as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Corinthian's publicly traded securities during the Class Period.  Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

31.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Corinthian has approximately 84.6 million shares of stock outstanding, potentially owned by tens of thousands of persons.

32.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     whether the 1934 Act was violated by defendants;

(b)     whether defendants omitted and/or misrepresented material facts;

(c)     whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)     whether the prices of Corinthian's publicly traded securities were artificially inflated; and

(f)     the extent of damage sustained by Class members and the appropriate measure of damages.

688211_1

33.     Plaintiffs' claims are typical of those of the Class because plaintiffs and the Class sustained damages from defendants' wrongful conduct.

34.     Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation.  Plaintiffs have no interests which conflict with those of the Class.

35.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**THE FOR-PROFIT EDUCATION INDUSTRY BACKGROUND**

36.     For-profit colleges offer post-secondary education to a wide-variety of students.  Unlike state-operated and not-for-profit colleges, whose primary goal is to provide a quality education for their students, for-profit colleges are profit-driven, bottom-line businesses.  Not surprisingly, given their profit-driven goals, for-profit colleges charge their students significantly more to attend than not-for-profit schools (often twice as much or more), and students at for-profit schools end up with substantially more debt upon graduation (if, indeed, they graduate at all) than students at non-profit colleges.  Moreover, most for-profit colleges rely heavily on federal funds (in the form of Pell Grants, Stafford Loans, and the like),[5] which provide up to 90% of their revenues.

37.     As described more fully throughout this Complaint, in an attempt to milk federal funds, Corinthian created a business model that incentivized its salespeople to engage in predatory recruitment and deceptive enrollment practices, resulting in a reliance on unqualified failing students, extremely low graduation rates and massive amounts of defaulted student loans.  While these untoward business practices certainly

---

[5]     A Pell Grant is a post-secondary education federal grant sponsored by the DOE that does not have to be repaid.  A Stafford Loan is a student loan offered to eligible students enrolled in accredited American institutions of higher education.  The repayment period for a Stafford Loan typically begins upon graduation or withdrawal by the student from the institution of higher education.

688211_1

harmed students targeted by Corinthian's predatory practices, defendants are also liable to plaintiffs and the Class for the damages caused by their failure to disclose Corinthian's predatory business model to the market and its shareholders, providing instead a completely different picture of what drove its revenue, and consequently misrepresenting the nature and substance of the Company's financials and future business prospects. These misrepresentations and material omissions caused Corinthian's publicly traded securities to trade at artificially inflated prices throughout the Class Period.

38. Enrollment at for-profit colleges grew dramatically in the past decade. Between 1998 and 2008, enrollment at for-profit colleges expanded by approximately 236%, while enrollment at traditional institutions of higher learning rose only approximately 20% during that same period.

39. Corinthian's business model, as detailed below, was hidden for years, until, through a series of partial disclosures, the truth was revealed. When the truth came out, the artificial inflation was removed from the price of Corinthian's publicly traded securities, and its shareholders incurred substantial damages.

40. Historically, families with greater needs generally sought lower-cost colleges to maximize the utility of available federal loans and grants, getting the most out of every dollar to reduce out-of-pocket expenses and minimize heavy debt burdens. Conversely, families with greater financial resources often sought higher-cost institutions because they could afford to pay in excess of what federal loans covered, and presumably received a better quality education. For-profit colleges have turned this traditional relationship between costs and means on its head by targeting and preying upon students with the greatest financial needs, regardless of their ability to repay the loans should they graduate and find employment, while at the same time inducing the students to incur massive expenses and debt and providing a substandard education.

688211_1

41.     Indeed, low-income and minority students make up 50% and 37% of students at for-profit colleges respectively, while, on average, for-profit colleges cost five and a half times the price of community colleges offering similar programs and degrees.   Bachelor's degree recipients at for-profit colleges have median debt of $31,190 compared with $17,040 at private, non-profit institutions and $7,960 at public institutions.   At four-year for-profit colleges, low-income students must find a way to finance, on average, almost $25,000 each year, with only a 22% chance of graduating. On the other hand, students at four-year private non-profit institutions need to finance, typically, only $16,600, and graduate at rates three times higher.   Moreover, private non-profit institutions, while costing students less, actually spend three and a half times more on each student than for-profit institutions do.[6]

42.     Prospective students obtain these funds by turning, usually at the direction of the for-profit colleges themselves, to the federal government.   For students with financial need, the federal government helps pay for higher education through Title IV.   Title IV covers the administration of the United States federal student financial aid programs, and includes Pell Grants, Stafford Loans, and other forms of federal financial aid.   Title IV aid is a combination of grants and low-interest loans available in limited quantity to students enrolled at any type of college.

43.     For-profit colleges recruit low-income students for a high-cost education in order to maximize the amount of federal loans and grants the students must take on in order to be able to afford classes.   This maximizes the amount of federal loans and grant monies that the for-profit colleges receive.   As much as 90% of revenue generated at for-profit colleges comes from federal student aid.[7]   Indeed, in 2007-

---

[6]     *See* "Subprime Opportunity: The Unfulfilled Promise of For-Profit Colleges and Universities," *The Education Trust* (Nov. 22, 2010), available for download in PDF format at  http://www.edtrust.org/dc/subprime.

[7]     Twenty-four percent of 2008 graduates of for-profit colleges took out federal loans in excess of $40,000.

688211_1

2008, approximately 97% of undergraduates attending for-profit two-year colleges took out student loans, while only 13% of undergraduates attending two-year public institutions took out student loans.   Similarly, during that same time period, approximately 95% of undergraduates attending for-profit four-year colleges took out student loans, while only 47% of undergraduates attending public four-year institutions took out student loans.

44.   Though federal financial aid is intended for the benefit of the student, as a practical matter, aside from education-related expenses, student aid disbursements go directly to the student's school.   Thus – as long as the school can keep enrollment rates steady or increase them – the more money a for-profit college charges per credit, the more revenue the institution will generate in guaranteed federal dollars from loans taken out by low-income and other at-risk students.

45.   Federal Pell Grants and Stafford Loans, together with aid from smaller Title IV programs, make up the lion's share of for-profit colleges' revenues.   While for-profit colleges enroll close to 10% of all higher education students, they currently receive approximately 24% of all Title IV funds.   Indeed, between 2000 and 2009, the amount of Pell Grants, Stafford Loans, and other Title IV aid packages given to for-profit institutions grew from $4.6 billion to $26.5 billion, representing a sizeable burden for U.S. taxpayers.[8]

46.   In the early 1990s, Congress was concerned that certain schools were engaging in a series of unethical practices leading to the admission of unqualified students just to obtain federal financial aid.   This led, ultimately, to students being unable to repay their loans – leaving the government holding the bag.

47.   Congress and the DOE took a number of actions to address this situation, including enacting the incentive compensation provision.   The incentive compensation

---

[8]   In 2009, for-profit colleges collected $4.4 billion of the $18.2 billion in federal Pell Grants.

provision of the HEA prohibits schools from paying student recruiters and employees involved in financial aid "any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid." 20 U.S.C. §1094(a)(20).  In 2002, the DOE clarified the incentive compensation plan by issuing a series of safe harbor regulations, 34 C.F.R. §668.14(b)(22)(ii).

48.    Relevant here, 34 C.F.R. §668.14(b)(22)(ii)(A) provided that a school may make up to two adjustments (upward or downward) to a covered employee's annual salary or fixed hourly wage rate within any 12-month period without the adjustment being considered an incentive payment, provided that no adjustment is based solely on the number of students recruited, admitted, enrolled, or awarded financial aid.

49.    To remain eligible to participate in Title IV programs, educational institutions must maintain an appropriate CDR.  The CDR is the percentage of a school's borrowers who enter repayment on certain federal student loans during a particular federal fiscal year (October 1 to September 30), and who default prior to the end of the next fiscal year.  The "cohort" is the group of students who first enter into student loan repayment during a federal fiscal year, and the CDR for each cohort is the percentage of the cohort members who default on their student loans prior to the end of the following federal fiscal year.  The CDR was initiated in the late 1980s to address the growing concern that fly-by-night trade schools were preying upon minorities and low-income populations to build their enrollments by enticing academically underqualified students to apply for grants and guaranteed student loans that the students were unlikely to repay.

50.    Under current law, if an institution's CDR exceeds 10% for any one of the three preceding years, it must delay for 30 days the release of the first disbursement of U.S. federal student loan proceeds to first-time borrowers enrolled in the first year of an undergraduate program.  Institutions with three consecutive CDRs

- 14 -

of 25% or greater or with a CDR greater than 40% in any one federal fiscal year could lose eligibility to participate in certain Title IV programs.

51.     The HEA further requires that programs at for-profit institutions – other than those clearly designated as "liberal arts," or not designed to lead to a degree – must prepare students for "gainful employment in a recognized occupation" to be eligible for Title IV federal student aid.   In addition, state authorization and accreditation by an accrediting commission recognized by the DOE are also required for an institution to become and remain eligible to participate in Title IV programs.

52.     For example, the Accrediting Commission of Career Schools and Colleges ("ACCSC") requires each accredited institution to maintain retention and placement standards of 60% and 65%, respectively.   An institution with retention and/or placement rates not in keeping with those standards may be subject to reporting.   Other requirements of the accrediting agencies include:

- "Advertising, recruiting, and admissions information adequately and accurately represent the programs, requirements, and services available to students."

- "An institution may not delegate without supervision these [recruiting] activities to anyone whose economic incentives are to recruit prospects through means that are unethical or subject to public criticism or to admit ill-prepared applicants."

- "[R]ecruiting shall be ethical and compatible with the educational objectives of the institution. . . .   The following minimums apply: (a) An institution shall ensure that any person or entity engaged in admissions or recruitment activities on its behalf is communicating current and accurate information regarding courses and programs, services, tuition, terms, and operating policies."

- Schools are required "to describe themselves to prospective students fully and accurately and to follow practices that permit prospective students to make informed and considered enrollment decisions without undue pressure.  The school's recruitment efforts must attract students who are qualified and likely to complete and benefit from the training provided by the school and not simply obtain enrollments. . . .  Each school observes ethical practices and procedures in the recruitment of its students."

- "No misrepresentations should be made in student recruitment, including . . . ; b. misrepresenting job placement and employment opportunities for graduates; c. misrepresenting program costs; d. misrepresenting abilities required to complete intended program."

53.    On August 4, 2010, David Hawkins, the Director of Public Policy and Research for the National Association for College Admission Counseling, provided testimony to the HELP Committee during a "Hearing on Marketing and Recruitment in For-Profit Education," in which he stated, in relevant part:

Few seem to be prepared for high-pressure sales tactics, and few – as evidenced by testimony from the previous hearing – seem aware that a college can be a for-profit company, or that there may be cause to question what recruiters and advertisements are telling them.  Whereas consumers may be prepared for a high-pressure sales pitch at a car dealership, home improvement store, or other commercial setting, few are aware that a college recruiter might employ the same tactics.  Taking advantage of this trust enables recruiters to exploit a potential student's lack of awareness of the terms of the interaction.

Students trust post secondary educational institutions and their admission officers because counseling – as opposed to sales or marketing

- 16 -

– has historically been a prominent part of ethical admission practice at American colleges and universities.[9]

**INFORMATION OBTAINED FROM CONFIDENTIAL AND PUBLIC SOURCES CONCERNING CORINTHIAN'S MANIPULATIVE AND UNETHICAL BUSINESS PRACTICES**

54.   **Confidential Witness 1.** CW1[10] worked as an admissions representative from March 2009 to November 2009 at one of Corinthian's Texas Everest campuses and provided the following information.   According to CW1, admissions representatives were compensated on a tier system according to their ability to meet certain quotas.   If the quotas were reached, their compensation remained the same; however, if the quotas were missed or exceeded, their compensation would respectively be decreased or increased.   The tiered compensation system had the effect of motivating admissions representatives to push through the application process potential students who should not have been admitted, and as a result, the academic ability of the students was extremely low.   Because many of the students were incapable of passing classes, there was a high incidence of students dropping out in the first and second semesters, with many students leaving in the first month.   CW1 indicated that the dropout rate in the first semester could have been as high as 70% and that this was the reason for the compensation system aimed at obtaining high levels of new starts and management pressure to admit all applicants.   The pressure on school staff to meet recruiting numbers for new starts created an environment where incapable prospects were enrolled, irresponsible assurances of high incomes were made, and almost anything was done to keep the influx of new recruits coming in.

---

[9]      A complete copy of Mr. Hawkins' testimony is available in PDF format on the HELP Committee's website at http://help.senate.gov/imo/media/doc.Hawkins1.pdf (last visited February 29, 2012).

[10]      Certain allegations are based on information obtained from former employees with the understanding that their identities as whistleblowers be kept confidential as permitted by law.   Those witnesses are identified as "Confidential Witness __" or "CW__."

55.     Once a student was enrolled, however, and federal funding was secured for the new student, little attention was paid to keeping them enrolled because the common experience was that so many would drop out.  Through conversations with co-workers and students, CW1 learned that students who were failing but wanted to stay and try to get their certificates worked out deals with instructors to just get them through.

56.     **Confidential Witness 2.**  CW2 worked at Corinthian from March 2008 to September 2008 and provided the following information.  CW2 was interviewed for his job by Massimino and hired for the position of Vice President, Internal Audit. CW2 reported directly to Massimino.  In that position, CW2 supervised a team of 22 auditors and was responsible for supervising audit work that evaluated Corinthian's compliance with requirements for government grants and student loans at campuses across the entire company.

57.     When CW2 was interviewed, Massimino indicated that he was aware of a "historical problem" at Corinthian where students were maintained on enrollment who should not have been kept.  However, CW2 quickly learned after auditing Corinthian campuses that Massimino was not interested in correcting the compliance problems that CW2 identified.

58.     When CW2 was hired, Corinthian maintained an Excel spreadsheet that tracked historical internal compliance audit scores going back at least three years to 2005.  The spreadsheet, which was available to management in the corporate office, including the senior executives, tracked the audit scores for the various Corinthian school campuses.  CW2 closely reviewed the spreadsheet in order to become familiar with the low-scoring schools in order to identify possible root causes.  CW2 used the first two weeks employed at Corinthian to evaluate audit findings throughout the school for the past three years.  During CW2's employment at Corinthian, CW2 reviewed the prior audit reports for campuses that CW2 visited and for campuses subject to a current audit that had prior poor scores.

- 18 -

688211_1

59.     Corinthian's campuses were required to be audited on an annual basis. The audits typically consisted of a visit lasting one to two weeks by two auditors who reported to CW2.  The audit reports were standardized and included approximately 40 steps, with each step testing a specific Corinthian procedure.  The score for any given procedure could be analyzed on a company-wide basis.  After the auditors sampled representative documents in order to evaluate compliance, a score was assigned based on the level of compliance, with "1" meaning "very good"; "2" meaning "good"; "3" meaning "satisfactory"; "4" meaning "poor"; and "5" meaning "very poor," which was considered a failure.  At the end of the audit, a final overall score would be assigned to an audited campus, again with "1" being the best and "5" the worst.  An audit report identifying areas of non-compliance would then be generated, which was then reviewed and signed by CW2 and a lead auditor, and submitted to Massimino.

60.     After reviewing the prior audit reports, CW2 determined that many had scored "4" (poor) or "5" (very poor) and that 20% to 30% had scored that low in each of the past two or three years.  From 2005 to 2008, about 20 Everest campuses showed consistent failed audits of "4" and "5" (either all "5s" or "5s" mixed with "4s").  About 60% of the campuses had scores with combinations of "4s" and "3s," which were considered passing but still poor performers in audits.  About 20% had grades of "2" (good), with very few "1s".

61.     The audit report procedures were derived from applicable regulations governing Corinthian's operations and certifications, particularly with respect to receiving federal loan money.  The scope of the audit included compliance with regulatory requirements, attendance, course completion and passing grades.  The auditors sampled attendance records to see if Corinthian was failing to drop students who did not meet attendance requirements.  The auditors also reviewed grades in order to determine if Corinthian was maintaining students as enrolled who should have been dropped.  The audit reports included a narrative summary of the reasons for

688211_1

1   the score and evaluated whether Corinthian's campuses were complying with FAFSA

2   (Free Application for Federal Student Aid) and Title IV criteria for federal funding.

3        62.   During CW2's tenure at Corinthian, he personally visited approximately

4   18 Everest campuses in connection with audits.  CW2 recalls that those campuses

5   included campuses in Southern California, in the San Francisco area, in the Seattle

6   area and in the Midwest.

7        63.   In addition to CW2's own campus visits, CW2 also reviewed each step of

8   the audit reports of the compliance auditors that CW2 supervised.  Audit reports for

9   approximately 35 to 40 campuses were prepared while CW2 was at Corinthian, in

10  addition to the reports reviewed by CW2 that predated CW2's employment.

11       64.   CW2 recalled one instance where CW2 visited a campus after one of the

12  auditors advised CW2 that it appeared that a teacher had falsified attendance entries.

13  After confirming that the records appeared to have been doctored, CW2 confronted

14  the teacher who initially denied altering the records, but subsequently admitted having

15  done so to the campus president.

16       65.   According to CW2, the schools with consistently failed audits often

17  carried students on enrollment who should have been dropped for non-attendance.

18  This was an ongoing issue at approximately 25% of the schools that were audited

19  while CW2 worked at Corinthian and was considered by the internal compliance

20  auditors to be a company-wide problem, which CW2 attributed to a practice of

21  enrolling "any warm body they could find."  CW2 discussed the non-attendance

22  problem with Massimino on several occasions, so that Massimino would understand

23  that it was not an isolated finding.  In response to CW2's suggestions to reevaluate

24  enrollment and retention practices, Massimino indicated that those things had been

25  tried in the past, had not worked, and that it was not a big deal.

26       66.   CW2 indicated that the compliance audits also identified similar

27  problems with student grades.  While visiting campuses, CW2 spoke with campus

28  teachers.  Many indicated that they knew of teachers who had been fired from an

Everest campus for failing too many students or having too many dropouts.  Teachers told CW2 and other auditors that they were concerned they would lose their jobs if they had too many students drop out of their classes.  CW2 was consistently told by teachers that they had been told not to fail students and that if they did, it would reflect their own failure as teachers.  CW2 discovered that teachers would give special assignments to students who had failed the coursework in order to justify giving the students passing grades, even though the students had failed the actual coursework curriculum.

67.    During the compliance audits, auditors sampled individual student test grades to see if the students' final grades were consistent with the students' actual assignment and test performance.  Auditors frequently discovered that teachers were passing students who were failing.  Students who had a lack of attendance, missed test dates and assignments, and failed to turn in homework or pass tests were given a passing grade instead of an "F," either by the teacher or campus administration.  The practice of giving a passing grade for "extra work" violated Corinthian procedures, which required the grade to be based on the actual planned coursework.

68.    CW2 brought this problem to Massimino's attention in their audit review meetings, but Massimino responded that "We're trying to help these people," but that "we're also a business."

69.    Internal compliance auditors and other Corinthian employees also told CW2 that admissions representatives often made promises to prospects overstating the incomes they could expect from the type of certificate in which they were interested and coaching students about how to get loans beyond what they were actually qualified for.

70.    As a result of the audits, and the review of student academic records, CW2 learned that numerous failing students were continuing to be carried and given passing grades so that Corinthian could still get paid.  In addition, during the campus visits, many employees indicated that they were annoyed at Corinthian's refusal to get

688211_1

rid of failing students.  There was, however, no financial incentive for Corinthian to do so.  In talking with employees and students, CW2 learned that teachers were encouraged to give passing grades to failing students after working out agreements with students to improve on certain areas in the next grading period.  Notwithstanding this practice, the records still indicated that too many students were failing or performing too poorly to justify maintaining them on active enrollment.

71.    CW2 raised these issues with Massimino; however, Massimino was not interested in them.  When, for example, CW2 learned from the auditors that CW2 supervised that some attendance records were being doctored, CW2 shared this information with Massimino.  Massimino responded that it wasn't all black and white and that there were gray areas.

72.    During campus visits, CW2 also observed the admission process and went though portions of the admission procedure without disclosing that CW2 was in fact a Corinthian employee.  CW2 learned that the admissions recruiters operated from scripts that were provided to them by the corporate office.  As an example of the complete lack of standards for admission, CW2 also expressed concern to Massimino over the lack of any quality threshold for new starts or students, noting that in one admissions test question a student was shown a picture of a cat and was asked what it was.  In a meeting about halfway through CW2's employment at Corinthian, CW2 asked a group of Corinthian executives, including Massimino and Ord, whether Corinthian had ever declined to admit a prospective student.  The executives responded that it was possible, but that they were unaware of any denial.  CW2 concluded that it was obvious that Corinthian would let anyone in as a student and would keep them as long as they wanted to stay.

73.    CW2 met with Massimino approximately twice a month and provided Massimino with the audit reports documenting the findings of non-compliance and would advise Massimino of the problem of maintaining failing students on a school's enrollment.  Massimino indicated that he was already aware of the problems of non-

688211_1

compliance.  CW2 recalls a specific conversation where CW2 suggested that the Company clarify and enforce policies with respect to enrollment and maintenance of failing students.  Massimino told CW2 that "We know about that, we tried it before and it didn't work."  CW2 understood this to mean that the current practices were necessary to maintain Corinthian's revenues.  After the first two or three meetings with Massimino to review campus audits and advising Massimino of the findings, CW2 concluded that it was apparent that there was no point in making suggestions for improvement.

74.    CW2 explained that the campuses were essentially "leaky buckets," with most students dropping out quickly.  As a result, in order to keep the appearance of robust or growing enrollment, it was necessary for Corinthian to aggressively recruit new starts while paying little attention to the quality of student.

75.    CW2 also met with defendant Waller and informed Waller of CW2's campus visits and findings of consistent problems with failing students being kept on enrollment.  Waller advised CW2 that he was aware of these issues.

76.    CW2 provided a quarterly audit report to the audit committee documenting the findings and summarizing individual campus audits in a statistical manner.  CW2 suggested to Massimino that CW2 be allowed to provide a narrative summary of the findings so that the audit committee could understand the report better.  Massimino advised CW2 not to do so.  CW2 indicated that the statistics reported to the audit committee, nonetheless, were adequate to demonstrate areas of concern.  CW2 recalled attending one meeting with the audit committee where CW2 reviewed the findings concerning enrollment and retention practices.

77.    CW2 recalled that Corinthian's campus presidents turned over quickly, especially at the Everest campuses and that the substance of conversations with the campus presidents were always about new student starts.  In speaking with the campus presidents and their staffs, CW2 learned that if a campus did not recruit a projected minimum, the president was terminated, which was the reason for the high turnover.

78.   **Confidential Witness 3.**  CW3 worked at an Everest Institute campus between August 2005 and September 2008 as a financial aid representative and financial planner and provided the following information.  Students routinely received Pell Grants of $4,500.  In addition, students routinely also received federal subsidized and/or non-subsidized loans of $5,000 and $6,000.  Repayment of the subsidized loans did not begin until after the student left school.

79.   CW3 said that it was common for students to default on their non-subsidized loans while in school, resulting in special arrangements being made where the student would be allowed instead to make minimal payments of $5 to $10.

80.   CW3 estimated that approximately 50% of the students dropped out in the first six months, with 25% of the remaining students dropping out before completing their program.

81.   CW3 indicated that school management would do anything it could to enroll students in order to secure the funding for the tuition.  Occasionally financial representatives would put down anything they wanted in financial applications even if the prospective student was not entitled to financial support because it was assumed that the student would not enroll unless financial support was provided.

82.   CW3 stated that there was always pressure from admissions and financial aid management to hit predetermined numbers and that those who consistently hit their numbers were given raises while those who did not were fired or squeezed out. There were four tiers that admissions representatives could reach, with higher salaries at each tier.  Admissions representatives were reviewed twice a year and if the representatives hit or exceeded their goal for the last two quarters, they would go up a level in pay.

83.   **Confidential Witness 4.**  CW4 was employed as an admissions recruiter at a Michigan Everest Institute campus from November 2007 through October 2008. CW4 explained that once students were enrolled, meaning that they had completed the application process and had qualified for financial aid, they had to attend class for

- 24 -

1  either one or two weeks to be considered a "start."  Once the student satisfied this

2  period, the admissions recruiter, the campus, and the company all received credit for a

3  start.  Corinthian's compensation structure provided incentives in the form of raises

4  for achieving certain levels of starts measured by month, with recruiters pressured by

5  local and regional managers to meet goals for numbers of  starts.  If recruiters met

6  their targets, they would move up a salary level.

7       84.     CW4 explained that although they were told not to represent specific

8  incomes that students could earn, they were encouraged to provide prospects with

9  salary ranges in order to make prospects believe they could earn an attractive salary by

10  enrolling, even though they either could not get through high school or had such low

11  grades they could not enroll into a regular college.

12       85.     CW4 also recalled that the campus provided deceptive job placement

13  numbers to prospective students by including jobs that were not related to the

14  programs that the student had completed.  For example, a student working delivering

15  flowers for a pharmacy or working as a janitor in a dental clinic could be counted as

16  having gotten a job as a medical technician.

17       86.     CW4 worked with students seeking a career related to medicine, as a

18  medical assistant, dental assistant or massage therapist.  Those students were required

19  to perform an externship and CW4 learned that the school was frequently told that the

20  extern would never be considered qualified for a career in the medical industry.  This

21  was consistent with CW4's impression as many of the students who got through the

22  courses were unable to construct sentences, spell or understand basic math.  Many got

23  through classes because instructors were willing to change an "F" to a passing grade

24  merely in return for completing extra credit work, regardless of the accuracy of the

25  work product.  CW4 felt that it was unfair to recruit such students because they would

26  just end up with substantial debt and be unable to obtain a position in the desired field.

27  CW4 concluded that many students lacked basic communication skills and that the

28  school was just taking their money.  Indeed, CW4 was also aware that prospective

688211_1

students who failed the admissions test would sometimes have their grades changed to pass so that they could be enrolled and that students were qualifying for financial aid when they were not entitled to it.

87.    CW4's impression of the recruitment process was that great pressure was placed by regional directors to make the numbers, but that it was obvious that students would spend over $10,000 to attend and likely not make it through graduation, while CW4 estimated that the one-third of students who did actually graduate would have great difficulty in finding a company to hire them.   Two campus directors of admissions that CW4 knew during the short time CW4 was employed at Corinthian were fired due to failures to make their recruiting numbers.

88.    **Confidential Witness 5.**  CW5 was employed as a dean and instructor at a California Everest school from 2007 to 2009 and provided the following information.   CW5 recalled hearing many accounts of students with no math knowledge at all or who did not know how to write a basic sentence.  Instructors were simply encouraged to get them in and out.  CW5 eventually concluded that it all came down to money and that there was no concern if students had basic academic skills.

89.    CW5 also observed that if a student was failing, it was typical for an instructor to give the student extra work and then disregard the other coursework or lack of attendance.   There were a lot of problems with students who were failing and instructors figuring out ways to get them through.  If a student had an "F," it was not uncommon for the instructors to willingly give them a "D-" or "D" to pass them and keep them enrolled in the program.   CW5 ultimately left because it seemed that Corinthian was setting students up to fail just so the company could make money.

90.    **Confidential Witness 6.**  CW6 was employed at a California Everest College campus as a Student Finance Representative from 2007 to 2009 and provided the following information.   CW6 recalls that many times when taking students through FAFSA applications, the students appeared to have been coached by admissions on what to say concerning their financial status.  Although the questions

688211_1

were used to determine financial eligibility, CW6 was not permitted to question students even if it was evident they were looking at notes and did not have any back-up information.  Financial representatives were not allowed to go beyond what the student told them to inquire about inconsistencies or question information that caused skepticism.

91.    CW6 recalls that about 30% of the new starts dropped out in less than three to 4 four months and most of these students were not candidates to complete the coursework.  Some were simply uneducated – they had barely gotten through high school – had limited communication skills, and had been sold by admissions on how much money they could make if they completed the program.

92.    **Confidential Witness 7**.  CW7 worked for Corinthian as an Admissions Director and Regional Director of Admissions in Southern California from 2006 to 2010 and provided the following information. CW7 explained that unreasonable start numbers were set in the budget for each of the campuses and the region, and that the pressure on admissions personnel to meet these unreasonable start numbers was immense – especially from 2008 to 2009 – to the point that even campus presidents feared for their jobs if the preset start numbers were unmet.  Given this immense pressure to meet unreasonable numbers, CW7 explained that reliance on ATB student recruitment significantly increased to the point, in 2010, that ATB students were constituting well over 40% of students at some campuses, including, for example, Everest campuses in San Bernardino and Los Angeles at which the percentage of ATB students was approximately 50%.  CW7 explained that because student enrollment was tracked in detail at the campus, regional, and corporate level, this exceeding reliance on ATB students to meet unreasonable enrollment quotas should have been apparent at every level of the Company.

93.    CW7 also explained that in the summer of 2010, at an Everest campus in Florida, representatives from Wonderlic, the contractor which administered Corinthian's enrollment tests to ATB candidates, discovered that Corinthian

- 27 -

688211_1

admissions representatives had obtained the answer keys to the ATB test and were giving the answers to the prospects being tested in order to meet enrollment quotas. The same practice was discovered at an Everest Campus in Arizona.

94.     CW7 also explained that because Corinthian did not perform background checks, enrolled students often had criminal histories that would obviously hamper employment prospects in the field for which the program was designed, for example, convicted criminals enrolling in programs to become parole officers or drug addicts and dealers enrolling in programs to become pharmacy technicians.

95.     **Confidential Witness 8**. CW8 was an instructor for Everest College in Southern California from 2002 to 2011. One reason given for CW8's termination was CW8's numbers, i.e., that too many of CW8's students dropped out. According to CW8, beginning in 2007 through 2010, admissions representatives feared losing their jobs if they did not meet start quotas pre-determined each month. This pressure to meet preset start numbers resulted in the enrollment of students with criminal backgrounds that rendered them unemployable in the fields they were pursuing, as well as students who were unable to read or write, much less perform at a college level. Though the students were clearly unable to perform, instructors were berated by campus administration about failing students and increasing drops, and told flatly that giving failing grades was unacceptable. CW8 understood that schools set limits for a teacher's drop rate, and that instructors with higher drop rates were to be warned then terminated. CW8 witnessed the campus president give such warnings during meetings with instructors, and knew instructors that were fired. Students were unable to perform in a college level English course, but were given passing grades anyway because CW8 was told to do so by school management. CW8 and other teachers were directly told by the campus president, starting in 2007, that there should not be any failing grades. Afraid for their jobs, instructors falsified attendance records and avoided giving any failing grades regardless of how poorly students performed.

- 28 -

96. ***Miller v. Corinthian Colleges Inc.*** In addition to confidential witnesses, plaintiffs also make allegations based on information obtained from the public docket in litigation brought by former students. The information set out below was obtained from a complaint and declarations filed in *Miller v. Corinthian Colleges, Inc.*, No. 100918220 in the Third Judicial District Court, Salt Lake City County, Utah[11] on behalf of former Everest campus students. The complaint was filed on September 24, 2010 and states the following.

97. Everest represents to potential students that it is "accredited," and that credits earned at Everest can be transferred to other post-secondary schools. But Everest fails to disclose that the type of "accreditation" that it has is not actually recognized by most public and non-profit schools, including the majority of universities and community colleges in Utah. Students who enroll at Everest – and typically incur tens-of-thousands of dollars in debts to pay the Everest tuition – learn only after the fact that the credits they have earned at Everest cannot be transferred to the other schools where they hope to complete their education. Thus, these students do not get what Everest had promised them, and what they had paid for.

98. Everest also deliberately prevents prospective students from ascertaining the true cost of its tuition and fees, and may in fact charge varying amounts of tuition and fees among its students based on the amount of financial aid for which each student qualifies. Everest never advertises or makes public its actual tuition or fees to prospective students. Rather, during an in-person enrollment process, prospective students are given an "estimate" in writing. But Everest then has the students fill out paperwork that allows Everest to seek student loans on the students' behalf that are far in excess of that "estimate." Although those loans are ostensibly applied for on behalf

---

[11]    On October 8, 2010, this action was removed to the United States District Court for the District of Utah. *Miller v. Corinthian Colleges, Inc.*, No. 2:10-cv-00999 (the *Miller* action").

1  of the students, the funds from the loans are disbursed directly to Everest, and students

2  typically only discover the full amount of their debt after the fact.  And that debt is

3  typically far in excess of the original "estimates" they were given at the time of

4  enrollment.

5       99.   Everest continues its policy of deception during meetings with its

6  admissions representatives.  Through scripted sales pitches, the representatives

7  consistently and systematically use catch phrases such as "we're fully accredited" to

8  mislead potential students regarding the value of the school's programs.

9       100.   When the students ask questions relating to the transferability of credits

10  to specific regional universities and community colleges or indicate that they wish to

11  continue their education elsewhere, Everest representatives do not disclose the truth.

12  Rather, through scripted responses, Everest representatives make false statements that

13  students should have "no problems" transferring the credits, or that the transferability

14  of credits are limited only by whether the school offers and recognizes the subject

15  matter of a given course.  Some Everest representatives go so far as telling students

16  outright that credits are transferable to a specific local community college or

17  university, even if that is false.

18       101.   Everest engaged in deceptive and misleading practices by uniformly and

19  knowingly failing to disclose the complete cost of Everest College's education

20  programs.  These uniform misrepresentations mislead or deceive potential students as

21  to the costs and fees related to enrollment at Everest.  Everest makes these

22  representations with the intent of inducing students to enroll and to maximize the

23  money Everest collects from federal and private lenders.  Everest devises, implements,

24  authorizes, or sanctions the policies or training programs that cause the admissions

25  representatives to engage in this deceptive practice.

26       102.   Due to the utter lack of information regarding the actual cost of Everest's

27  programs, students are unable to even determine how such costs are actually

28  calculated, or the total cost of a given program at Everest's Salt Lake City campus.

688211_1

Everest's website contains an impressive amount of information, but even the smallest details regarding tuition, costs, financial aid and scholarships are conspicuously absent.

103.    Everest admissions representatives knowingly misrepresent the total costs of education.  During the admissions process, if a prospective student pushes the admissions representative to reveal a total cost or cost per credit, the admissions representatives uniformly tell students that the financial aid department will assist the students with affording the program through loans, grants or scholarships, or, when pressed, give unsubstantiated estimates of total cost.  In fact, the only verbal or written information a student is given during this process regarding the cost of the program is the consistently inaccurate "estimated cost" per academic year.

104.    When meeting with the financial aid department, students then are given a sheet containing the number of credits the student needs to complete his or her program, and the amount that each credit hour will cost.  But the total cost is not displayed or otherwise directly conveyed to the students.  This is because the actual cost per unit is more than double the amount of the estimated cost per year – the same estimated cost that the students reviewed only moments ago in the admissions department.  To prevent the students from noticing the discrepancy between the estimated and actual unit costs, the financial aid department uniformly encourages students to take out as much money as the government will authorize.  Thereafter, students are not provided with a statement of account, bill or other record of the amount of money the student has paid toward the total tuition cost.  Rather, if students have questions about the cost, students are directed to keep track of the amount they pay for tuition through federal loan disbursements.

105.    **Chelsi Miller.**  Chelsi Miller ("Miller") was an Everest University student between August 2006 and June 2008 and is a named plaintiff in the *Miller* action.    After seeing advertisements, Miller contacted an Everest admissions representative by telephone.  The representative advised Miller that credits earned at

1    Everest would transfer to Salt Lake Community College ("SLCC") or to the
2    University of Utah.

3         106.   After Miller signed the enrollment agreement, the admissions
4    representative gave Miller a "Student Financial Planning Sheet" that indicated the
5    estimated cost of the total program.  When Miller asked the admissions representative
6    to explain the costs, she was immediately shuttled to Everest's financial aid
7    department.  There, financial aid representatives presented Miller with the cost-per-
8    credit sheet, but pressured Miller to just initiate a request for as much money as she
9    could get to cover her tuition and fees.   Other than the planning sheet and
10   disproportionate cost-per-credit quote that she later more than exceeded in debt, Miller
11   was never provided with specific or accurate information regarding the cost of the
12   program.

13        107.   Approximately every three months, Miller was called to the financial aid
14   office and informed that her federal disbursements did not match the cost of her
15   course load.   With no other explanation (and no documentation), financial aid
16   representatives told Miller that she would have to incur additional loans to continue
17   classes.  Miller was confused because her first disbursement covered far more than the
18   $12,280 estimated cost per program.  But because multiple other students were being
19   asked to do the same thing, and because she believed that she could not complete her
20   classes at Everest without doing so, Miller acquiesced.

21        108.   Miller graduated from the program in June 2008.  In June 2009, Miller
22   applied to the University of Utah pre-medical program.  She was accepted, but the
23   school informed her that it did not accept credits from Everest because Everest was
24   not regionally accredited.  She would have to pay for and take the courses all over
25   again from the University of Utah.

26        109.   In August 2009, Miller applied to SLCC, hoping to at least gain
27   recognition of her credits at the less-expensive community college (which, as
28   discussed above, was her original plan), obtain another associate's degree there, and

use it to transfer to the University of Utah.  But SLCC informed Miller that it also did not recognize credits from Everest because Everest was not regionally accredited, and that she would have to take the courses all over again.

110.   In October 2009, Miller called Everest to confront the school about its misrepresentations regarding the transferability of its credits.  Once representatives became aware that Miller was privy to their fraudulent practices, they repeatedly directed Miller to unanswered extensions and voicemail boxes.  Miller's phone calls and voicemails went unreturned.

111.   Miller then placed telephone calls to Everest admissions representatives to clarify whether the credits were transferable.  This time, suspecting the worst, Miller did not tell the representative that she had already graduated from Everest and had already tried to transfer her credits.  Consistent with the company's policy of deceiving and misleading students, Everest representatives still assured Miller that credits and degrees earned at Everest are likely transferable to other institutions like SLCC and the University of Utah.

112.   **Daniel Marty.**  Daniel Marty ("Marty") is a former Everest student who is a named plaintiff in the *Miller* action.  According to the sworn Declaration of Plaintiff Daniel Marty, he was enrolled in Everest University's surgical technology program from 2008 to 2010.  After seeing a number of advertisements, Marty visited the campus to explore enrolling.  At the financial aid department, he could not get a clear answer to the total cost of the program, but was instead told he should just apply for financial aid to see how much he could get.

113.   Marty alleges that the Everest admission representative assured Marty that credits earned at Everest would easily transfer to the University of Utah and SLCC.  But in response to his question regarding affordability, the representative told Marty that he would have to sign "paperwork" and then visit financial aid to "see what he could afford."

688211_1

114.   Marty returned the next day and went directly to financial aid to determine the real cost of the program and the amount of aid he would likely qualify for at the school.   Upon inquiring about the program's cost, a financial aid representative told him to just apply for loans and "see how much you can get."

115.   Throughout his matriculation at Everest, Marty was frequently interrupted during class and sent to the financial aid office.   It was a routine occurrence at the school for many students.   Upon arriving at the financial aid office, representatives told Marty that his tuition balance was more than was originally calculated, and that his existing loans were insufficient to keep him enrolled for the remainder of the term.   When Marty would ask for a statement or other written indication regarding the program's actual cost, he was directed to the federal government's website to look at the amount that had been dispersed on his behalf.

116.   More than once, Marty took out several loans pursuant to the financial aid office's last-minute requests.   But he finally refused to take on any more debt to cover his unaccounted-for tuition and fees.   As a result, financial aid informed Marty that he would have to drop half of his classes.

117.   Marty decided that he could still achieve his objectives by transferring to the nursing program at SLCC as he had intended to before enrolling at Everest, and ultimately work towards achieving a higher medical degree.   In or around December 2009, Marty contacted SLCC to facilitate the enrollment process, but was immediately informed that SLCC takes credits from "regionally accredited sources only."

118.   Relying on the prior assurances and thinking that SLCC was an exception, Marty contacted the University of Utah a few months later and inquired about enrolling in its Physician Assistant's master's degree program.   The University of Utah immediately informed Marty that credits from "for-profit schools" were not transferable.

119.   Marty finished Everest's program in August 2010, realizing that in order to achieve his ultimate goal of obtaining a Physician's Assistant master's degree, he

- 34 -

688211_1

1    would be forced to pay for and attend duplicative classes at a regionally accredited

2    institution.  Marty graduated from Everest with over $40,000 in loans disbursed on his

3    behalf to Everest.

4        120.  **Christie Cotton.**  Christie Cotton ("Cotton") is a former Everest

5    University student who is a named plaintiff in the *Miller* action.  After seeing an

6    advertisement, Cotton visited an Everest campus.  The admissions representative

7    advised her that because she was pregnant and had two children she would likely

8    qualify for financial aid.  She was told that even if the associate's degree earned at

9    Everest did not transfer as a whole, the majority of the general credits would transfer

10   to all the local schools, including Weber State University, the University of Utah and

11   SLCC.

12       121.  Everest's admissions representative specifically told Cotton the credits

13   would transfer to SLCC, Weber State University and the University of Utah.

14       122.  At the financial aid department, Cotton filled out applications for loans,

15   grants and scholarships.  When she asked for clarification and specific information,

16   the representatives told her "not to worry about it" because her unique combination of

17   grants and scholarships would require her to pay back only $50 a month after

18   graduation.  After enrolling, Cotton waited to receive evidence that a grant or

19   scholarship had been applied to her tuition balance, and other paperwork setting forth

20   the terms of her tuition, payments and fees, and received nothing.  She later received a

21   bill from Sallie Mae indicating that it had dispersed over $30,000 in student loans to

22   Everest on her behalf.  After graduation, she learned she would be paying Sallie Mae

23   approximately $250 per month.

24       123.  In February 2010, Cotton decided to contact the University of Utah to

25   start the process of enrollment.  The school informed her that it would not accept

26   associate's degrees earned at Everest to fulfill any of its requirements or otherwise

27   give credit for classes taken at Everest.  Cotton later found out that the same was true

28

688211_1

1  for Weber State University and all other regionally accredited universities in the
2  region.

3       124.  **Shayler White.**  Shayler White was employed as an adjunct professor at
4  Everest College from January 2009 to December 2009 and as an admissions
5  representative from December 2009 to September 2010.  According to the sworn
6  Declaration of Shayler White, filed in the *Miller* action, admissions representatives
7  were trained by Everest to use questions designed to put down the prospective student,
8  making them feel hopeless, bad about their current situation and stuck at a dead end,
9  in order to make enrolling look like the best solution to the problem.  If an admissions
10 representative did not comply with these directions, they would be subject to
11 reprimand or termination.  Admissions representatives were trained to discuss a career
12 path with prospective students; however, these could be unrealistic.

13                    **DEFENDANTS' FALSE STATEMENTS**

14      125.  Throughout the Class Period, defendants made similar false statements
15 concerning: (1) Corinthian's enrollment and revenue growth; (2) Corinthian's
16 graduation and placement rates; (3) Corinthian's legal compliance; and (4)
17 Corinthian's admissions practices.  In order to minimize duplication, the false
18 statements are identified and grouped below by category.  Each category is followed
19 by allegations demonstrating why the statements are false or misleading.  Further
20 detail concerning the allegations based on information obtained from the CWs is set
21 out in ¶¶54-95.

22 **A.   Corinthian Student Enrollment and Revenue Growth**

23      **1.   False Statements**

24      126.  Defendants made numerous misleading statements concerning
25 Corinthian's growing enrollments and revenues and the reasons for that growth.  On
26 October 30, 2007, Corinthian issued a press release reporting its first quarter 2008
27 earnings.  The Company reported net income of $2.0 million or $0.05 diluted earnings

28

688211_1

per share and revenue of $247.5 million for the quarter ended September 30, 2007.  In the release, defendant Massimino stated:

> "Our company-wide initiatives to revitalize growth and improve service to students are beginning to produce results . . . . ***In particular, more effective advertisements, brand consolidation, and a shift toward national advertising helped generate positive growth over the past several months.  In the first quarter, new student growth increased 13%,*** and we expect growth of 8%-9% in fiscal 2008.  Over time, we believe that a higher student population will allow us to achieve greater economies of scale, improve facility utilization, and expand margins."

127.   On October 30, 2007, Corinthian held a conference call during which defendants emphasized the issue of strong start growth, stating:

[Massimino:]

We experienced ***strong start growth of 13% year-over-year*** which exceeded previous guidance. ***Our national advertising campaign which continues to generate record lead volume was a primary impetus for growth in the quarter.  In addition, we believe that our ongoing efforts to improve the caliber of management, standardize and upgrade key business processes and improve service to students are helping to revitalize growth.***

\*       \*       \*

[Waller:]

Following the strong fourth quarter ***start growth in the first quarter new student starts totaled 28,310, an increase of 13% compared with the first quarter of the prior year***. . . .  As we discussed last quarter, one of the main factors behind ***our recent start growth is the success of our new advertising campaign*** for the Everest brand.

- 37 -

128.   On January 29, 2008, Corinthian held a conference call to discuss its second quarter 2008 financial results.   Defendants Massimino, Waller and Ord participated in the call on behalf of the Company. Addressing growth rates, defendant Massimino stated:

> ***Revenue from continuing operations was $272.6 million in the Second Quarter, up 15.9% year-over-year.  The revenue increase was primarily driven by new student starts, which grew by 10% compared with the same quarter last year.***  Our Second Quarter results were at the high end of our previous guidance range for earnings per share and exceeded our guidance range for start growth and revenue.
>
> ***Our national advertising campaign continued to be the primary impetus for growth in the quarter. In addition, we believe that our ongoing efforts to improve the caliber of management, reduce employee turnover, standardize and upgrade key business processes and improve service to students are contributing to higher growth.***

129.   On February 4, 2008, the Company filed with the SEC its Quarterly Report on Form 10-Q for the second quarter 2008, which reported revenue of $272.6 million and was signed by Massimino and Ord.

130.   On April 30, 2008, Corinthian issued a press release reporting revenue of $281.5 million for the quarter ended March 31, 2008.  In the press release, defendant Massimino stated:

> "***In the third quarter we continued our positive growth trend, posting a 13.3% increase in new student starts*** . . . .  More effective marketing, coupled with higher employee retention, ***better service to students and continued operational improvements, has helped generate strong enrollment growth over the past four quarters***."

688211_1

131.   On April 30, 2008, Corinthian also held a conference call to discuss its reported financial results.  Defendants Massimino, Waller and Ord participated in the call.  During the call, defendant Massimino stated:

> *March was our 14th consecutive month of positive start growth, driven by more effective marketing, lower employee turnover, better service to students and other operational improvements*.

132.   On August 26, 2008, Corinthian issued a release in which defendant Massimino stated:

> "*For continuing operations, we generated new student growth of 13.0% in fiscal 2008* and began to improve operating margins.  In fiscal 2009, we believe higher enrollment will allow us to achieve greater economies of scale, improve facility utilization, and further expand margins."

133.   During an August 26, 2008 conference call with analysts and investors, Massimino noted Corinthian's strong student starts, revenue and student population growth, stating:

> *Revenue from continuing operations was $274 million in the fourth quarter, up 18.3%. The revenue increase was primarily driven by new student starts which grew by 11.5% in the fourth quarter compared with the same quarter last year, above our guidance range. The total student population at June 30, 2008 was 69,211 students, an increase of 12.8% over the prior year*.

134.   On November 5, 2008, Corinthian issued a press release reporting its 1Q09 revenue of $289.6 million for the quarter ended September 30, 2008.  In the release, Massimino represented:

> "*The first quarter marked our tenth consecutive quarter of start growth* in continuing operations, primarily driven by our on-going initiatives to improve marketing and operational effectiveness . . . . *Our*

- 39 -

1    ***end-of-quarter student population increased 11.3% over September 30***

2    ***last year***, and we believe continued growth will allow us to leverage

3    fixed expenses and increase operating margins over time."

4    135.   During the November 5, 2008 earnings conference call with analysts and

5    investors, defendant Massimino stated:

6          We were encouraged by our first quarter results which exceeded

7    our guidance range for start growth, were at the high end of our guidance

8    range for revenue . . . and hit the midpoint of our guidance range for

9    earnings per share.  ***Revenue was $289.6 million in the first quarter, up***

10    ***18.4%.  The increase was mainly driven by growth in our student***

11    ***population and new student starts.  At the end of the first quarter, our***

12    ***total student population was 74,265 students, an increase of 11.3%***

13    ***over September 30 of last year.  New student starts grew by 7.3% in the***

14    ***first quarter, compared with if same quarter last year***.

15    136.   On February 3, 2009, Corinthian issued a press release reporting revenue

16    of $318.3 million for the quarter ended December 31, 2008.  In the release, defendant

17    Massimino stated:

18          "Our strong second quarter reflects our continued focus on

19    fundamentals – hiring, developing and retaining the best employees,

20    growing enrollment, ***improving student outcomes***, strengthening

21    business processes, and increasing marketing effectiveness . . . .  ***We***

22    ***have reported increased start growth for eleven consecutive quarters,***

23    ***and the resulting rise in student population is leveraging fixed costs***."

24    137.   During the February 3, 2009 earnings conference call with analysts and

25    investors, Waller stated:

26          ***Our growth is primarily driven by new student starts, so I'll***

27    ***move now to our progress in the marketing area. For the 11th***

28    ***consecutive quarter we reported an increase in starts from continuing***

- 40 -

*operations*. In the second quarter, starts totaled 26,334, an increase of
16.2% compared with the second quarter of the prior year. As you recall,
our guidance for second quarter start growth was 10% to 12%.  All of
our US and Canadian continuing operations, both ground schools and
online, reported an increase in starts.

138.   On April 30, 2009, Corinthian issued a press release reporting its revenue
of $346.4 million for the quarter ended March 31, 2009.  In the release, defendant
Massimino represented the following:

"Our strong third quarter results reflect the continued progress of
our business initiatives as well as some favorable impact from the
recession . . . . ***We have now reported increased start growth for twelve
consecutive quarters, and the resulting rise in student population is
leveraging fixed costs***."

139.   On August 25, 2009, Corinthian issued a press release reporting revenue
of $353.5 million for the quarter ended June 30, 2009.

140.   During an August 25, 2009 earnings conference call with analysts and
investors, defendant Massimino stated:

Revenue for fiscal year 2009 totaled $1.31 billion, up 22% over
the $1.07 billion reported in the previous year. ***Our revenue growth was
mainly driven by an increase in student population. At the end of the
fourth quarter, our total student population was 86,088 students, an
increase of 24.4% over the same period last year***.

141.   On October 29, 2009, Corinthian issued a press release reporting revenue
of $388.5 million for the quarter ended September 30, 2009.

142.   On February 4, 2010, the Company filed with the SEC its Quarterly
Report on Form 10-Q for 2Q10, which reported revenue of $414.3 million.  The Form
10-Q was signed by defendants Waller and Ord.

- 41 -

143.   On May 4, 2010, Corinthian issued a press release reporting revenue of $478.3 million for the quarter ending March 31, 2010.  The revenue results were incorporated into Corinthian's May 4, 2010 Form 10-Q and signed by defendants Waller and Ord.

**2.   Reasons Why Defendants' Statements Concerning Student Enrollment and Revenue Growth Were False and Misleading**

144.   Defendants' statements concerning Corinthian's increasing student starts, enrollment, and revenues, together with the reasons for that growth, were misleading because defendants concealed the fact that the increases depended upon enrolling and retaining tens of thousands of unqualified, failing and non-attending students as active students, and churning through the tens of thousands of students who quickly dropped out.   Corinthian's growth and enrollment numbers were artificially inflated by defendants' recruitment of students who could not read, write, perform basic math and/or were kept enrolled as active students through manipulative grading practices even if they were failing their coursework for not attending classes.  The growing numbers were the result of Corinthian's compensation program which motivated admissions representatives to push through students who should not have been admitted and pressured teachers not to fail students even if the students were not earning passing grades or attending month.

145.   At the end of the Class Period, Corinthian terminated its ATB program for non-high school graduates due to the non-high school graduates' high dropout rates, placement difficulties and high default rates.  ¶¶4, 14, 199, 226, 229-230, 241. Those students had accounted for 21% of Corinthian's total student enrollment in 2008, 24% in 2009 and 14% in 2010, but dropped to a mere 4% in 2011 after new ATB enrollments stopped.  The termination of the ATB program resulted in a sharp reduction of Corinthian's enrollment and forecasted growth.  Ex. A.  The 66.5% associate's degree program dropout rate for fiscal 2008 enrollees meant that over 29,000 students dropped out in a school system that reported 69,000 students.

- 42 -

1  Corinthian's 40% loan default rate, far higher than other for-profit schools,
2  corroborates the singularly poor quality of its student base. *See* Chart at ¶240.

3  146.  According to CW1, there was a high dropout rate due to the low ability of
4  the students who enrolled, particularly in the first and second semesters, with many
5  students leaving in the first month.  CW1 estimated a dropout rate for the first
6  semester of as high as 70%.

7  147.  According to CW2, a large number of Everest campuses consistently
8  failed compliance audits due to students who should have been dropped for non-
9  attendance. ¶¶54-95.  This was an issue at approximately 25% of the schools audited
10  during CW2's employment and considered by the auditors to be a company-wide
11  problem.  CW2 similarly discovered a widespread problem with teachers giving
12  passing grades to students who were failing or simply missing too many classes.  The
13  attendance and grading problems were of sufficient magnitude that between 20% and
14  30% of Corinthian's campuses had consistently been rated "4" (poor) and "5" (very
15  poor) for the past three years, while another 60% had scores of "3" (satisfactory) and
16  "4" (poor).  Although "3s" and "4s" would represent passing the audit, they were still
17  considered poor performers.

18  148.  Many Corinthian employees told CW2 that they were annoyed with
19  Corinthian's refusal to get rid of failing students, and that teachers were encouraged to
20  give passing grades to failing students.  Teachers were concerned that they would lose
21  their jobs if too many students dropped out of their classes.

22  149.  Massimino admitted to CW2 that he was aware of a problem at
23  Corinthian involving maintaining students on enrollment who should not have been
24  kept.

25  150.  CW2 described the Everest campuses as "leaky buckets," with most
26  students dropping out quickly, so that Corinthian was required to aggressively recruit
27  new students while paying little attention to the students' capabilities.

28

688211_1

151.   CW3 confirmed that approximately 50% of the students dropped out in the first six months, with 25% of the remaining students dropping out before completing their programs.

152.   According to CW4, many students were unable to construct simple sentences, spell or understand basic math.  Students were able to get around failing classes because instructors were willing to change an "F" to a passing grade in return for completing extra credit work, regardless of the accuracy of the work product. ¶86. Prospective students who failed the admissions test would sometimes have their grades changed to pass so they could enroll.  Corinthian put great pressure on making the numbers, even though it was obvious that most would not graduate, while those that did would have great difficulty finding a company to hire them.

153.   According to CW5, many students had no math knowledge at all or did not know how to write a basic sentence.  Even when students had earned an "F", it was not uncommon for the instructors to give them a "D-" or "D" to pass them and keep them enrolled in the program.  ¶¶88-89.

154.   According to CW6, about 30% of the new students dropped out in less that three to four months, due in part to students with limited communication skills who had barely gotten through high school.  ¶91.

**B.     Corinthian's Graduation and Placement Rates**

**1.     False Statements**

155.   Defendants made numerous misleading statements concerning Corinthian's graduation and placement rates.  On January 29, 2008, Corinthian held a conference call to discuss its second quarter 2008 financial results.  Defendants Massimino, Waller and Ord participated in the call on behalf of the Company. Addressing graduation and placement rates, defendant Massimino stated:

> *[W]e're very proud of our graduation and placement rates, which generally exceed the standards set by our national accreditation*

688211_1

1    ***agencies.***  These agencies are recognized as reliable authorities by the

2    Federal Department of Education.

3    156.   On February 25, 2008, Massimino spoke at the Credit Suisse Group

4    Global Services Conference and emphasized students placed, stating:

5    Career placements for our Company is a very big deal.  ***Last year we***

6    ***placed 84% of the students who graduated.  That was over 38,000 jobs.***

7    ***So a huge number of our students complete***.  60 to 70% complete every

8    year, and we placed almost 38,000, or 84%, in jobs last year.

9    157.   On May 28, 2008, Corinthian held its 2008 Analysts Day.  During those

10    presentations, Massimino stated:

11    ***So I mentioned improving placement results.  We think this year***

12    ***we're going to place 85% of our students in jobs.***  That'll be an increase

13    again of 1% over what it was last year, a pretty remarkable achievement

14    when you think about our students, the markets that we're in and the

15    work environments that they're going into today.  It's a little tougher

16    market to get a job today than it was a year ago, given what's happening

17    with the economy.

18    158.   During the August 26, 2008 earnings conference call with analysts and

19    investors, Massimino discussed Corinthian's "most important measure" of success,

20    stating:

21    I want to emphasize all of our operational initiatives have essentially the

22    same goal: to help create an outstanding experience for students from

23    lead to graduation and beyond.  ***By the most important measure,***

24    ***graduate employment, we continue to help thousands of students reach***

25    ***their career goals.  More than 83% of our graduates were placed in***

26    ***careers during calendar 2007, the most current measurement period.***

27    159.   On August 29, 2008, the Company filed with the SEC its Annual Report

28    on Form 10-K for the fiscal year ended June 30, 2008.  The Form 10-K was signed by

- 45 -

1  defendants Massimino, Ord and Waller.   The Form 10-K contained signed

2  certifications by defendants Massimino and Ord confirming that the Form 10-K did

3  not contain any material misrepresentations and stated the following:

4      Most of our colleges in the United States accept non-high school

5      graduates who can demonstrate an ability to benefit ("ATB students")

6      from the program by passing certain tests which are required by the ED.

7      ***We believe that ATB students can successfully complete many of our***

8      ***diploma programs and our colleges have demonstrated success in***

9      ***graduating and placing these students over the years***.   As of June 30,

10      2008, ATB students accounted for approximately 21.5% of total

11      enrollments in our U.S. schools.

12      160.   During the April 30, 2009 earnings conference call with analysts and

13  investors, defendant Waller stated the following:

14      When we look at pricing in total, and that counts price increases, ***we are***

15      ***very, very cognizant of the total value proposition***.   This is central to the

16      way that we think, and the way that we act.   And over the last two to

17      three years, we have been increasing focus on that.   ***We have focused on***

18      ***what is the cost of education at Corinthian, what is the placement rate,***

19      ***what are the salaries when they are placed, what is the return on***

20      ***investment that they have?***   So that is the number one guider

21      strategically for us, the value proposition.

22      161.   During an August 25, 2009 conference call with analysts and investors,

23  Massimino stated:

24      Most importantly, we continued to help our students achieve their

25      career goals in the face of a difficult economic environment.   ***Our***

26      ***placement rate for the 2008 cohort was 78.1%, a solid performance***

27      ***given the weak labor market that exists today***.

28      162.   During that same August 25, 2009 conference call, Waller stated:

688211_1

Our fifth operational priority, execution, is about getting it right for students every day, every time. ***We can measure execution in many ways, but the most important measures are completion and career placement of graduates***. In fiscal 2009, retention improved slightly compared with the prior year. But as we've discussed previously, the recession is making placement more difficult and we're meeting that challenge head on.

***Our placement rate for the 2008 cohort of graduates was 78.1%, down from 83.7% the previous year***.

163. On February 23, 2010, defendants Waller and Ord participated in the Global Service Conference sponsored by Credit Suisse and Waller made the following statements:

Linked to that is placement. Clearly, if they are getting into jobs, if they are building their careers, there is more chance they're going to be building their loan repayment plan. ***And I do want to update you on where we are on placements. It is the same as we said on our earnings call, that last year we had about a 78% placement rate for the 2008 cohort***, which you have until six months into the following year, June 2009, it was.

**2. Reasons Why Defendants' Statements Concerning Graduation and Placement Rates Were False and Misleading**

164. Defendants' statements concerning the placement and graduation rates of its students were false and misleading because defendants' concealed the fact that a majority of Corinthian students were quickly dropping out. Defendants' touted Corinthian's high graduation and job placement rates, but failed to disclose that the vast bulk of Corinthian's students never graduated and never benefitted from having enrolled.

688211_1

165.   Defendants repeatedly reported that as many as 85% of its students found jobs relating to their program.[12]  If 66% didn't graduate, however, only 29% of its students ended up with jobs.  A 29% placement rate is far different from an 85% placement rate, and it was misleading to disclose one without disclosing the other.

166.   The 66.5% dropout rate for students who enrolled in the associate's degree program during fiscal 2008, parallels the drop-out rates independently observed by various CWs.  According to CW1, many students were incapable of passing classes and as a result, there was a high incidence of students dropping out in the first and second semesters, with as many as 70% dropping out in the first semester and many students leaving after the first month.  ¶54.

167.   According to CW2, Massimino admitted to CW2 that he was aware of a historical problem at Corinthian involving maintaining students on enrollment who should not have been kept.  In addition, compliance audits of Corinthian's Everest campuses uncovered widespread problems and compliance audit failures as the result of non-attending and failing students due to a practice of admitting unqualified applicants and retaining failing and non-attending students.

168.   According to CW3, approximately 50% of Corinthian's students dropped out in the first six months, with another 25% dropping out before graduating.  ¶80.  According to CW6, about 30% of the new students dropped out in less that three to four months, due, in part, to students with limited communication skills who had barely gotten through high school.  ¶91.

169.   According to CW4, Corinthian's graduate placement rates were themselves misleading because Corinthian included jobs that were not meaningfully related to the graduating student's program.  For example, a student who delivered

---

[12]   Corinthian's placement figures sometimes referred to "graduates" and other times simply referred to "students."

688211_1

1  flowers for a pharmacy or a janitor in a dental clinic could be categorized as a medical
2  technician just because the job happened to be in a pharmacy or medical office.

3      170.   The misleading nature of these statements is further corroborated by the
4  post-Class Period disclosures that approximately 66.5% of associate's degree program
5  enrollees dropped out after a median period of 4.1 months, with approximately 40% of
6  Corinthian's students defaulting on their loans, due to the inability to graduate or
7  obtain meaningful employment.  ¶¶2-4, 227, 240.

8  **C.      Corinthian's Regulatory and Ethics Compliance**

9      **1.      False Statements**

10     171.   Defendants also made numerous false statements misrepresenting
11 Corinthian's compliance with regulations governing access to federal education funds.
12 During an October 30, 2007 conference call, defendant Massimino addressed
13 compliance issues stating:

14         I'll start with the investigation by the Office of the Inspector General of
15         the Department of Education.  Before discussing the particulars of the
16         investigation, we want to reemphasize that ***we are ex[c]ited to be[] in***
17         ***full regulatory compliance.  As discussed on several past calls, our***
18         ***compliance, oversight measurements and monitoring systems are***
19         ***significantly stronger than they were three years ago***.  Among other
20         actions we've established a corporate level compliance committee which
21         meets monthly and involves the senior-most executives of the company
22         in a school-by-school compliance review process.  We increased the size
23         of our internal audit team and created a more effective auditing,
24         reporting and follow-up process.  We created an in-house department
25         dedicated to job placement verification.  ***We routinely evaluate and***
26         ***strengthen existing compliance policies and procedures.  In short,***
27         ***we've gone a long way towards weaving compliance into the fabric of***
28         ***the organization.***

172.   On January 29, 2008, Corinthian held a conference call to discuss its second quarter 2008 financial results.   Defendants Massimino, Waller and Ord participated in the call on behalf of the Company.   Addressing compliance, defendant Massimino stated:

> *We want to reemphasize that we are committed to being in full regulatory compliance.*

173.   On February 25, 2008, Massimino spoke at the Credit Suisse Group Global Services Conference.   Emphasizing compliance, Massimino noted:

> *Compliance for the organization really has been job one for us.   We really have made it part of our DNA.*   We have strengthen[ed] it throughout our organization.   It is a gating factor.   I have told you this before for incentive comp[ensation], not just for the Presidents in our schools, but for me as well and everyone between me and them.   If we don't achieve – if we don't have a compliant organization, incentive comp in our Company doesn't happen.

174.   On May 28, 2008, Corinthian held its 2008 Analysts Day during which various analysts toured Corinthian's facilities and defendants made presentations. During those presentations, defendant Massimino addressed the compliance issue reiterating that compliance was "a focal point" stating at core:

> *[C]ompliance is a very big issue for me . . . .   And believe me, if anybody understands regulation, I understand it.   And so we've made it a focal point of our program* and I'm going to talk in a minute a little bit more about how it works inside Corinthian.
>
> *      *      *
>
> So compliance, this has been a real hot issue for us.   A number of things have happened to the organization over the last three and a half years since I've been involved at this level.   What we did immediately

688211_1

1    was we made compliance an even bigger gating factor than the company

2    had previously made it for part of the incentive compensation program.

3         So from the school Presidents all the way up to me, if we don't

4    make the compliance threshold, I don't care how much money we make,

5    I don't care how many students we bring in the front door, I don't care

6    about anything else, we don't get an incentive comp check.  ***So***

7    ***compliance is a huge, all or nothing gating factor for the organization.***

8                            *        *        *

9    ***The good news about that is that the tone at the top of our organization***

10   ***is all about compliance.  And we move very quickly when we find those***

11   ***kinds of circumstances to resolve those issues and take affirmative***

12   ***action in the organization***.

13                           *        *        *

14   And compliance comes back to, I think, that regulatory environment, that

15   regulatory risk component.  We pay a lot of attention to it.  We have 20

16   auditors in the field today auditing our schools on a routine basis.

17        In addition to that, we shop each and every one of our schools at

18   least, what, twice a year Bill?  At least twice a year.  Lots of remedial

19   action comes out of that.  When our auditors are out there they're not just

20   auditing compliance, they're doing SOX audits at the same time for

21   Sarbanes-Oxley.   They're doing all of those pieces as part of our

22   regulatory compliance process.

23        175.   On August 26, 2008, Corinthian issued a press release reporting revenue

24   of $1.1 billion for the year ended June 30, 2008.  In the release, defendant Massimino

25   stated the following:

26        "Over the past three fiscal years, we have implemented several

27   company-wide initiatives to revitalize growth and improve service to

28   students . . . . ***These initiatives, which focus on employee retention and***

1   *development, marketing, regulatory compliance, and other key*
2   *operational processes, are producing tangible results*."

3   176.   On August 29, 2008, the Company filed with the SEC its Annual Report
4   on Form 10-K for the fiscal year ended June 30, 2008.  The Form 10-K was signed by
5   defendants Massimino, Ord and Waller.   The Form 10-K contained signed
6   certifications by defendants Massimino and Ord confirming that the Form 10-K did
7   not contain any material misrepresentations and stated the following:

8   We also employ various admissions supervisory and monitoring
9   programs . . . which help us ensure compliance with both government
10   regulations and our corporate policies.

11   *          *          *

12   As of June 30, 2008, *management believes the Company's institutions*
13   *were in compliance with the applicable regulations in all material*
14   *respects*.

15   177.   On August 26, 2009, the Company filed with the SEC its Annual Report
16   on Form 10-K for the year ended June 30, 2009 which was signed by defendants
17   Massimino, Ord and Waller.  The Form 10-K stated:

18   The [DOE] will certify an institution to participate in the Title IV
19   Programs only after the institution has demonstrated compliance with the
20   HEA and the [DOE]'s extensive regulations regarding institutional
21   eligibility.  An institution must also demonstrate its compliance to the
22   [DOE] on an ongoing basis.  As of June 30, 2009, management believes
23   the Company's institutions were in compliance with the applicable
24   regulations in all material respects.

25   178.   On September 22, 2009, defendants Waller and Ord participated in the
26   Bank of America Securities Smid Cap Conference.  Waller stated:

27   *So we have a compliance-wide company culture.   And we have*
28   *broad oversight with a dedicated compliance committee.*  We have a

- 52 -

1    dedicated placement verification team.  Ultimately, our value proposition

2    is on the placement area, so we want to make sure that we're really

3    delivering against that, and so we have checks and balances.

4         179.   Throughout the Class Period, defendants disseminated Corinthian's Code

5    of Business Conduct and Ethics (the "Code") on their internet page and specifically

6    referenced the Code in the Company's August 29, 2008 and August 26, 2009 SEC

7    Forms 10-K.  The Code contained false and misleading statements that were designed

8    to mislead investors.  The Code stated:

9                        CORINTHIAN COLLEGES, INC.

10                   Code of Business Conduct and Ethics

11    I.    Introduction

12         At Corinthian Colleges, Inc. ("Corinthian," or the "Company"),

13    our reputation for integrity is one of our most valuable assets.  ***We***

14    ***believe this reputation flows from our commitment to compliance with***

15    ***the law and to ethical conduct in all our dealings.  This commitment is***

16    ***embodied in David Moore's oft-repeated statement that "we have no***

17    ***tolerance for lying, cheating or stealing***." . . .

18         We recognize, however, that we live in a complex world and that

19    what's "right" may not always be obvious.  Accordingly, we have

20    developed Corinthian's Code of Business Conduct and Ethics (this

21    "Code") to provide practical overviews of some of the legal and ethical

22    standards we all must follow.  ***Both the Board of Directors and the***

23    ***Audit Committee of the Board have approved this Code, which applies***

24    ***to all employees of Corinthian Colleges, Inc. and its subsidiaries***.  It

25    also applies to members of the Board of Directors in their capacity as

26    directors (included in the term "employees" as used in this Code).  Every

27    employee is expected to know, understand, and comply with this Code,

28    which has been adopted to accomplish the following:

- 53 -

\*      \*      \*

- **promote compliance with applicable laws and governmental rules and regulations**, as well as the rules and regulations of accrediting agencies and self-regulatory organizations of which the Company is a member;

\*      \*      \*

II.      <u>Honest Conduct and Compliance with the Law</u>

Each employee of the Company is a representative of the Company, each having a responsibility in the pursuit of our Company goals and our commitment to quality.  As such, ***all employees' conduct should conform to the spirit and letter of the law in rendering service to our students and other customers. Employees are expected to conduct themselves in an ethical and honest manner, while ensuring compliance with all applicable laws, regulations*** and the Company's policies and values.

***It is the personal responsibility of each employee to know, understand, and adhere to the laws, regulations, and Company policies applicable to his or her job***.

**2.      Reasons Why Defendants' Statements Regarding Regulatory and Ethics Compliance Were False and Misleading**

180.      Defendants' statements concerning Corinthian's compliance with regulatory, ethics and accreditation requirements were misleading because Corinthian was failing to comply with legal requirements governing access to federal education funds, including requirements addressing admissions, attendance, academic progress and prohibiting recruiting misrepresentations.

181.      Defendants' statements were false in light of misleading recruiting claims, manipulated admissions practices, widespread alteration of failing grades, and

- 54 -

1  the retention of non-attending students, as set out above in further detail at ¶¶2-4, 6-

2  16, 36-44, 54-124.

3       182.   Corinthian was required to "appl[y] reasonable standards for measuring

4  whether an otherwise eligible student is maintaining satisfactory academic progress in

5  his or her educational program" including a "qualitative component which consists of

6  grades . . . work projects completed, or comparable factors that are measurable against

7  a norm." 34 C.F.R. §§668.16(e) and 668.16(e)(2)(i).  The systemic falsification of

8  passing grades, as confirmed by CWs 2, 4, 5, 7 and 8 and the continued enrollment of

9  students failing to satisfy Corinthian's attendance requirements, as confirmed by CWs

10  2, 5 and 8, made it impossible for Corinthian to measure student academic progress

11  and indeed concealed the fact that many students were failing and not even attending

12  class and were not making academic progress. ¶¶2-4, 54-77, 79-80, 86, 88-89, 91-92,

13  95.

14       183.   The HEA also prohibits an institution receiving Title IV funds from

15  "engag[ing] in substantial misrepresentation of the nature of its educational program,

16  its  financial  charges,  or  the  employability  of  its  graduates."    20  U.S.C.

17  §1094(c)(3)(A); 34 C.F.R. §668.71(b).  Defendants and other Corinthian employees,

18  however,  made  numerous  statements  that  mislead  students  with  respect  to

19  Corinthian's programs.

20       184.   Recruiters made irresponsible assurances of high incomes upon

21  graduation.  Corinthian also provided misleading placement numbers by including

22  placements that were not meaningfully related to the field of study.  Corinthian

23  recruited students that lacked basic writing or math skills for programs that would

24  require such skills in order to be hired.

25       185.   Defendants' positive statements concerning a Corinthian education

26  concealed the fact that its students had extremely high dropout and default rates,

27  including but not limited to a 66% dropout rate for associate program students, and

28

- 55 -

that many withdrew after a median period of only 4.1 months.  ¶¶2-4, 6, 15, 145, 165-166, 170.

**D.    Corinthian's Admissions Practices**

    **1.    False Statements**

186.  Defendants also misrepresented Corinthian's admissions.  On August 29, 2008, the Company filed with the SEC its Annual Report on Form 10-K for the fiscal year ended June 30, 2008.  The Form 10-K was signed by defendants Massimino, Ord and Waller.  The Form 10-K contained signed certifications by defendants Massimino and Ord confirming that the Form 10-K did not contain any material misrepresentations and stated the following:

> ***One of our objectives in the admissions process is to identify students who have the ability to succeed in our schools.  The majority of prospective students must pass a standardized admissions test***.  Most of our colleges in the United States accept non-high school graduates who can demonstrate an ability to benefit ("ATB students") from the program by passing certain tests which are required by the ED. . . .  As of June 30, 2008, ATB students accounted for approximately 21.5% of total enrollments in our U.S. schools.

187.  On August 26, 2009, the Company filed with the SEC its Annual Report on Form 10-K for the year ended June 30, 2009 which was signed by defendants Massimino, Ord and Waller.  The Form 10-K contained certifications signed by defendants Waller and Ord stating that the Form 10-K did not contain any material misrepresentations.  The Form 10-K stated:

> ***One of our objectives in the admissions process is to identify students who have the ability to succeed in our schools.  The majority of prospective students must pass a standardized admissions test.  Most of our colleges in the United States accept non-high school graduates who can demonstrate an ability to benefit ("ATB students") from the***

- 56 -

*program by passing certain tests which are required by the ED. We believe that ATB students can successfully complete many of our diploma programs and our colleges have demonstrated success in graduating and placing these students over the years.*  As of June 30, 2009, ATB students accounted for approximately 23.8% of total enrollments in our U.S. schools.

188.   On September 22, 2009, defendants Waller and Ord participated in the Bank of America Securities Smid Cap Conference.  Waller stated:

> *We, certainly, from a Corinthian point of view, feel strongly about monitoring entrance testing. And we have also the checks and balances and mechanisms with third-party agencies to make sure that happens.*

189.   During the October 29, 2009 earnings conference call, defendant Waller stated:

> *In light of the report and the hearing we want to reiterate that we have had and continue to have policies and procedures in place to ensure that the Federal ATB and high school diploma requirements are followed and are processed for monitoring compliance. We have a zero tolerance policy toward employees who do not follow the rules.*

> *   *   *

> *First of all, from setting them up for success we do have CPAT entrance testing across the Company so that that [sic] we're helping understand and helping the students understand whether they're going to be successful[] academically and meet certain standards.* . . .  So academically and financial wherewithal up front is important.

190.   During a May 4, 2010 conference call with analysts and investors, defendant Waller stated the following:

688211_1

*[L]et me just remind you what we do at the front end in terms of the potential for what we might call a filter at the front end. We do have a entrance qualification test*, a CPAT test across all of our campuses and in the last part of our business we actually also do a placement test on math and writing, *so we're trying to insure that from a capability for the students that they have the where with all to complete whatever education they might have been involved in whether it was in high school or whether they've come out of a community college*.

**2. Reasons Why Defendants' Statements Concerning Corinthian's Admissions Practices Were False and Misleading**

191.    Defendants' assurances that Corinthian followed effective admissions practices in order to ensure that it only enrolled qualified students were grossly misleading.  Directly contrary to assurances that Corinthian's admissions processes were designed to identify students with an ability to succeed in their schools and that Corinthian had demonstrated success in graduating and placing ATB students, and that defendants felt "strongly about monitoring entrance testing," the truth was the exact opposite, as demonstrated by the abysmal default and dropout rates due to a practice of enrolling anyone possible in order to gain access to additional financial education funds.

192.    Corinthian's high dropout rate resulted in a downward spiral where the numerous withdrawals led to management pressure to obtain high levels of new starts. Unfortunately, the only way to obtain sufficient the new starts was to lower admissions standards, which only continued to feed the high withdrawal and default rates.  The pressure on staff to meet recruiting numbers created an environment where incapable prospects were enrolled, irresponsible assurances of high income were made and almost anything was done to keep an influx of new recruits coming in.  ¶¶5-12, 36-44, 54-55, 65, 69, 72, 74, 81-87, 90, 92-94, 96-106, 112-113, 120-121, 124.

688211_1

193.   CW2, who visited and spoke with staff at some 18 Everest campuses and reviewed compliance audit reports school-wide concluded that Corinthian suffered from a practice of enrolling "any warm body they could find."  The admissions tests required applicants to perform meaningless tasks such as identifying a cat.  When CW2 asked Corinthian's executives whether an applicant had ever not been admitted, they merely indicated that it was possible, but they were did not know.

194.   According to CW2, compliance audits of Corinthian's Everest campuses uncovered widespread problems and compliance audit failures as the result of non-attending and failing students due to a practice of admitting unqualified applicants.  ¶¶56-77.

195.   According to CW4, many students were unable to construct sentences, spell or understand basic math.

196.   According to CW5, many students had no math knowledge at all or did not know how to write a basic sentence.  If a student had an "F," it was not uncommon for the instructors to give them a "D-" or "D" to pass them and keep them enrolled in the program.  ¶¶88-89.

197.   According to CW6, about 30% of the new students dropped out in less than three to four months, due in part to students with limited communication skills who had barely gotten through high school.  ¶91.

198.   In approximately mid-2010, the entity administering the entrance exams discovered that the enrollment representatives at a Florida Everest campus were providing applicants with answer keys so that they could pass the entrance exam and the recruiters could meet their recruitment goals.  An Arizona campus was engaged in the same manipulative admissions conduct., which prompted the test company to terminate its contract with Corinthian.  ¶¶92-93.

199.   Corinthian eventually was forced to tighten its entry requirements and abandon its ATB program, explaining that it would phase ATBs out because "ATB

688211_1

students drop out at a higher rate, are more challenging to assist with career placement, and default on their loans at a higher rate than high school graduates."

## SCIENTER

200.   The Individual Defendants knew that their false and misleading statements and public documents were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.   By virtue of their receipt of information reflecting the true facts regarding Corinthian, their control over Corinthian's materially misleading misstatements and access to confidential proprietary information concerning Corinthian, participated in the fraudulent scheme alleged herein.   Corinthian and the Individual Defendants were aware of the widespread problems as a result of information provided to them concerning drop-out rates, default rates and non-compliance.

201.   More specifically, Massimino, Waller and other senior executives had been advised by CW2 of the extensive and widespread problems at Corinthian's Everest campuses concerning unqualified, non-attending and failing students, including the falsification of passing grades, as set out in ¶¶56-77.

202.   Those executives were also on notice of Corinthian's past problems with deceptive recruiting practices, unqualified and failing students as the result of prior litigation and government investigations.

203.   In addition to the foregoing, the Individual Defendants were privy to confidential and proprietary information concerning Corinthian, its operations, finances, financial condition, and present and future business prospects.   The Individual Defendants also had access to material adverse non-public information concerning Corinthian, as discussed in detail below, and participated in weekly Monday Executive Meetings to review Corinthian's business operations.  Because of

- 60 -

their positions with Corinthian, the Individual Defendants had access to non-public information about its business, finances, enrollment, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or were severely reckless in disregarding that adverse facts specified herein had not been disclosed to, and were being concealed from (in order to mislead), the investing public.

204.   Indeed, during the course of the Class Period, the defendants admitted that they employed management practices which would have brought the concealed problems to their attention.  During the May 28, 2008, Analysts Day presentations, the following statements were made:

[Massimino:]

In addition to that, we shop each and every one of our schools at least, what, twice a year Bill?  At least twice a year.  Lots of remedial action comes out of that.  When our auditors are out there they're not just auditing compliance, they're doing SOX audits at the same time for Sarbanes-Oxley.   They're doing all of those pieces as part of our regulatory compliance process.

*     *     *

[Waller:]

Everywhere we have our performance standards.  And then those performance standards are tracked, some of the things I just alluded to, and then as I say, we rack and stack on the score cards.  And frankly, celebrate our progress.  I mean that's what the point of racking and stacking is, to celebrate the progress and to ensure that we can recognize

688211_1

those who need recognition or should have recognition and then coach those who clearly need some help.

205.   Similarly, Corinthian's August 29, 2008 Annual Report on Form 10-K stated:

Our senior management team monitors operating performance and profitability of each college and has established ***periodic communication with the college presidents to review key performance indicators such as lead flow, starts, student population, retention, placement, compliance*** and other operating results to determine the proper course of action.

\*      \*      \*

We proactively manage our students' repayment obligations and have engaged a professional default management firm to assist us in managing the Cohort Default Rates at our U.S. institutions.  We believe that professional default management services can continue to assist us in managing these Cohort Default Rates.

206.   Throughout the Class Period, the Individual Defendants were able to, and did, control the contents of the Company's SEC filings, reports, press releases, and other public statements.  The Individual Defendants were provided with copies of, reviewed and approved, and/or signed such filings, reports, releases, and other statements prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.

207.   The Individual Defendants were further motivated to commit fraud as a result of the Company's executive compensation structure.  During the Class Period, the majority of the Individual Defendants' compensation was variable and tied to the Company's short-term financial performance.  Most notably, Corinthian's executives were motivated by annual bonuses dependent on the Company hitting targets.

688211_1

1    **208.**  As established herein, Corinthian's student enrollment figures and

2  reported graduate employment rates were artificially and ultimately manipulated

3  throughout the Class Period so that, among other things, the Company could hit these

4  targets.   Indeed, by fraudulently inflating the Company's enrollment, graduate

5  employment rates, and, ultimately, its financial performance, the Individual

6  Defendants were able to greatly increase their compensation during the Class Period,

7  as set forth in the chart below:

**Massimino:**

| Year | Base Salary | Annual Bonus Dependent on Company Performance | Bonus as % of Base Salary |
|------|-------------|----------------------------------------------|---------------------------|
| 2008 | $800,000 | $1,119,333 | 140% |
| 2009 | $832,000 | $1,913,600 | 230% |
| 2010 | $832,000 | $1,913,600 | 230% |

**Waller:**

| Year | Base Salary | Annual Bonus Dependent on Company Performance | Bonus as % of Base Salary |
|------|-------------|----------------------------------------------|---------------------------|
| 2008 | $475,000 | $577,917 | 122% |
| 2009 | $494,000 | $988,000 | 200% |
| 2010 | $650,000 | $1,495,000 | 230% |

**Ord:**

| Year | Base Salary | Annual Bonus Dependent on Company Performance | Bonus as % of Base Salary |
|------|-------------|----------------------------------------------|---------------------------|
| 2008 | $425,000 | $387,813 | 91% |
| 2009 | $442,000 | $663,000 | 150% |
| 2010 | $442,000 | $663,000 | 150% |

- 63 -

**Ouimet:**

| Year | Base Salary | Annual Bonus Dependent on Company Performance | Bonus as % of Base Salary |
|------|-------------|-----------------------------------------------|---------------------------|
| 2009 | $197,308 | $337,500 | 171% |
| 2010 | $450,000 | $900,000 | 200% |

## LOSS CAUSATION/ECONOMIC LOSS

209.   During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the value of Corinthian's publicly traded securities throughout the Class Period. Defendants' creation and implementation of a systemically predatory business model operated as a fraud or deceit on Class Period purchasers of Corinthian's publicly traded securities by misrepresenting the Company's financials and future business prospects, including, but not limited to, misrepresenting and making misleading statements concerning the strength and source of the Company's revenues, the volume of student enrollments in Corinthian's degree programs, the employment statistics for graduates, and the ability of the Company to meet its financial projections.

210.   Defendants' false and misleading statements had their intended effect and directly and proximately caused, or were a substantial contributing cause of Corinthian's publicly traded securities trading at artificially inflated levels, reaching a Class Period high of $21.47 per share on February 9, 2009.

211.   As a result of defendants' fraudulent conduct as alleged herein, the prices at which Corinthian's publicly traded securities traded were artificially inflated, at varying levels, throughout the Class Period.  When plaintiffs and other members of the Class purchased their Corinthian's publicly traded securities, the true value of such publicly traded securities was substantially lower than the prices actually paid by plaintiffs and the other members of the Class.

688211_1

212.   By misrepresenting the success of the Company's business and concealing its improprieties, defendants presented a misleading picture of Corinthian's financial condition and future business prospects.  For example, defendants' consistent statements that the Company was achieving strong and ever-increasing enrollment results, caused and maintained the artificial inflation in the price of Corinthian's publicly traded securities throughout the Class Period – even as negative news reached the market – until the truth was finally and fully revealed at the close of the Class Period.

213.   Defendants' false statements directly or proximately caused, or were a substantial contributing cause of, the damages and economic loss suffered by plaintiffs and other members of the Class, and maintained the artificial inflation in the prices of Corinthian's publicly traded securities throughout the Class Period until the truth leaked out and was partially revealed to the market, at which time the prior inflation came out of the securities.  Defendants' false and misleading statements had the intended effect and directly and proximately caused, or were a substantial contributing cause, of Corinthian's publicly traded securities trading at artificially inflated levels throughout the Class Period.

214.   A chart illustrating Corinthian's reactions to the various adverse disclosures is attached hereto as Exhibit 2.  On February 2, 2010, Corinthian issued a press release reporting revenue of $414.3 million for the quarter ended December 31, 2009, however, during a conference call with market analysts that same day, the Company expressed concern over the potential effects of proposed government regulations on financial aid resources, specifically aimed to protect students from taking on debt that they would not be able to repay.  That day, the price per share of Corinthian stock fell nearly 3%, on high trading volume, to close at $13.95.

215.   On May 27, 2010, Corinthian's stock price fell 3% on heavy volume following news that the DOE was expected to issue new regulations to "protect students from enrolling in costly programs whose graduates end up with dead-end

688211_1

1    jobs," unable to repay their loans.  Corinthian's stock continued its decline from May

2    through June 2010 following additional disclosures of Senate hearings and tightened

3    regulations.

4         216.   On June 10, 2010, Senator Harkin, chairman of the HELP Committee,

5    announced that he would be holding a series of hearings to examine federal spending

6    at for-profit colleges.  The press release provided in pertinent part:

7              Senator Tom Harkin (D-IA), Chairman of the Health, Education,

8         Labor and Pensions (HELP) Committee, today announced that he plans

9         to hold a series of hearings to examine federal education spending at for-

10        profit higher education institutions.  The hearings will begin June 24th.

11             "In the past two years we have made major new investments to

12        expand federal financial aid," said Harkin.  "Pell Grants and student

13        loans now provide more than $20 billion to for-profit higher education

14        companies every year.  We need to ensure for-profit colleges are

15        working well to meet the needs of students . . . . We owe it to students

16        and taxpayers to make sure these dollars are being well spent."

17             Between 1998 and 2008 the for-profit sector has grown from

18        550,000 students to 1.8 million, a 225 percent increase.  Students at for-

19        profit institutions are borrowing more, and more frequently, than their

20        peers at non-profit schools, and according to the Department of

21        Education, one in five students who left a for-profit college in 2007

22        defaulted on their loan within three years.

23             The Committee will examine a broad range of issues related to the

24        growing role of the for-profit higher education sector, including the

25        scope and rapid growth of the federal investment in for-profit higher

26        education and the corresponding opportunities and risks for students and

27        taxpayers.  Details on the first hearing will be available in the coming

28        weeks.

688211_1

217.   On June 16, 2010, the DOE announced that it was proposing new tougher regulations on the industry designed to protect college students and taxpayers from abusive or fraudulent practices. On this news, Corinthian's stock price fell 5% to close at $11.38 on June 17, 2010.

218.   On June 24, 2010, the Senate held the first of its hearings entitled "Emerging Risk? An Overview of the Federal Investment in For-Profit Education." In response, Corinthian's stock price fell 5% to close at $10.25 on June 25, 2010.

219.   By the end of June, Corinthian stock was trading at less than $10 per share, closing at $9.85 per share on June 30, 2010.

220.   On August 3, 2010, additional adverse news began to leak into the market concerning the findings from an undercover operation conducted by the U.S. Government Accountability Office ("GAO") on recruiting techniques used in the for-profit higher education industry.

221.   On August 3, 2010, Corinthian stock closed down $0.51 per share or 6% on high volume to close at $8.74 per share on August 3, 2010.  As news continued to come out concerning details of the government's investigation and the anticipated repercussions from the investigation on Corinthian's business and prospects, Corinthian stock continued to decline.

222.   On August 4, 2010, the GAO issued its report detailing its findings.  At the request of Congress, the GAO undertook its investigation to determine if for-profit colleges engaged in fraudulent, deceptive or otherwise questionable marketing practices.  The GAO's report cited many instances of abuse in the sector, finding that many of the companies in the industry employed fraudulent and deceptive practices in their student recruitment, targeting students who used federal financial aid to pay for their schooling.   The study was presented at a Senate education hearing held on August 4, 2010 as part of its ongoing inquiry into the for-profit sector.  This was the second of the Senate's hearings on the industry.  It was entitled "For Profit Schools: The Student Recruitment Experience."

223.   On August 13, 2010, after the market closed, the DOE released data which showed student-loan repayment rates at the nation's colleges and universities. Repayment rates at Corinthian's schools were startlingly low, with some of the Company's schools approximately one-third the rate of private non-profit institutions.

224.   In addition, the DOE proposed new regulations for programs to continue to be eligible to receive federal financial aid.  The tests for eligibility would be based on repayment rates and debt-to-income loads.  The revised regulations are scheduled to go into effect in July 2012.  Based on the proposed regulations, many of Corinthian's programs would be in jeopardy of losing their financial aid status.

225.   On August 16, 2010, Corinthian's stock price dropped another 22%, from $6.66 to $5.22, after the DOE released data on student loan repayment rates, including data showing some Corinthian schools with repayment rates less than 20%, and proposed new institutional eligibility rules for federal financial aid.

226.   Then, on August 20, 2010, Corinthian issued a press release admitting that (already high) student loan defaults were "trend[ing] substantially higher" for the 2009 cohort in comparison with the 2008 cohort and that the number of campuses exceeding the DOE's 25% default rate was also expected to be substantially higher. Corinthian also announced that in an effort to reduce defaults, it would phase out the enrollment of students who had not graduated from high school, commonly referred to as ATB students.  The termination of the ATB students would have a substantial negative impact on Corinthian's business because non-high school graduates had represented 24% of Corinthian's students as recently as 2009.  In the press release defendant Waller further provided in part:

> "We are investing in areas which help improve student outcomes, reduce risk and ensure regulatory compliance now and in the future.  For example, we . . . are in the process of reducing the risk profile of our student population."

- 68 -

688211_1

1   On this news, Corinthian's stock dropped another 17%, falling $0.91 per share to

2   $4.49.

3        227.   After the Class Period, the DOE confirmed a sharp increase in

4   Corinthian's default rate, including an astounding 40% default rate for Corinthian's

5   2008 three-year cohort.  The 40% default rate for the 2008 cohort actually understated

6   Corinthian's problems given Corinthian's August 20, 2010 admission that the 2009

7   cohort default rate was expected to be "substantially higher" than the 2008 default

8   rate.  Corinthian's default rates confirm, moreover, that Corinthian was not simply

9   caught up in an economic downturn, but the Company was, by a substantial margin,

10  the worst of a number of similar offenders.

11       228.   The timing and magnitude of the decline in Corinthian's publicly traded

12  securities negates any inference that the loss suffered by plaintiffs and other Class

13  members were caused by changed market conditions, macroeconomic factors or

14  Company-specific facts unrelated to defendants' fraudulent conduct.  As a result of

15  their purchases of Corinthian's publicly traded securities during the Class Period,

16  plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under

17  the federal securities laws when the above-described revelations reached the market

18  and the artificial inflation was removed.

19       229.   Analyst reports issued during 2010 confirmed the negative impact and

20  the market's reaction to the disclosures of increased regulatory scrutiny, forcing

21  Corinthian to tighten its admission policies, terminate its ATB student program due to

22  unqualified students and sharply reduce enrollments in order to reduce dropout and

23  loan default rates.

24       230.   On February 3, 2010, Deutsche Bank also issued a report stating that:

25       ***[D]ue to Corinthian's 24% exposure to Ability-to-Benefit students, any***

26       ***government crackdown or perceived crackdown on ATB students will***

27       ***be negative for Corinthian*** . . . further deterioration of the credit quality

28       of students being funded by Corinthian's balance sheet or the need to

- 69 -

1   increase internal funding levels for any reason . . . negative
2   developments regarding access to Title IV funds due to adverse rulings
3   regarding state or Federal accreditation, the 90/10 rule, or investigations
4   by the OIG.

5   231.   On February 4, 2010, RBC Capital issued a report stating that:

6        We remain concerned about COCO's 2008 CDR levels. The
7   company expects that between 10 and 17 institutions of the ~40 which it
8   operates will have CDR levels in excess of 25% when draft numbers are
9   released by the DOE next week. COCO is responding to rising CDR
10   levels by capping enrollment at 10 schools where student loan
11   performance has been poor. This is likely to further moderate new
12   student enrollment growth.

13                                *    *    *

14   Concerns about slowing enrollment growth, comparatively low margins,
15   high CDR levels and weak student outcomes lead us to believe that
16   multiple expansion will be muted even if COCO succeeds in raising its
17   operating margins to ~15%.

18   232.   On May 4, 2010, Morgan Stanley issued a report stating that:

19        COCO's focus on low quality students and its decentralized
20   operations make it more exposed to regulatory problems than its peers.

21   233.   On May 6, 2010, RBC Capital Report also issued a report stating that:

22        Regulatory Pressures, High CDR Levels & Slowing Enrollment
23   Growth Overwhelm Strategic Initiatives

24   234.   On May 25, 2010, Argus Report issued a report stating that:

25        The relative weakness in the past month can be attributed to
26   concerns over future regulatory action.

27   235.   On August 16, 2010, Deutsche Bank also issued a report stating that:

28

- 70 -

COCO's repayment rates came in lower than feared, as did the Missouri wage data for the industry. This new data combined with COCO's high and rising CDRs makes the next few years challenging for the company. While this should already be priced into the stock, we have been very surprised at what is not priced into the education stocks. ***We have significantly cut our EPS ests. based on our belief that COCO will need to raise admission criteria,*** temporarily hurting earnings. Our price target declines from $24 to $7.

\* \* \*

***For Profits have to reassess the value of enrolling students with multiple risk factors . . . .  Admission criteria will rise and access will drop. Corinthian is on the bleeding edge of this forthcoming industry change due to its student profile.***

\* \* \*

[W]ith the DoE's data release on Friday, basically enrolling students with risk factors has gotten much more dangerous. We believe Corinthian will have to raise admission criteria as it is too risky to continue with their current strategy.  Gainful Employment is going to cut much more access than we expected, and ***Corinthian will be one of the most negatively impacted schools from this new DoE/Administration policy.***

236.   On August 20, 2010, Morgan Stanley issued a report stating that:

COCO's Q4 press release noted that its cumulative default rates have trended higher in 2009, and a "substantially higher" number of OPEIDs will exceed the DOE's 25% threshold (up from 9 in 2008). Additionally, the Higher Learning Commission has recommended the withdrawal of Everest College Phoenix's accreditation, posing a serious risk to the company. COCO is the most inexpensive stock in our

- 71 -

education coverage, as *the market is pricing in many challenges facing the company – high cohort default rates, slowing demand, and high GE exposure*.  The [DOE] data release last Friday was not a help, as COCO's repayment rate of 24% on a consolidated basis was the lowest of the for-profits under our coverage.

237.   On August 20, 2010, Deutsche Bank issued a report stating that:

Three comments will capture investors attention today: 1) the potential loss of accreditation at the Everest College Phoenix campus (5% of students), 2) a majority of COCO's OPE IDs will have 3-yr cohort default rates (CDRs) above 30% in 2009 and the possible loss of Title IV eligibility at 3 locations, and 3) comments that mgmt is "unable to gauge the full impact of [Gainful Employment] on our students and the company."

**POST CLASS PERIOD EVENTS**

238.   Following the close of the Class Period, additional events reached the market and further demonstrated not only the falsity of defendants' Class Period statements, but also the extent to which Corinthian's financial performance and future business prospects depended upon defendants' ability to defraud both Corinthian students and investors by continuing to implement Corinthian's systemically predatory business model.

239.   For example, on September 30, 2010, the HELP Committee held a third hearing focusing on whether for-profit colleges were benefitting their students.  As part of the hearing, and based in part on the documents produced by Corinthian and other for-profit education companies to Chairman Harkin, the HELP Committee

688211_1

1   released a report titled "The Return of the Federal Investment in For-Profit Education:

2   Debt without a Diploma."[13]

3        240.   On April 4, 2011, the DOE reported three-year cohort default rates for

4   various for-profit education companies, including an astounding 40% default rate for

5   Corinthian.  In other words, two out of five students at Corinthian campuses would

6   default on their loans within three years of leaving school.  An analyst reported that

7   none of the 49 Corinthian campuses had a default rate below 20%.  The table set out

8   below (prepared by Education Sector), summarized the DOE data:

**Two- and Three-Year Cohort Default Rates of Publicly Traded Companies, CY2005-08**

| Company | 2005 2 Year | 2005 3 Year | 2006 2 Year | 2006 3 Year | 2007 2 Year | 2007 3 Year | 2008 2 Year | 2008 3 Year |
|---|---|---|---|---|---|---|---|---|
| American Public Ed. | | | | | 0% | 3% | 5% | 11% |
| Apollo Group | 7% | 12% | 11% | 15% | 11% | 18% | 14% | 24% |
| Bridgepoint Ed. | 4% | 9% | 4% | 6% | 13% | 17% | 13% | 22% |
| Capella Education Co. | 2% | 4% | 2% | 4% | 3% | 6% | 3% | 8% |
| Career Education Corp. | 12% | 22% | 9% | 18% | 10% | 20% | 11% | 25% |
| Corinthian Colleges | 11% | 24% | 14% | 28% | 16% | 30% | 20% | 40% |
| DeVry | 8% | 13% | 7% | 13% | 9% | 16% | 10% | 20% |
| Education Management Corp. | 5% | 12% | 7% | 11% | 9% | 15% | 7% | 18% |
| Grand Canyon | 2% | 3% | 2% | 3% | 1% | 3% | 4% | 8% |
| ITT Educational Services | 9% | 21% | 10% | 20% | 12% | 24% | 12% | 29% |
| Kaplan Higher Education | 9% | 19% | 14% | 23% | 19% | 28% | 18% | 30% |
| Lincoln Ed. Services | 9% | 21% | 11% | 24% | 13% | 25% | 15% | 31% |
| Strayer | 4% | 9% | 4% | 11% | 6% | 13% | 7% | 14% |
| Unviersal Technical Institute | 5% | 14% | 7% | 16% | 7% | 14% | 5% | 15% |

Source: Education Sector analysis of U.S. Department of Education data.

---

[13]   Materials from the September 30, 2010 HELP Committee hearing can be found online  at:  http://help.senate.gov/hearings/hearing/?id=3e235bb6-5056-9502-5df5-5d5b0f000e01 (last visited May 5, 2011).  A copy of the report is also available online at: http://help.senate.gov/imo/media/doc/Education%20Report.pdf.

- 73 -

241.   Consistent with analyst expectations, as Corinthian has been forced to revise its recruiting practices, new student enrollment at Corinthian has dropped precipitously.  In the quarter ended December 31, 2010, new student enrollment dropped 8%.  The following quarter, new student enrollment declined by 21.5%.  On May 3, 2011, Corinthian announced that it expected a further drop of 24% to 27% in new student enrollments for the fourth fiscal quarter and expected to enroll approximately 3,000 to 5,000 new ATB students in fiscal 2012 versus approximately 20,000 students in fiscal 2010.

242.   These post-Class Period events serve to further corroborate the detailed accounts of myriad confidential witnesses described herein.  Put simply, once the curtain was pulled back and defendants' scheme was revealed, Corinthian's performance suffered.  The declining enrollment trends are further indicia of how Corinthian would have performed during the Class Period absent defendants' fraudulent omissions and misrepresentations concerning Corinthian's systemically predatory business model.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

243.   At all relevant times, the market for Corinthian's publicly traded securities was an efficient market for the following reasons, among other things:

(a)   Corinthian's publicly traded securities met the requirements for listing, and were listed and actively traded on NASDAQ, a highly efficient and automated market;

(b)   As a regulated issuer, Corinthian filed periodic public reports with the SEC; and

(c)   Corinthian regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services

- 74 -

688211_1

1 and through other wide-ranging public disclosures, such as communications with the

2 financial press and other similar reporting services.

3     244.   As a result, the market for Corinthian's publicly traded securities

4 promptly digested current information regarding Corinthian from all publicly

5 available sources and reflected such information in the price of Corinthian's publicly

6 traded securities.  Under these circumstances, all purchasers of Corinthian's publicly

7 traded securities during the Class Period suffered similar injury through their purchase

8 of Corinthian's publicly traded securities at artificially inflated prices and a

9 presumption of reliance applies.

10 <div align="center">**NO SAFE HARBOR**</div>

11     245.   The federal statutory safe harbor provided for forward-looking statements

12 under certain circumstances does not apply to any of the allegedly false statements

13 pleaded in this Complaint.  Many of the specific statements pleaded herein were not

14 identified as "forward-looking statements" when made.  To the extent there were any

15 forward-looking statements, there were no meaningful cautionary statements

16 identifying important factors that could cause actual results to differ materially from

17 those in the purportedly forward-looking statements.  Alternatively, to the extent that

18 the statutory safe harbor does apply to any forward-looking statements pleaded herein,

19 defendants are liable for those false forward-looking statements because at the time

20 each of those forward-looking statements was made, the particular speaker knew that

21 the particular forward-looking statement was false, and/or the forward-looking

22 statement was authorized and/or approved by an executive officer of Corinthian who

23 knew that those statements were false when made.  Moreover, to the extent that

24 defendants issued any disclosures designed to "warn" or "caution" investors of certain

25 "risks," those disclosures were also false and misleading since they did not disclose

26 that defendants were actually engaging in the very actions about which they

27 purportedly warned and/or had actual knowledge of material adverse facts

28 undermining such disclosures.

688211_1

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

246. Plaintiffs incorporate ¶¶1-245 by reference.

247. During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

248. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) employed devices, schemes and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Corinthian's publicly traded securities during the Class Period.

249. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Corinthian's publicly traded securities. Plaintiffs and the Class would not have purchased Corinthian's publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

250. Plaintiffs incorporate ¶¶1-249 by reference.

251. The Individual Defendants acted as controlling persons of Corinthian within the meaning of §20(a) of the 1934 Act. By reason of their positions with the

- 76 -

Company, and their ownership of Corinthian's publicly traded securities, the Individual Defendants had the power and authority to cause Corinthian to engage in the wrongful conduct complained of herein. Corinthian controlled the Individual Defendants and all of its employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

<div style="text-align:center"><strong>PRAYER FOR RELIEF</strong></div>

WHEREFORE, plaintiffs pray for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.     Awarding plaintiffs and the members of the Class damages, including interest;

C.     Awarding plaintiffs reasonable costs and attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

<div style="text-align:center"><strong>JURY DEMAND</strong></div>

Plaintiffs demand a trial by jury.

DATED: February 29, 2012                ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                        JOHN K. GRANT

                                        _____
                                        JOHN K. GRANT

                                        Post Montgomery Center
                                        One Montgomery Street, Suite 1800
                                        San Francisco, CA 94104
                                        Telephone: 415/288-4545
                                        415/288-4534 (fax)

                                        ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                        DAVID W. HALL
                                        655 West Broadway, Suite 1900
                                        San Diego, CA 92101
                                        Telephone: 619/231-1058

1   619/231-7423 (fax)

2   ROBBINS GELLER RUDMAN
      & DOWD LLP
3   DAVID J. GEORGE
    ROBERT J. ROBBINS
4   120 East Palmetto Park Road, Suite 500
    Boca Raton, FL  33432
5   Telephone:  561/750-3000
    561/750-3364 (fax)
6
    Lead Counsel for Plaintiffs
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

1.     That declarant is and was, at all times herein mentioned, a citizen of the United States and employed in the City and County of San Francisco, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is Post Montgomery Center, One Montgomery Street, Suite 1800, San Francisco, California 94104.

2.     That on February 29, 2012, declarant served the THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS by depositing a true copy thereof in a United States mailbox at San Francisco, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.     That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 29, 2012, at San Francisco, California.

_____
ANGELA C. JOHNSON

CORINTHIAN 10
Service List - 2/29/2012    (10-0182)
Page 1 of  1

**Counsel For Defendant(s)**

John W. Spiegel
Robert L. Dell Angelo
Lynn H. Scaduto
Munger, Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA  90071-1560
    213/683-9100
    213/687-3702 (Fax)

**Counsel For Plaintiff(s)**

Lionel Z. Glancy
Michael  Goldberg
Andy  Sohrn
Glancy Binkow & Goldberg LLP
1925 Century Park East, Suite 2100
Los Angeles, CA  90067
    310/201-9150
    310/201-9160 (Fax)

Marc I. Gross
Jeremy A. Lieberman
Pomerantz Haudek Grossman & Gross LLP
100 Park Avenue
New York, NY  10017-5516
    212/661-1100
    212/661-8665 (Fax)

Patrick V. Dahlstrom
Pomerantz Haudek Grossman & Gross LLP
10 South LaSalle Street, Suite 3505
Chicago, IL  60603
    312/377-1181
    312/377-1184 (Fax)

Darren J. Robbins
Danielle S. Myers
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
    619/231-1058
    619/231-7423 (Fax)

# EXHIBIT A



**Corinthian Colleges, Inc. Enrollment**

|  | 6/30/2007 | 6/30/2008 | 6/30/2009 | 6/30/2010 | 6/30/2011 |
|---|---|---|---|---|---|
| ATB | 9,752 | 14,878 | 20,489 | 16,698 | 4,019 |
| Non-ATB | 52,363 | 54,322 | 65,599 | 93,882 | 89,438 |
| Total | 62,115 | 69,200 | 86,088 | 110,580 | 93,457 |

\* The ATB and Non-ATB numbers are calculated from the total student enrollment data and ATB percentage breakdowns appearing in Corinthian's SEC Forms 10-Ks.

# EXHIBIT B



Corinthian Colleges, Inc. Stock Price Compared to Dow Jones
Dow Jones
5/4/10
On disclosure of increased spending for loan default management and Corinthian's need to improve admissions screening, stock drops over 6% on high volume.
5/27/10
Stock falls 3% on news of proposed DOE regulations cutting off financial aid to for-profit programs whose students cannot repay their loans.
6/10/10
Stock drops 1.7% after Senator Harkin announces a series of hearings to examine federal spending at for-profit colleges.
6/16/10
DOE announces that it would propose new tougher regulations on the industry. The following day the stock price dropped 5.4%.
6/24/10
Senate holds its first hearing entitled "Emerging Risk? An Overview of the Federal Investment in For-Profit Education." Stock drops 5% the next day.
6/30/10
By the end of June, Corinthian stock was trading at less than $10 a share, closing at $9.85 per share on June 30, 2010.
8/3/10
Stock drops 6% on high volume on news of a GAO investigation of improper practices in the for-profit industry
8/4/10
Stock drops 3.3% after the GAO's findings of deceptive recruiting practices are presented at a public hearing before the Senate.
8/13/10
DOE releases data showing Corinthian campuses with loan repayment rates below 20% as compared to rates of 54% and 56% at public and private non-profit colleges. By the close of the next trading day, the stock was down 22%.
8/20/10
Stock drops 17% on extremely high volume upon disclosure that a majority of Corinthian campuses would exceed the CDR threshold and Ability-to-Benefit students would no longer be enrolled.
Corinthian Colleges Stock Price
Dow Jones
Date
0
2
4
6
8
10
12
14
16
18
20
0
500
1000
1500
2000
2500
3000
3500
4000
4500
5000
5500
6000
6500
7000
7500
8000
8500
9000
9500
10000
10500
11000
11500
4/1/2010
5/1/2010
6/1/2010
7/1/2010
8/1/2010
9/1/2010

Exhibit B